## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT COVINGTON

| | | |
|---|---|---|
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | : | **CASE NO.** |
| | : | |
| | : | **JUDGE** |
| | : | |
| | : | **PLAINTIFF'S COMPLAINT WITH** |
| **Plaintiff,** | : | **JURY DEMAND** |
| | : | |
| **v.** | : | |
| | : | |
| **THE NEW YORK TIMES COMPANY d/b/a THE NEW YORK TIMES,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**NOW COMES** Nicholas Sandmann, by and through his parents and natural guardians, Ted Sandmann and Julie Sandmann, and by and through counsel, and states his Complaint for Defamation against The New York Times Company d/b/a The New York Times (the "Times") as follows:

### INTRODUCTION

1.     This is a defamation action arising out of the Times' publication and republication of a false and defamatory factual narrative accusing Plaintiff Nicholas Sandmann ("Nicholas"), at the time a 16-year old minor high school student, of racist misconduct at the National Mall on January 18, 2019 (the "January 18 Incident").

2.     The Times' coverage of the January 18 Incident included at least seven (7) articles, only one (1) of which is the subject of this action.  The Times' article that is the subject of this action is known as the "January 19 Article."  All of the Times' articles were

published online through its website, Nytimes.com, and some of its online articles, including the January 19 Article, were also published in its print newspaper.

3.  The Times' reporting conveyed the false and defamatory assertion that while at the Lincoln Memorial, Nicholas confronted and blocked the path of Nathan Phillips ("Phillips"), a Native American activist who was purportedly praying and singing during the Indigenous Peoples' March, and prevented Phillips' retreat while Nicholas and a mass of other young white boys surrounded, taunted, jeered and physically intimidated Phillips.

4.  The Times' reporting conveyed, among other things, the false and defamatory gist that Nicholas was the face of an unruly hate mob of hundreds of white, racist high school students who physically assaulted and harassed Native Americans who were engaged in peaceful demonstrations, song and prayer at the National Mall.

5.  Moreover, the Times' reporting conveyed that, during the January 18 Incident, Nicholas committed conduct that could constitute, among other things, a hate crime, punishable by 18 U.S.C. § 245 (b), and an assault by aggressively interrupting song and prayer "at the Indigenous Peoples March," at the Lincoln Memorial—a national park.

6.  The Times accused Nicholas of behavior constituting menacing racial intimidation of Phillips, a Native American political activist, while Phillips was purportedly engaged in peaceful song and prayer at the Lincoln Memorial.

7.  The Times' accusations against Nicholas are totally, provably, and unequivocally false.

8.  The truth is that, after the Indigenous Peoples' March was over, Phillips approached Nicholas and the other students from afar, bypassed wide open steps to his alleged destination of the Lincoln Memorial, specifically confronted Nicholas, and never

attempted to move past, around, or away from Nicholas, as Nicholas stood quietly for several minutes in a "Make America Great Again" hat while Phillips beat a drum and sang loudly within inches of Nicholas' face on January 18, 2019, at the Lincoln Memorial.

9.   The truth is that, at the time of the confrontation by Phillips, Nicholas and his classmates from Covington Catholic High School (the "CovCath students") were assembled on the stairs of the Lincoln Memorial at the direction of their chaperones for buses that would take them home to Northern Kentucky.

10.   The truth is that, Nicholas and his CovCath classmates were bullied, attacked, and confronted with racist and homophobic slurs and threats of violence by the Black Hebrew Israelites, a recognized hate group, before being unexpectedly confronted without explanation by Phillips, an activist, who proceeded to target Nicholas while chanting and beating a drum inches from his face and being flanked by activist companions filming the event in the hopes of capturing a viral sensation that would be used to advance, via social media, an ulterior political agenda.

11.   Phillips specifically targeted Nicholas and placed himself directly in front of Nicholas.

12.   When Phillips approached, Nicholas stood still—in the same place he had been standing before Phillips approached—standing quietly and respectfully for several minutes while Phillips continued to beat his drum and sing in Nicholas' face.

13.   Nicholas politely acquiesced in Phillips' chosen course of conduct.

14.   To justify its reporting, the Times inexcusably relied on a false, incomplete and out-of-context viral video, published to Twitter on the evening of January 18, 2019, which showed Nicholas in a red "Make America Great Again" hat looking at Phillips.  This

viral video was originally published by a politically-weaponized Twitter account, which was designed to disseminate political disinformation.

15.    On the evening of January 18, 2019—the same evening the viral video was published to Twitter—a complete video of the January 18 Incident (over ninety (90) minutes long) was uploaded to Facebook by one of the Black Hebrew Israelites and was widely available for public viewing.  This full-length video was ignored by the Times in its January 19 Article, notwithstanding the fact that it set forth the whole context of the January 18 Incident and plainly contradicted Phillips' assertion that Nicholas blocked Phillips' retreat.

16.    To justify its reporting, the Times negligently relied on Phillips' false factual narrative of the January 18 Incident.  Phillips is a documented liar who has a history of manufacturing false stories to advance his political and activist agenda.

17.    Without conducting any reasonable investigation into Phillips, the short viral video clip or the suspicious account that posted it on Twitter (Twitter later banned that suspicious account from its platform), the Times jumped at the opportunity to falsely portray Nicholas as the white, Catholic, MAGA hat-wearing aggressor who blocked, bullied and beleaguered a Native American elder who was engaged in peaceful song and prayer because the narrative, even though it was provably false, fit neatly within the Times' anti-Trump credo.

18.    If the Times had engaged in basic journalistic due diligence regarding the veracity of the viral video or the fraudulent, politically-weaponized account that posted it to Twitter, it would have quickly discovered—like many others did—that what the viral video depicted was merely a brief, incomplete moment of the January 18 Incident and that the viral video was completely deprived of any context whatsoever.

19.     Likewise, if the Times had engaged in basic journalistic due diligence regarding the veracity of Phillips as a witness, it would have quickly discovered that he was a dubious and dishonest source with a criminal background, has a history of lying about his military service and stolen valor, and has a history of lying about other encounters with children to promote his political and activist agenda.  Therefore, the Times would have discovered that Phillips was lying about his encounter with Nicholas at the January 18 Incident.

20.     The Times engaged in an agenda-driven campaign to bully, harass, threaten, disparage and vilify Nicholas—a minor who literally and factually did nothing more than stand still when unexpectedly confronted by Phillips and his companions who pointed a myriad of cameras at Nicholas in the hopes of capturing a viral encounter.

21.     Following the January 18 Incident, Phillips became a "mainstream media darling," engaging in a publicity tour during which he manufactured out of whole cloth varying and conflicting descriptions of the events prior to, during, and after the January 18 Incident in a superficial attempt to garner public sympathy and advance his own political agenda.

22.     In certain of his interviews, Phillips had tears in his eyes as he lied and said that Nicholas and the CovCath students were shouting, "Build that wall, build that wall."

23.     As one of America's most prominent news outlets, the Times knew but ignored the importance of verifying damaging and, in this case, incendiary accusations against a minor child prior to publication.

24.     By failing to correct its false reporting, the Times continued to promote its false narrative that Nicholas had instigated a racist confrontation with Phillips by

blocking his retreat long after Phillips was exposed as a fraud whose fictitious version of the January 18 Incident was disavowed by responsible members of the media.

25.     Given the breadth of the Times' media reach, its false and defamatory accusations against Nicholas were published repeatedly on various outlets.  As a result, the Times' coverage generated its own media frenzy that subjected Nicholas to public scorn, ridicule, and serious threats of physical harm.

26.     The Times took advantage of the social media hate mob to further its own political and financial agenda.

27.     In a practical demonstration that the accusations made against Nicholas in this case are factual events capable of being proven false, other news outlets have clarified, corrected, and/or retracted several false factual assertions also made by the Times and have admitted mistakes that were made in coverage of the January 18 Incident.

28.     For example, KTXL Fox40 issued "A Note To Our Viewers About Our Covington Coverage," stating, in part, as follows:

> "Early reports also contained unverified statements about the students' conduct, including statements by Phillips that they had chanted 'Build That Wall,' and made remarks offensive to Native Americans.  Though several videos have come to light since the incident, none of them contains evidence of hostile remarks by the students."

> ***

> "Our reports contained other remarks which, after videos emerged and both sides were heard from, proved unsubstantiated or untrue.  Sandmann was accused of blocking Phillips' path so he could not climb the steps of the Memorial to pray.  Students were accused of assembling in the Indigenous People's space, and taunting and mocking the Native Americans.  We reported the Diocese of Covington's condemnation of the Covington Catholic High School students, a denunciation that was retracted in six days when the church admitted it had rushed to judgment ... saying they had been 'bullied and pressured into making a statement prematurely.'"

> ***

"The facts now available about this story show no evidence of taunting by the students ... Phillips was not denied freedom of movement – he approached the student gathering and said he wanted to promote peace between the students and the other activist group that taunted them with profanity.  Sandmann, for his part, professed the same motive:  keeping calm, and preventing the situation from getting out of hand.  His behavior, and the prompt arrival of the school buses, achieved this goal.  Until the story went viral the next day."

\*\*\*

"The lion's share of the denunciations of this event landed on the students, and the focus of attention was on Sandmann, who reportedly had bought his red cap that afternoon.  Such is the result of cell phone video presented as news: it shows a small window of reality for a short burst of time. Context, which is essential in any news report, is lacking.  Judgments are reached without the benefit of all or even most of the facts.  It is a prescription for error[.]"

\*\*\*

"We should have considered that the targets of this story were high school students."

\*\*\*

"We owe an apology to the students, their families, and the face of the Covington student group, Nick Sandmann. . . . Because of the way this story came together – fueled by a viral video with no on-scene reporting by independent voices – we lost sight of our standard of fairness, context, and accuracy.  This is especially serious when the groundswell of misinformed anger fell on a group of teenagers who never sought the attention, let alone the abusive treatment, they got.  They deserved better, and so did our viewers."

A true and correct copy of KTXL Fox40's statement is attached hereto as ***Exhibit A***.

29.     After being sued, and while failing to issue an admission of fault, an apology, an adequate correction, or an unequivocal retraction, *The Washington Post* published an online "Editor's note related to Lincoln Memorial incident" providing, in part, as follows:

"Subsequent reporting, a student's statement and additional video allow for a more complete assessment of what occurred, either contradicting or failing to confirm accounts provided in that story – including that Native

American activist Nathan Phillips was prevented by one student from moving on, that his group had been taunted by the students in the lead-up to the encounter, and that the students were trying to instigate a conflict."

*The Washington Post* published a similar Editor's Note in print as follows:

"A Jan. 20 Metro article provided an account from Native American activists about an encounter with a group of high school students from Covington, Ky. Subsequent reporting and video evidence contradicted or failed to corroborate that one of the activists was accosted and prevented from moving on, that the activists had been taunted by the students in the lead-up to the encounter, that the students were trying to instigate a conflict, or that 'March for Life' participants chanted 'Build that wall.' A Jan. 21 Page One article reported an account by one of the activists that he had heard students earlier make disparaging comments about Native Americans and had heard students shout 'Go back to Africa!' The story reported the denial of one student that he had heard any students say anything hateful or racist at any time. The story should have noted that widely circulated video from that day does not corroborate that such statements were made."

True and correct copies of *The Washington Post's* Editor's Notes are attached hereto as

***Exhibit B***.

30.     Nicholas has already sued The Washington Post, Cable News Network and NBCUniversal for statements very similar, if not identical to those published in the Times' January 19 Article. Each of those defendants filed a motion to dismiss, but all three were denied by the Hon. William O. Bertelsman, District Court Judge for the Eastern District of Kentucky with respect to "statements … that plaintiff 'blocked' Nathan Phillips and 'would not allow him to retreat.'" *See Sandmann v. WP Company LLC, d/b/a The Washington Post*, Case No. 2:19-cv-00019 [Doc. 64]; *Sandmann v. Cable News Network, Inc.*, 2:19-cv-00031 [Doc. 43]; *Sandmann v. NBCUniversal Media, LLC*, Case No. 2:19-00056 [Doc. 43].

31.     In order to fully compensate Nicholas for the perpetual reputational harm, emotional distress, mental anguish, and personal physical injury and physical sickness

suffered as a result of the Times' false attacks, this action seeks compensatory damages in excess of Fifteen Million Dollars ($15,000,000.00).

32.     In order to punish the Times and to deter it from ever again engaging in false, reckless, malicious, and agenda-driven attacks against children in violation of well-recognized journalistic standards and ethics, this action seeks punitive damages in excess of Fifty Million Dollars ($50,000,000.00).

## DETAILED FACTUAL BACKGROUND

## THE JANUARY 18 INCIDENT

33.     On January 18, 2019, Nicholas attended the March for Life on a school trip chaperoned by sixteen (16) adults, nine (9) of whom were faculty members at Covington Catholic High School ("CovCath").

34.     Nicholas and his classmates were instructed to meet at the steps of the Lincoln Memorial at the National Mall by 5:00 p.m. to catch their buses for the return trip to Kentucky.

35.     Nicholas was wearing a red Make America Great Again hat ("MAGA hat") that he had purchased that day as a souvenir.

36.     While at the National Mall, a small group of adult men who describe themselves as Black Hebrew Israelites – a recognized hate group – began verbally assaulting and taunting Nicholas and his CovCath classmates with threats of physical violence and vitriolic statements, shouting, among other things, "you only got one n***er in the crowd," "oh, you got two n***ers in the crowd," "get out, n***er, get out," "this is a faggot child molester," "Christ is coming back to kick yo cracker ass," "there will be no peace until there is bloodshed," "incest babies," "dirty ass crackers," and "future school shooters."

37.     While still waiting for the buses, one of Nicholas' classmates requested and received permission from a school chaperone to engage in CovCath school sports cheers in an effort to ignore and drown out the hate speech being hurled at them by the Black Hebrew Israelites.

38.     During a school cheer, Phillips and his activist companions – all of whom had been participating in the Indigenous Peoples March at the National Mall earlier that day – instigated a confrontation with Nicholas and his CovCath classmates.

39.     Phillips began singing the AIM song, which he has used previously in protests and as a type of rallying cry when confronting non-Indigenous Peoples.

40.     Rather than focusing their attention on the Black Hebrew Israelites, who had been relentlessly hurling insults at both the teenagers for almost an hour and the Native Americans attending the Indigenous Peoples March prior to that, Phillips and his activist companions deliberately targeted the CovCath students from a distance while beating drums, singing, dancing, and carrying cameras to hopefully capture a viral video moment of the confrontation.

41.     When Phillips first approached them, many of the CovCath students "felt like he was coming into their group to join in with the students' cheers" and some joined in dancing to Phillips' drumbeat and song.

42.     Phillips intentionally walked up to the crowd of CovCath students.

43.     Immediately behind and around Phillips were several of his own companions, and Nicholas and the CovCath students did not move toward Phillips or otherwise actively approach or surround him or his companions.

44.     Nicholas and the students acquiesced in Phillips' election to confront their group and beat his drum within inches of Nicholas' face.

45.    Once within their group, Phillips freely moved about, briefly walking up to certain students within the group of students, which included many children who were not CovCath students.

46.    Phillips then walked directly to where Nicholas was standing on the steps so that he could confront Nicholas and get within inches of his face.

47.    Phillips was a complete stranger to Nicholas.

48.    While staring and glaring at Nicholas, Phillips continued to beat his drum and sing loudly within inches of Nicholas' face for several minutes.

49.    Contrary to Phillips' initial lie that he was "swarmed" by the students as he was preparing to leave or his subsequent lie, republished by the Times, that he was trying to move to the top of the steps of the Lincoln Memorial, Phillips approached the students from a distance and walked past clear pathways leading to the Lincoln Memorial.

50.    When Phillips made his incursion into the crowd of students and directly confronted Nicholas, Phillips never made any attempt to move past, around, or away from Nicholas even though he could have done so at any time.

51.    Phillips had walked a distance over to Nicholas and stopped directly in front of him, which was exactly where Phillips wanted to be.

52.    Prior to being directly confronted by Phillips, Nicholas had not noticed Phillips at the National Mall.

53.    Nicholas was startled and confused by the actions of Phillips in singling him out and confronting him.

54.    During the confrontation instigated by Phillips, Nicholas stood still, as he was concerned that turning away from Phillips might be misconstrued as a sign of disrespect.

55.     While he stood there with Phillips beating a drum near his face and singing loudly, Nicholas remained silent and did not utter a single word to Phillips.

56.     Nicholas did not make any gestures by hand or otherwise toward Phillips.

57.     At all times, Nicholas acted respectfully, responsibly, appropriately, and in a manner consistent with the values instilled upon him by his family and his faith.

58.     While Phillips fully engaged Nicholas' attention, at least one of the other members of Phillips' group taunted and insulted Nicholas' classmates.

59.     One of Phillips' accomplices walked up the steps around Nicholas and was berating one of Nicholas' classmates: "So if you want to make America a great cause for you white people, go back to Europe where you came from.  This is not your land."  After Nicholas' classmate responded, the adult Native American then said to the teenager: "Get the fuck out of my face with that shit."

60.     At that point, Nicholas' attention wavered from Phillips—for the only time during the encounter—when Nicholas gestured to his classmate not to engage with Phillips' profanity spewing cohort and instead to pay attention to Phillips.

61.     The confrontation ended when Nicholas and his fellow CovCath students were instructed to board buses to return to Kentucky.

62.     After Nicholas moved away from him, Phillips made no attempt to climb the steps toward the Lincoln Memorial.

63.     Instead, Phillips stepped up to the spot vacated by Nicholas, and he and his supporters celebrated their "victory" over the CovCath students.

64.     The Phillips supporter who had told one of the other students to "go back to Europe" shouted "I got him man.  I got him, man, I got him. . . .  We won grandpa, we fucking won grandpa."

65.    Phillips then held his drum above his head and beat it loudly and rapidly as the rest of his group cheered, yelled, and jumped around in celebration.

66.    In the interviews Phillips gave after the January 18 Incident, Phillips purported to express factual descriptions of the encounter to media, but Phillips intentionally lied in order to stir up controversy and the media republished his lies without the slightest diligence.

67.    At no point in time was Phillips frightened or blocked by Nicholas.  To the contrary, Phillips was very deliberate in his actions, placing himself where he wanted to be.  Therefore, any statements by Phillips that he was frightened or blocked by Nicholas were misrepresentations of the truth.

68.    During the entirety of the January 18 Incident, contrary to Phillips' statements, Nicholas:

   (a)    did not instigate a confrontation of any kind;

   (b)    did not surround Phillips or the Black Hebrew Israelites;

   (c)    did not target, confront, or assault Phillips or the Black Hebrew Israelites;

   (d)    did not threaten Phillips;

   (e)    did not move from where he was standing when Phillips approached him;

   (f)    did not block Phillips' path or egress;

   (g)    did not taunt, mock, or harass Phillips or anyone else present; and

   (h)    did not engage in any conduct whatsoever that could even remotely be described or characterized as racist, a hate crime, blocking, intimidation, or as placing any person in fear of bodily harm.

69.     On January 19, 2019, the Times recklessly disregarded the truth and falsely accused Nicholas of, among other things, "block[ing]" Phillips' path as he was trying to "retreat" from a "mob" as he and his classmates "harass[ed]," "taunted," and "mock[ed]" Phillips—which were described as acts amounting to racial hostility, such that it was worthy of days-long and widespread international news coverage.

### ONLINE VIDEOS OF THE JANUARY 18 INCIDENT

70.     On the evening of January 18, 2019, at 7:33 p.m., Kaya Taitano, a participant in the Indigenous Peoples March, posted online a selectively edited 59-second video depicting only a small portion of the interaction between Nicholas and Phillips, *see* https://www.instagram.com/p/Bsy80cfFVAR/ (last visited Feb. 7, 2020); and later that night, she posted a 3-minute 44-second video of the interaction that included the time period in the initial video, *see* https://www.youtube.com/watch?v=sIG5ZB0fw1k (last visited Feb. 7, 2020) (collectively, the "Taitano Videos").

71.     The Taitano Videos were a severely incomplete representation of the facts of the January 18 Incident. The Taitano Videos did not show, among other things:

(a)     the Black Hebrew Israelites' misconduct and homophobic, racist slurs directed at the CovCath students;

(b)     that Phillips had approached the students and inserted himself into their area before confronting Nicholas;

(c)     that the students were already engaged in school cheers at the time Phillips approached;

(d)     Nicholas engaging in any misconduct, including harassing, mocking, or taunting anyone;

(e)    Nicholas making any gesture of any kind except to, at times, awkwardly smile;

(f)    Nicholas uttering any words to Phillips or his companions;

(g)    Nicholas moving into Phillips' path;

(h)    Nicholas blocking Phillips' escape; or

(i)    Nicholas physically or verbally threatening Phillips in any manner.

72.    At 11:13 p.m. on January 18, 2019, @2020fight, a fake Twitter account with a following of approximately 41,000, tweeted a 1-minute 1-second clip from the Taitano Videos with the comment, "This MAGA loser gleefully bothering a Native American protestor at the Indigenous Peoples March" (the "2020fight Video" or "Viral Video").  For the Court's convenience, a screenshot or ("cover image") of the 2020fight Video tweet is attached here:



73.     Upon information and belief, the Times did not take any reasonable steps to investigate the @2020fight account to determine whether the video had been edited and whether the account was legitimate.

74.     The 2020fight Video is reported as having been viewed at least 2,500,000 times, retweeted 14,000 times, and liked 27,000 times before the account was suspended by Twitter no later than January 21.

75.     Screenshots available online of the 2020fight Video show it was viewed at least 10.6 million times.

76.     Any reasonable, objective, and unbiased journalist would have readily known that the 2020fight Video was little more than a snapshot of a limited portion of the January 18 Incident and that accurate and fair reporting on it required investigation into the events which occurred before and after those depicted in the short video clip posted on Twitter.

77.     According to media reports, the @2020fight account was created in December 2016, tweeted an average of 130 times a day, and immediately aroused suspicion for its high follower count, unusually high rate of tweets, highly polarized and yet inconsistent political messaging, and the use of someone else's image in the profile photo.

78.     An accurate, contemporaneous video as to what occurred on January 18, 2019, was available online on the evening of January 18, 2019, when Shar Yaqataz Banyamyan, one of the Black Hebrew Israelites who was present for the encounter between Phillips and Nicholas, was streaming a Facebook Live video while the January 18 Incident was occurring (the "Banyamyan Video").

- 16 -

79.     Following the conclusion of the Facebook Live video stream on January 18, the 1 hour and 46-minute video was available for public viewing on Banyamyan's Facebook page.

80.     The Banyamyan Video was deleted from Facebook no later than January 20 at 2:00 am EST, but prior to being deleted, it was downloaded, copied, and mirrored onto YouTube by different individuals, and therefore preserved and made widely available on the internet no later than 1:00 am EST on January 20. *See, e.g.,* https://www.youtube.com/watch?v=t3EC1_gcr34&feature=youtu.be&t=523 (last visited Feb. 7, 2020); *see also* https://twitter.com/Timcast/status/1086866650446655488 (last visited Feb. 7, 2020).

81.     A plethora of additional relevant video of the January 18 Incident was also available online but ignored by the Times and the social media mob as the Times continued its false reporting and the republication of the false accusations by news outlets.

82.     In fact, before the Times even published its accusations about Nicholas on January 19, 2019, longer videos were available online that demonstrated the falsehoods in Phillips' account of the January 18 Incident.

83.     For instance, and as an example only, video of Phillips instigating and approaching Nicholas and his classmates – rather than the other way around – was available on Twitter no later than 12:48 p.m. on January 19, 2019, and additional videos continued to appear on social media and in the media throughout January 19 and 20:



*See* https://twitter.com/mariajudy_/status/1086681831804674048 (last visited Feb. 7, 2020); *see also, e.g.,* https://twitter.com/AmeerWashington/status/1086729474912276480 (tweeting longer video on January 19, at 3:57 pm) (last visited Feb. 7, 2020).

84.    A statement from a CovCath student, along with links to additional videos, was available on Twitter at 10:00 pm on January 19, 2019. *See, e.g.,* https://twitter.com/AClementsWKRC/status/1086822521012473858?ref_src=twsrc%5 Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1086822521012473858&ref_url=http s%3A%2F%2Fwww.dailywire.com%2Fnews%2F42416%2Fheres-what-you-need-know-about-confrontation-emily-zanotti (last visited Feb. 7, 2020).

85.    From online video and fair use of media broadcasts, Nicholas' counsel produced a fourteen-minute video distilling what occurred on January 18, entitled

"Nicholas Sandmann: The Truth in 15 Minutes" (the "Sandmann Video"), available at https://www.youtube.com/watch?v=lSkpPaiUF8s (last visited Feb. 7, 2020).

86.     The Banyamyan and Sandmann Videos accurately set forth the truth of the January 18 Incident.

87.     The Banyamyan and Sandmann Videos demonstrate that this incident was instigated by Phillips and that Nicholas was targeted by professional activists whose false accusations neatly fit the mainstream media's and social media's anti-Trump agenda, particularly following the furor over the President's tweet about Elizabeth Warren earlier that week.

88.     The Banyamyan and Sandmann Videos demonstrate that Nicholas did not engage in any misconduct and, more specifically, did not engage in the misconduct attributed to him by the Times.

## NICHOLAS' STATEMENT AND NBC INTERVIEW

89.     On the afternoon of January 20, 2019, in an attempt to stem the threats of physical violence being made against him, his family, and his CovCath classmates, Nicholas made public a statement in which he provided a detailed and accurate factual description of the January 18 Incident.  A copy of Nicholas' January 20 statement is attached hereto as **Exhibit C**.

90.     On January 23, 2019, in a further attempt to stem the threats of physical violence being made against him, his family, and his CovCath classmates, Nicholas agreed to an interview by Savannah Guthrie on the NBC *Today* show in which he reiterated his detailed and accurate factual description of his encounter with Phillips despite accusatory, "victim shaming" questions by Guthrie.

## AN INVESTIGATION CONFIRMS THE TRUTH

91.     The Times did not conduct a proper investigation before publishing its false and defamatory statements of and concerning Nicholas.

92.     Pressured by the agendas of certain individuals, a false and defamatory statement of and concerning Nicholas was also published by the Diocese of Covington on January 19 before a proper investigation had been conducted by the Diocese.

93.     If the Times had bothered to speak to the Diocese of Covington, it would have learned that the statement was issued without any investigation by the Diocese.

94.     For instance, on January 25, 2019, the Diocese of Covington issued a statement stating, among other things, "[w]e should not have allowed ourselves to be bullied and pressured into making a statement prematurely," and "I especially apologize to Nicholas Sandmann and his family…"  A true and correct copy of said statement is attached hereto as ***Exhibit D***.

95.     Subsequently, the Diocese of Covington retained through its counsel a third-party investigative firm, Greater Cincinnati Investigation, Inc. ("GCI"), to investigate and determine the facts of the January 18 Incident.

96.     On January 22, the Diocese of Covington issued a statement indicating that "the independent, third-party investigation is planned to begin this week" and stating that "[i]t is important for us to gather the facts that will allow us to determine what corrective actions, if any, are appropriate" and that "[w]e pray that we may come to the truth. . . ." *See*   https://www.archlou.org/statement-regarding-covington-catholic-incident/   (last visited Feb. 7, 2020).

97.     On February 11, 2019, GCI issued its Final Investigative Report (the "GCI Report"), a true and correct copy of which is attached hereto as ***Exhibit E***.

98.     On February 11, 2019, Diocese Bishop Foys released the GCI Report and said in a letter to the Covington Catholic parents that the GCI Report exonerated the students and demonstrated that the students did not instigate the incident at the Lincoln Memorial.  A true and correct copy of said letter is attached hereto as ***Exhibit F***.

99.     The GCI Report is entirely consistent with all video evidence as well as statements issued by Nicholas and other CovCath students and chaperones.

100.    According to the GCI Report, four (4) licensed investigators spent approximately 240 man hours investigating the incident, interviewed 43 students and 13 chaperones, reviewed approximately 50 hours of Internet activity, and attempted to interview Phillips, who failed to respond to phone calls, emails, or investigators who waited outside his home for 6 hours and left a note asking him to contact them.

101.    The GCI Report made the following key findings:

(a)     Nicholas' January 20 statement accurately reflects the January 18 Incident.

(b)     There was "no evidence that students responded [to the Black Hebrew Israelites] with any offensive or racist statements of their own."

(c)     The students asked their chaperones if they could perform school cheers to drown out the Black Hebrew Israelites' invective, and upon receiving approval, they performed the same cheers that are commonly performed at football or basketball games.

(d)     There was "no evidence that the students performed a 'Build the Wall' chant."

(e)     Phillips approached the Covington Catholic students.

(f)     There was "no evidence of offensive or racist statements by students to Mr. Phillips or members of his group."

(g)     The majority, if not all, of the MAGA hats being worn by students were purchased before, during, or after the March for Life.

(h)     In previous years, some students had purchased 'Hope' hats in support of President Obama.

(i)     "Mr. Phillips' public interviews contain some inconsistencies. . . ."

### PHILLIPS WAS A BIASED AND UNRELIABLE WITNESS

102.   The Times did not publish Phillips' narrative as opinion but rather published it as a factual narrative of what occurred during the January 18 Incident in online news articles.

103.   Phillips was not making truthful statements about the January 18 Incident or his state of mind during that incident but instead was spreading lies about the events and about Nicholas in an attempt to stir up animosity toward pro-life, Catholic Trump-supporters, and to create publicity for Phillips' activism in favor of Indigenous Peoples.

104.   Phillips' statements were republished by the Times as a factual narrative of the events capable of being proven false, not expressions of Phillips' opinion.

105.   Publicly available information demonstrates that Phillips is—and was at all times during the Times' reporting on the January 18 events—a biased and unreliable witness, and it was negligent and reckless for the Times to publish without any investigation Phillips' narrative as if it were a truthful, factual account of the January 18 Incident or of Phillips' feelings or reactions during those events.

## Activism and Publicity-Seeking

106.   Phillips has a well-documented history of leftist activism that should have caused the Times to question his accusations against a white, MAGA hat-wearing Catholic teenager.

107.   Phillips has a known bias against President Trump that was readily discoverable with a single Google search.

108.   Indeed, there are dozens of photographs and articles involving Phillips available online, as he regularly seeks out the media and publicity.

109.   In 2012, Phillips was featured in a Skrillex video for a song called "Make it Bun Dem," which depicts activism and violence against a police officer, including Phillips wielding a shotgun while staring down a police officer.   *See* https://www.youtube.com/watch?v=BGpzGu9Yp6Y&fbclid=IwAR03qui2DycCtozD4ywL0yAMf6kUqp2ZkxEDWDAl1ezWfKlt59Q8QgOYgTA (last visited Feb. 7, 2020).   This video has in excess of 430 million views.

110.   Also in 2012, Phillips was the subject of a documentary titled "Between Earth and Sky."   *See, e.g.,* https://www.imdb.com/title/tt2508074/ ("The story of a Native American family's struggle against cancer and cultural extinction takes an unexpected turn as money becomes more and more important.") (last visited Feb. 26, 2020).

111.   From November 2016 to February 2017, Phillips lived at a camp in North Dakota near Standing Rock Indian Reservation to protest the Dakota Access Pipeline project that was revived by President Trump shortly after he was elected.

112.   That protest was ended when the governor of North Dakota ordered the evacuation of the camps, and 200 law enforcement officers in full riot gear forcibly removed those protestors who refused to leave willingly.  Phillips left just ahead of the deadline—after his group started fires that resulted in injuries to protestors.

113.   Phillips' daughter initially left the camp ahead of the deadline, but then she returned to the camp to be one of the last protestors to be forcibly removed.  As she went back into the camp, Phillips sang the AIM song as a rally cry in her support against the authorities—the same song that he sang during the January 18 Incident.

114.   On April 27, 2017, Phillips protested regarding various environmental issues, including the Dakota Access Pipeline, by beating his drum and singing on the steps of the Trump International Hotel in Washington, D.C.:



*: Native Youth Alliance Executive Director Nathan Phillips of Omaha Tribe in Nebraska beats a drum on the steps in front of the Trump International Hotel during a protest April 27, 2017 in Washington, DC. Organized by The Indigenous Environmental Network, the protesters gathered in front of the hotel that bears the name of U.S. President Donald Trump to rally against the Dakota Access Pipeline, the XL Pipeline and other projects and programs that they say damages the environment. (Photo by Chip Somodevilla/Getty Images)*

115.    Phillips, along with his group Native Youth Alliance, participated in numerous marches and protests in Washington, D.C. and New York City throughout 2017 and 2018, including the Native Nations Rise March on Washington; divestment actions in New York City where they camped outside a Wells Fargo bank branch and then marched to City Hall; the Peoples' Climate March in Seattle; and the United Nations Permanent Forum on Indigenous Issues. *See, e.g.,* https://www.vogue.com/projects/13542941/return-to-standing-rock/ (last visited Feb. 26, 2020).

116.    On January 13, 2019, just five (5) days before the January 18 Incident, Phillips live-streamed on Facebook and said, among other things, that "[w]e need

universal healthcare for everybody in America.  We could do it, we could feed everybody in America, but yet they want to build a wall, and they want to divide people. . . ."  *See* https://www.facebook.com/NativeYouthAlliance/videos/2262929833751375/       (last visited Feb. 26, 2020).

117.    Shortly after the January 18 Incident, Phillips appeared at a "Fake Trump Emergency" protest at the White House on February 18, during which he announced to the crowd that "[w]e need to build up this country instead of building a wall."  *See* https://www.facebook.com/moveon/videos/vb.7292655492/324827541476931/?type=2&theater (last visited Feb. 7, 2020).

### Protest at Washington D.C. Catholic Church

118.    The Times should have known by the evening of January 19, 2019, that Phillips was using the January 18 Incident for his own benefit and political motives.

119.    Phillips' activism in Washington, D.C. continued the following day, January 19, 2019, when Phillips led a group of protestors in a rally at the Basilica of the National Shrine of the Immaculate Conception in Washington, D.C. around 5:00 pm.  *See, e.g.,* "Nathan Phillips and Other Protestors Storm DC Basilica, Demand Punishment For Covington Boys," Daily Caller, Jan. 24, 2019, *avail. at* https://dailycaller.com/2019/01/23/nathan-phillips-protesters-storm-basilica-covington/ (last visited Feb. 7, 2020).

120.    The protestors, who were playing drums and chanting, attempted to enter the Basilica during Mass but were rebuffed by security guards.

121.    Security guards were forced to lock the doors of the Basilica with the congregation still inside to prevent Phillips' group from entering the Basilica and disrupting Mass.

122.    During the protest at the Basilica, Phillips read a statement saying that "[w]e demand that the students of Covington Catholic High School be reprimanded not just by the school officials but, as seniors, by their upcoming universities."

123.    Phillips also made demands from the Catholic Church, asking that it "hold itself responsible for the . . . hundred-plus years of genocide that indigenous peoples have endured and endure persistently."

124.    As part of their demonstration outside the Basilica, the protestors reportedly performed the AIM song, the same one that Phillips sang during the January 18 Incident.

**<u>Stolen Valor</u>**

125.    The Times falsely reported that Phillips was a Vietnam veteran in an attempt to bolster outrage at his purported mistreatment.

126.    Phillips previously stated unequivocally in a video posted to Facebook on January 3, 2018, that "I'm a Vietnam vet . . . . I got honorable discharge, and one of the boxes in there . . . shows whether it is peacetime or what my box says is that I was 'in theater.'"                                                                  *See* https://www.facebook.com/NativeYouthAlliance/videos/1552014181500389/ (Jan. 3, 2018) (Phillips live-streaming: "I got a Section 8 home because I'm a veteran, a wartime veteran like that, honorable, 'in theater.'") (last visited Feb. 7, 2020); https://www.facebook.com/NativeYouthAlliance/videos/1713504705351335 (May 18,

- 27 -

2018) (Phillips live-streaming:  "Myself, I'm a Vietnam veteran, uh times like that, you know.  My DD-214, my discharge paper, says um, says uh 'honorable discharge,' um and it says uh 'in theater'....") (last visited Feb. 7, 2020); https://www.facebook.com/NativeYouthAlliance/videos/1369302426544046/ (Dec. 17, 2018) (Phillips live-streaming: "some of my supporters who come to support me as a veteran, you know, Vietnam times, honorably discharged, 'in theater,' that's what my DD-214 says" and "I was gifted a place to stay because of my Vietnam times") (last visited Feb. 7, 2020).

127.    However, it was quickly discovered and exposed that Phillips had lied about his service, that he did not serve in Vietnam, that he was "discharged" instead of "honorably discharged," that he had been AWOL at least three times, and that he had never even been deployed outside of the United States.  *See, e.g.,* https://www.theblaze.com/news/nathan-phillips-awol-criminal-record, Jan. 24, 2019 (last visited Feb. 7, 2020).

128.    The Times was forced to issue a correction to its reporting that had falsely identified Phillips as a Vietnam veteran, although the Times failed to disclose to its readers that Phillips had actually lied about his service:

*Correction: Jan. 22, 2019*
*An earlier version of this article, using information from the*
*Indigenous Peoples Movement, gave an incorrect description of Mr.*
*Phillips's military service. Mr. Phillips said in an interview on*
*Sunday and again on Wednesday that he had served during the*
*Vietnam era, but was never deployed in South Vietnam. A copy of his*
*record released Wednesday indicates that he enlisted in the Marine*
*Corps Reserve in 1972 and served until 1976, but is not a Vietnam*
*veteran.*

## Previous Unsubstantiated Claim of Harassment

129.     The January 18 Incident is not the first time that Phillips claimed to have been taunted and harassed by a group of white students.

130.     In April 2015, Phillips claimed that he was harassed by a group of students at Eastern Michigan University.  *See* "Native American claims racial harassment by EMU students dressed as indians [sic]," Fox 2 Detroit, Apr. 22, 2015, *avail. at* http://www.fox2detroit.com/news/native-american-claims-racial-harassment-by-emu-students-dressed-as-indians (last visited Feb. 26, 2020).

131.     Phillips asserted that he walked over to a yard where a theme party was being held at which 30-40 students were dressed as Hurons, the former EMU mascot, and that when he asked what they were doing, they said that they were honoring him.

132.     Much like his statement in response to the January 18 Incident, Phillips said in an interview in 2015 that after he walked over to the fence and told the students they were being racist, "it really got ugly."  *Id.*

133.     Although Phillips called the police to report the EMU students, he said that by the time the police arrived, "it was like there was no party there at all."

134.    Phillips said that "there's a lot of hate behind that" and called on school authorities to investigate and punish the students: "'Whoever would sit judgment on them, the university, the law, you know, society, that is their job. . . .'" *Id.*

135.    In a different interview, Phillips said that the students told him that they were "doing a ceremony to impregnate women." *See* "College students in 'red face' mock native elder, claim racist party is ceremony to 'impregnate women,'" Raw Story, Apr. 19, 2015, *avail. at* https://www.rawstory.com/2015/04/college-students-in-red-face-mock-native-elder-claim-racist-party-is-ceremony-to-impregnate-women/ (last visited Feb. 7, 2020).

136.    In another interview, Phillips claimed that the party-goers "began charging the fence," which is reportedly why he called the police. *See* "University Party in MI Reveals Unsafe Climate For Native American Students," Indian Country Today, Apr. 25, 2015, *avail. at* https://newsmaven.io/indiancountrytoday/archive/university-party-in-mi-reveals-unsafe-climate-for-native-american-students-FBGkN1DHYky5iAUol88lUQ/ (last visited Feb. 26, 2020).

137.    Much like the political climate surrounding the January 18 Incident, the political climate in Ypsilanti at the time of the alleged taunting and harassment in 2015 was already racially charged with debates over a partial reinstatement of the former EMU mascot, the Huron, a Native American logo.

138.    Fueled in part by Phillips' claim of harassment, protestors held press conferences and demonstrations at the school, objecting to any use of the mascot. *See*, *e.g.,* "Native Americans rally against Hurons logo at EMU," Detroit News, June 16, 2015, *avail.                                                                                  at*

- 30 -

https://www.detroitnews.com/story/news/local/michigan/2015/06/16/eastern-michigan-university-hurons-logo/28797179/ (last visited Feb. 26, 2020).

139.    Phillips attended one of the on-campus rallies, giving an interview to MLive, and playing his drum.  *See* "Drum-Banging Indian Nathan Phillips Was in the News 4 Years Ago, Telling an Eerily Similar Story," The Western Journal, Jan. 21, 2019, *avail. at* https://www.westernjournal.com/ct/drum-banging-indian-nathan-phillips-news-4-years-ago-telling-eerily-similar-story/ (last visited Feb. 26, 2020).

140.    There was never any identification of the students who allegedly taunted Phillips in that instance, and there is no available record that any type of disciplinary actions were taken by the university or the police.

**<u>Criminal Activities</u>**

141.    Unlike Nicholas, Phillips actually has a criminal background involving violence and assault, which should have led the Times to question the truthfulness and accuracy of Phillips' claims that he was "blocked" by Nicholas or that he was frightened by the high school student.

142.    Phillips has admitted to violence, proudly and laughingly stating that he "beat up" the boyfriend of a "little blonde-hair, blue-eyed hippie girl" who spit on him. *See*

https://www.facebook.com/NativeYouthAlliance/videos/326861671434840/?t=4351 (Oct. 29, 2018) (last visited Feb. 26, 2020).

143.    Phillips also has reportedly been charged with, arrested for, and/or convicted of numerous crimes, including escaping from prison, assault, and various alcohol-related crimes. *See*, *e.g.*, https://www.washingtonexaminer.com/politics/native-

american-activist-nathan-phillips-has-violent-criminal-record-and-escaped-from-jail-as-teenager (last visited Feb. 26, 2020).

**Inconsistent Statements**

144.    Phillips is known to have given at least nine interviews to mainstream media following the January 18 Incident, including *Detroit Free Press*, the *Washington Post*, *CNN, NBCUniversal, The Associated Press,* MSNBC*,* ABC, CBS, NBC, and *DemocracyNow!.*

145.    The accusations of Phillips as published by the Times are remarkable in their inconsistency with each other because Phillips' factual retelling of the January 18 Incident changed with each passing day.

146.    According to the first *The Washington Post* print article, Phillips stated that the students "suddenly swarmed around him as he and other activists were wrapping up the march."

147.    According to *The Associated Press*, Phillips changed his story to say that "he felt compelled to get between two groups with his ceremonial drum to defuse a confrontation."

148.    According to *DemocracyNow!*, Phillips stated that "I wasn't focusing on anybody except taking the youth out of there, the Indigenous youth that was with me, out of that situation, and that's when Mr. Sandmann stood in front of me and blocked my path."

149.    According to the *Washington Post*, Phillips stated that it "was getting ugly" and he needed to find "an exit out" of there, but Nicholas "blocked [his] way and wouldn't allow me to retreat."

150.    According to NBC, Phillips stated that "I was blocked" because "we couldn't go right.  We couldn't go left, back."

151.    But according to another *Washington Post* print article, Phillips queried "why should I go around him?"

152.    Contrary to Phillips' public claims that the students yelled "build that wall," "go back to Africa," and "go back to the reservation," and that Phillips has seen video in which you can hear the students shouting "build that wall," no video evidence exists substantiating these accusations.

153.    Contrary to Phillips' claim to *DemocracyNow!* that the students left because they were "running from the police," the video evidence and statements of witnesses demonstrate that the students left to catch their buses, and Phillips then turned away from the top of the stairs and celebrated his perceived "win" with his companions.

154.    The fact that Phillips changed his story within the first day after the events were reported should have put the Times on further notice that Phillips was not a reliable or trustworthy witness.

155.    Phillips told his narrative as though it were a factual recitation of events, and that is how the Times reported it.

156.    Even a cursory review of Phillips' past would have raised serious concerns among objective journalists as to his reliability and credibility as a source for describing the January 18 Incident and would have revealed that Phillips was a liar and an agenda-driven activist.

**THE TIMES' COVERAGE**

157.    The Times was among the first members of the print and online mainstream media to assassinate Nicholas' character and reputation.

158.    To the extent the January 18 Incident was newsworthy at all, it was not "hot news" or "breaking news."

159.    The Times did not investigate the January 18 Incident prior to publishing its January 19 Article.

160.    The Times ignored all ethical standards of journalism, especially concerning the heightened duty of care when reporting on matters concerning minors.

161.    To the date of the filing of this Complaint, the Times has never issued a formal retraction, correction (aside from corrections regarding Phillips' stolen valor), or an apology to Nicholas, despite a written demand from Nicholas that the Times do so.

**EXPRESSIONS OF HATRED AND SCORN BY THE PUBLIC**

162.    Within hours after the Times' published its false and defamatory January 19 Article, Nicholas became the subject of overwhelming public hatred, contempt, disgrace and scorn from the public.

163.    The Times, whose coverage emphasized that Nicholas was wearing a "MAGA" hat, shouted "Build that Wall, Build that Wall" at Phillips and the Native Americans, "blocked…[Phillips'] retreat" and "taunt[ed] and harass[ed] Mr. Phillips" contributed to the rampant cyber-assault and cyber-bullying suffered by Nicholas in the aftermath of its initial reporting, which was also undertaken in mass by the mob of other bullies made up of other members of the mainstream media, individuals on Twitter, church officials, celebrities, and politicians.

164.    The Times' own website displays evidence of that public hatred and scorn— the Times hosts public comments to its articles covering the January 18 Incident.

165.    It is well-known, and it was well-known at the time the Times published its false and defamatory article, that many people consider the phrase "Make America Great

Again"—and particularly wearing a MAGA hat—to be the equivalent of a racist statement. *See, e.g.,* "Are Trump's Make America Great Again hats patriotic or racist?" Detroit Free Press, Jan. 24, 2019, *avail.* at https://www.freep.com/story/news/local/michigan/2019/01/24/maga-hats-racism-donald-trump/2659479002/ (last visited Feb. 7, 2020) ("Many, including actress and activist Alyssa Milano, now are calling the baseball caps the modern-day white hoods of the Ku Klux Klan, representing a white nationalist ideology pushed by the president.").

166.   It also is well-known, and it was well-known at the time the Times published its false and defamatory articles and tweets about Nicholas, that many people consider chanting "Build the wall!" to be racist.  *See, e.g.,* "Trump's Wall of Shame," The New York Times, Jan. 24, 2019, *avail. at* https://www.nytimes.com/2019/01/24/opinion/trump-wall-shutdown.html (last visited Feb. 7, 2020) ("Whether praised by its supporters or condemned by its opponents, the wall is a stand-in for the larger promise of broad racial (and religious) exclusion and domination. It's no surprise, then, that some Americans use 'Build the wall' as a racist chant. . . .   In fact, you can almost think of the wall as a modern-day Confederate monument. . . ."); "Trump Never Actually Believed in the Wall," New York Magazine, Jan. 10, 2019, *avail.* at http://nymag.com/intelligencer/2019/01/trump-never-believed.html (last visited Feb. 7, 2020) ("'Build the wall!' chants whipped [Trump's] nativist base into a frenzy when he was a candidate . . . as both rallying cry and racist taunt.").

167.   Long before the January 18 Incident, the Times itself suggested that shouting "Build that Wall" is considered a "racial jeer." *See* "'Trump, Trump, Trump!' How a President's Name Became a Racial Jeer" N.Y. Times, Dec. 16, 2017,

https://www.nytimes.com/2017/12/16/us/trump-racial-jeers.html?searchResultPosition=1 (last visited Feb. 26, 2020).

168.    In fact, the understanding that "Build the wall!" is racist is so widespread that chanting that phrase has been used as the basis for termination of employees and disciplining of students. *See, e.g.,* "A School Employee Was Removed From Campus After Shouting 'Build the Wall' at Striking Los Angeles Teachers," Jan. 17, 2019, https://www.buzzfeednews.com/article/briannasacks/los-angeles-teachers-strike-employee-build-wall (last visited Feb. 26, 2020).

169.    The false accusation that Nicholas and his classmates were chanting "Build the wall!" at Native Americans during and/or following an Indigenous Peoples March provided additional context to the false and defamatory factual narrative published by the Times, from which a reasonable reader would undoubtedly conclude that they were being accused of racist conduct.

170.    This is particularly true given the furor just days earlier regarding a tweet on January 13, 2019, by the President in which he referred to Elizabeth Warren as "Pocahontas" and referenced the Wounded Knee massacre of Native Americans. *See, e.g.,* "Trump invokes one of the worst Native American massacres to mock Elizabeth Warren," The Washington Post, Jan. 14, 2019, *avail. at* https://www.washingtonpost.com/nation/2019/01/14/trump-invokes-one-worst-native-american-massacres-mock-elizabeth-warren/ (last visited Feb. 26, 2020); "Native Americans Slam Trump For Racist 'Wounded Knee' Dig At Sen. Elizabeth Warren," HuffPost, Jan. 14, 2019, *avail. at* https://www.huffpost.com/entry/native-americans-trump-wounded-knee-elizabeth-warren_n_5c3d4086e4b0e0baf540636f (last visited Feb. 26, 2020).

171.    The Times linked the January 18 Incident with the President's controversial tweet.  For example, in its January 19 Article, the Times actually incorporated by reference and embedded a Twitter link to the President's tweet about Elizabeth Warren and discussed it:

> The [January 18 Incident] became the latest touchpoint for racial tensions in America, particularly under Mr. Trump, who has painted immigrants in broad strokes as rapists and drug dealers and recently mocked Senator Elizabeth Warren with a reference to Wounded Knee and Little Bighorn, sacred ground for Native Americans whose ancestors fought and died there.

*See*  https://www.nytimes.com/2019/01/19/us/covington-catholic-high-school-nathan-phillips.html  (linking        to        President        Trump's        Tweet,        *available        at* https://twitter.com/realDonaldTrump/status/1084644517238714369).

172.    Phillips, who told numerous news outlets that Nicholas and his classmates had chanted "Build the wall!" obviously considered the chant to be offensive.

173.    If chanting "Build the wall!" was not considered to be a racist chant, which added additional context to the false narrative, the Times would have had no reason to report it.

174.    Similarly, if wearing a MAGA hat was not considered by some to be racist, there would have been no reason for the Times to include that detail so prominently in its January 19 article and collective reporting.

## **PARTIES, JURISDICTION, AND VENUE**

175.    Nicholas Sandmann and his parents are citizens of Kentucky.

176.    Nicholas Sandmann and his parents reside in Kenton County, Kentucky.

177.    Nicholas is a 17-year-old 12th grade student who attends CovCath, an all-male Catholic high school in Park Hills, Kentucky.  At the time of the January 18 Incident and relevant Times reporting, Nicholas was 16 years old and was an 11th grade student.

178.    The Times is a foreign corporation existing under the laws of the State of New York with its principal place of business being located at 620 Eighth Avenue, New York, New York 10018.  The Times may be served by delivery of a copy of the summons and complaint to its chief executive officer, Mark Thompson, at 620 Eighth Avenue, New York, New York 10018.

179.    The Times is a citizen of the State of New York.

180.    There exists complete diversity of citizenship between Plaintiff and the Times.

181.    The amount in controversy greatly exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests, costs, and attorneys' fees, as required to sustain subject-matter jurisdiction in this Court.

182.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).

183.    The Times transacts business in the State of Kentucky, including through the distribution of its content through print newspaper and the Internet, and the Times committed the tortious acts identified herein in the State of Kentucky.

184.    The Times published the print and online article identified herein in the State of Kentucky.

185.    The Times has intentionally sought and obtained benefits from its tortious acts in the State of Kentucky.

186.    The Times directed its conduct at Nicholas, a citizen of Kentucky.

187.    Nicholas suffered substantial and perpetual reputational and emotional harm in this District.

188.    There is a reasonable and direct nexus between the Times' tortious conduct in Kentucky and the harm suffered by Nicholas in Kentucky and beyond.

189.    The Times is subject to the jurisdiction of this Court pursuant to KRS § 454.210.

190.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Times is subject to personal jurisdiction in this District and/or a substantial part of the events giving rise to this claim occurred in this District, including publication and injury.

## CAUSE OF ACTION FOR DEFAMATION

191.    Nicholas reasserts and incorporates by reference the foregoing paragraphs of this Complaint as if fully restated herein.

192.    The Times published to third parties without privilege at least seven (7) articles covering the January 18 Incident, only one (1) of which is the subject of this action. The Times' article that is the subject of this action is known as the "January 19 Article."

193.    The Times published the January 19 Article on January 19, 2019 via its website, Nytimes.com.

194.    According to its website, the Times also published its false and defamatory article about Nicholas in the Sunday edition of its print newspaper on January 20, 2019:



195.    The Times repeatedly referenced and embedded a short clip from the Taitano Videos (the "2020fight Video" or "Viral Video"), which featured Nicholas prominently by publication of his face.

196.    The January 19 Article conveyed in context that Nicholas, among other things, engaged in racist misconduct.

197.    The Times negligently and with reckless disregard of the truth relied on the false and incomplete Viral Video and Phillips' manufactured lies, which gave its readers a false and incomplete factual basis about what occurred at the January 18 Incident.

198.    The Times published imputations of specific conduct such as "blocking" Phillips' "retreat," which are words that have factual connotations that can be proven either true or false.

**THE JANUARY 19 ARTICLE**

199.    The Times published two different online versions of the January 19 Article.

200.    The first version of the January 19 Article was published by the Times via Nytimes.com under the headline, "Boys in 'Make America Great Again' Hats Mob Native Elder at Indigenous Peoples March" (the "Mob Headline").  The first version is still available for public viewing via an internet archive service, which can be viewed by the Court at  http://archive.is/7X3ya.  *See* **Exhibit G**.

## Boys in 'Make America Great Again' Hats Mob Native Elder at Indigenous Peoples March

201.    The second version of the January 19 Article was published shortly after the "Mob Headline" version, which practically demonstrates that (1) the first headline was

actionable as a matter of law and (2) the Times unjustifiably rushed to condemn Nicholas because he was wearing a "MAGA" hat.

202.   The second version of the January 19 Article modified the headline to read, "Viral Video Shows Boys in 'Make America Great Again' Hats Surrounding Native Elder." The second version of the January 19 Article is still publicly viewable online and can be viewed by the Court at https://www.nytimes.com/2019/01/19/us/covington-catholic-high-school-nathan-phillips.html. *See **Exhibit H***.

203.   Both versions of the January 19 Article prominently published the Viral Video, which depicts Nicholas by prominent publication of his face:



204.   The January 19 Article is about Nicholas because it emphasizes his individual and singular involvement by:

(a) specifically identifying and embedding the Viral Video which, along with its cover image, prominently displays Nicholas' face atop the article;

(b) linking and incorporating by reference other articles (also written by the Times) into the January 19 Article, which identify Nicholas explicitly by his name; and

(c) other descriptive circumstances such as "one boy, wearing the red hat that has become a signature of President Trump stood directly in front of the elder…", and Phillips' reference to the "guy in the hat."

205.    Nicholas' friends and acquaintances reasonably understood the January 19 Article to be about Nicholas specifically.

206.    In its January 19 Article, the Times published or republished the following false and defamatory statement (the "Blocked Retreat Statement"):

> "It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial,'" Mr. Phillips told The Post.  "I started going that way, and that guy in the hat stood in my way and we were at an impasse.  He just blocked my way and wouldn't allow me to retreat."

207.    The Blocked Retreat Statement is unequivocally and provably false: Nicholas did not block Phillips from retreating or escaping the January 18 Incident.

208.    The Blocked Retreat Statement and the Mob Headline convey a defamatory meaning because it imputes to Nicholas, among other things, conduct constituting an aggressive intent-to-intimidate assault and hate crime because, in the paragraph that immediately precedes the Blocked Retreat Statement, the January 19 Article is specific that Nicholas' alleged aggression occurred "***at*** the Indigenous Peoples March" at the Lincoln Memorial (emphasis added).  The truth is that the Indigenous Peoples March was

already over at the time of the alleged conduct and Nicholas in no way interfered with Indigenous Peoples March—a federally protected activity.

209.   The Times published the January 19 Article and its Blocked Retreat Statement negligently and with actual malice, in purposeful avoidance of the truth.

210.   The Times' January 19 Article was unprivileged.

211.   The Times' January 19 Article is defamatory per se.

## NICHOLAS IS A PRIVATE FIGURE

212.   Nicholas is a private figure for the purposes of this defamation action, having lived his entire life outside of the public eye.

213.   Prior to the January 18 Incident, Nicholas had no notoriety of any kind in the community at large.

214.   Nicholas did not, by any voluntary act, involve himself in any particular and identifiable public controversy.

215.   Nicholas did not involve himself publicly to the extent that he either assumed a role of public prominence or was in a position to influence others or the outcome of any identifiable public controversy.

216.   Nicholas has never enjoyed regular and continuing access to the media.

217.   Nicholas made no public appearances prior to the initial false accusations against him arising from the January 18 Incident.

218.   Following the January 18 Incident and prior to the Times' January 19 Article, Nicholas had issued no public statements and made no media appearances.

219.   Following the January 18 Incident, Nicholas issued only one public statement and gave one interview.

220.    Nicholas' limited public statements were reasonable, proportionate, and in direct response to the false accusations against him and do not render Nicholas a limited purpose public figure with respect to the January 19 Article or any of the Times' reporting.

### THE TIMES PUBLISHED NEGLIGENTLY AND MALICIOUSLY

221.    The Times published its January 19 Article negligently and with actual knowledge of falsity or a reckless disregard for the truth.

222.    As one of the world's leading news outlets, the Times knew but ignored the importance of verifying damaging and, in this case, incendiary accusations against a minor child prior to publication.

223.    The Times recklessly rushed to publish its January 19 Article in order to advance its own political agenda and possibly other agendas to be discovered in the course of this litigation, and to create a false narrative in which it framed the January 18 Incident as being part of a rising trend in racial animosity, spawned by President Trump, toward Native Americans and others.

224.    The negligence and actual malice of the Times is demonstrated by its utter and knowing disregard of the complete video of the January 18 Incident (the Banyamyan Video), which was available contemporaneously with the selectively-edited and highly misleading video clip it actually embedded in the January 19 Article (the Viral Video).  At the time of the January 18 Incident, the Times chose to ignore the full-length Banyamyan Video because the selectively-edited clip could be easily mobilized to support the Times' biased narrative that the January 18 Incident was part of a rising trend in racial animosity, spawned by President Trump, toward Native Americans and others.

225.    The Times' January 19 Article only provided its readers with the Viral Video, which the Times knew was selectively-edited and highly misleading.  The Times falsely

represented to its readers that the Viral Video contained a complete picture of the January 18 Incident.  The Viral Video did not provide a complete picture of the January 18 Incident.

### The Times Published Negligently

226.   The Times negligently published its January 19 Article by failing to conduct a reasonable investigation prior to publication.

227.   The Times negligently published its January 19 Article by relying on unreliable and biased sources with questionable credibility.

228.   The Times knew, or certainly could have discovered with a simple and instantaneous Google search, that Phillips has a history of activism, opposition to President Trump and his policies, and criminal activity such that it was not reasonable for the Times to publish Phillips' statements without some minimal level of corroboration and additional investigation.  Indeed, the Times relied primarily upon interviews with Phillips and other participants and organizers in the Indigenous People March who had biased pre-dispositions.

229.   The Times negligently failed to consult publicly available information demonstrating the charge of its January 19 Article to be false, including, without limitation, other video evidence available online demonstrating that Phillips specifically approached the students and specifically confronted Nicholas, and that Nicholas did not engage in surrounding, blocking, or otherwise physically intimidating Phillips or anyone else present.

230.   The Times negligently failed to seek information from other obvious sources who were present at the January 18 Incident and would have demonstrated the charge of

its January 19 Article to be false, including Nicholas, and upon information and belief, his classmates, and/or the chaperones.

231.   The Times negligently published its January 19 Article despite internal inconsistencies in Phillips' statements, as well as material differences in his statements to other outlets published January 19 and 20.

232.   The Times' duty to investigate is heightened where, as here, the January 18 Incident was not breaking news and involved a minor child.

233.   Upon information and belief, at the time it published its January 19 Article, the Times did not know Nicholas' age and did not make any reasonable attempt to ascertain it despite the general knowledge that Nicholas was a high school student and thus a minor.

234.   The Times departed from the reasonable standard of care employed by journalists, including those standards articulated by the Society of Professional Journalists' Code of Ethics and its self-prescribed ethical Code by:

(a) failing to verify each accusation before publication;

(b) failing to take special care not to misrepresent or oversimplify its coverage;

(c) failing to use special sensitivity when dealing with children;

(d) failing to provide accurate context to its January 19 Article;

(e) failing to avoid stereotyping;

(f) failing to examine the way in which its own biases and agenda shaped its false reporting;

(g) failing to treat Nicholas as a human being deserving of respect;

(h) wrongfully placing an anti-Trump, anti-Catholic, and anti-pro-life agenda over the harm its January 19 Article caused to Nicholas.

**The Times Published with Actual Malice**

235.   The Times recklessly published its January 19 Article by failing to conduct a reasonable investigation prior to publication.

236.   The Times recklessly published its January 19 Article by relying on unreliable and biased sources with questionable credibility.

237.   The Times knew, or should have known, that Phillips—a man who was in the Marines, who faced down law enforcement in riot gear, and who has admitted to committing assault—was not actually scared of a teenage boy who did nothing more than stand completely still.  Instead, the Times should have investigated the possibility that Phillips was fabricating his description of the entire incident to get publicity and further his activist narrative.

238.   Phillips is wholly unreliable and lacks credibility, as shown in part by his false claim to have served in Vietnam while a member of the military, his status as a professional activist with a known bias against President Trump and his supporters, his documented history of making similar false accusations, his use of the January 18 Incident to promote his own political and personal agenda, the contradictions in his story established in his interviews, and the video evidence that undeniably refutes his narrative.

239.   The Times had obvious reasons to doubt the veracity of its purported firsthand sources, including because they are manifestly biased and because the short video evidence on which the Times relied did not show Nicholas or the students uttering the chants or slurs they were accused of making or blocking Phillips' egress.

240.    The Times knew, or should have known by reviewing contemporaneously available video, that Phillips' account of the January 18 Incident could not be truthful because Nicholas did not do anything that could possibly be described as jeering, taunting, blocking, or surrounding Phillips, although the Times republished Phillips' description as being factual and true.  Indeed, Nicholas did not engage in any conduct whatsoever as he stood perfectly still.  Therefore, any other characterization of conduct on his part was necessarily a false statement of fact.

241.    The Times consciously elected to ignore this contrary information in favor of its pre-conceived false narrative against President Trump and his supporters.

242.    The Times, in purposeful avoidance of the truth, failed to consult publicly available information, available from a simple and instantaneous Google search, demonstrating the charge of its January 19 Article to be false, including, without limitation, other video evidence available online demonstrating that Phillips specifically approached the students and specifically confronted Nicholas, and that Nicholas did not engage in surrounding, blocking, or otherwise physically intimidating Phillips or anyone else present.

243.    Not only was the Times aware that the snippets of video it reviewed and broadcast did not support the charge of its January 19 Article, the Times knew that the video it reviewed (the Viral Video) was unsourced and obviously incomplete.  Despite this and the knowledge that the January 18 Incident was not "breaking" or "hot news," the Times published its January 19 Article against Nicholas without any reasonable investigation.

244.    In fact, upon information and belief, prior to the publication of the January 19 Article, the Times knew that the Black Hebrew Israelites had hurled slurs and taunts

at the students, who responded with school cheers, and that Phillips had confronted Nicholas and his classmates. But the Times wholly omitted and otherwise contradicted this information.

245.   The Times recklessly failed to seek information from other obvious sources who were present at the January 18 Incident and would have demonstrated its False and Defamatory Accusations to be false, including Nicholas, and upon information and belief, his classmates, and/or the chaperones.

246.   The Times recklessly published its January 19 Article despite internal inconsistencies in Phillips' statements, as well as material differences in his statements to other outlets published on January 19 and 20, 2019.

247.   Nicholas' counsel propounded a written demand for retraction of the January 19 Article upon the Times on February 13, 2020.  A true and correct copy of the retraction demand is attached hereto as ***Exhibit I.***

248.   To the date of filing this Complaint, the Times has stood behind the false and defamatory charge in its January 19 Article, long after it had actual knowledge of its falsity, after having reviewed video evidence and statements of Nicholas contradicting the charge of its January 19 Article.

249.   The Times' actual malice is further evidenced by its failure to retract its January 19 Article.

250.   The Times published its January 19 Article with common law malice because:

>          (a) the Times intended to harm Nicholas because he was a Catholic student at the March for Life wearing a MAGA hat, and it consciously ignored

the threats of harm that it knew would inevitably ensue from its accusatory coverage in favor of its political agenda;

(b) the Times failed to retract its January 19 Article despite the harm and danger it knew would be inflicted upon Nicholas; and

(c) the Times callously ignored the consequences of its actions upon a minor child.

## **DAMAGES**

251.    The publication of the January 19 Article directly and proximately caused substantial and permanent damage to Nicholas.

252.    As a direct and proximate result of the January 19 Article, the Times created a false reputation for Nicholas, which continues to garner significant public hatred and scorn directed against Nicholas.

253.    By imposing a false reputation on Nicholas, the January 19 Article deprives Nicholas, a minor, of his right to create, through his own acts and words, his unique reputation as an adult and human being.

254.    The January 19 Article is now forever a part of the historical Internet record and will haunt and taint Nicholas for the remainder of his natural life and impugn his reputation for generations to come.

255.    The January 19 Article was republished by third parties and members of the mainstream and social media mob, which was reasonably foreseeable.

256.    The January 19 Article against Nicholas are defamatory per se, as it is libelous on its face without resort to additional facts, and subjected Nicholas to public hatred, contempt, scorn, obloquy, and shame.

257.   As a direct and proximate result of the Times' publication of the January 19 Article:

    (a) Nicholas suffered personal physical injury and physical sickness;

    (b) Nicholas suffered permanent, perpetual harm to his reputation;

    (c) Nicholas suffered and will continue to suffer severe emotional and mental distress;

    (d) Nicholas sought and received medical treatment for emotional and mental distress at Cincinnati Children's Hospital and to date has incurred Four Hundred Thirty-Eight Dollars ($438.00) in out-of-pocket medical expenses, with a probability of additional expenses being incurred in the future; and

    (e) Nicholas is forced to live his life in a constant state of concern over his safety and the safety of his family.

258.   The Times published its January 19 Article with actual malice and common law malice, thereby entitling Nicholas to an award of punitive damages.

259.   The Times' conduct was outrageous and willful, demonstrating that entire want of care that raises a conscious indifference to consequences.

260.   Nicholas is entitled to an award of punitive damages to punish the Times and to deter it from repeating such egregiously unlawful misconduct in the future.

**WHEREFORE**, Nicholas respectfully prays:

(a)   That judgment be entered against the Times for substantial compensatory damages in an amount not less than Fifteen Million Dollars ($15,000,000.00);

(b)   That judgment be entered against the Times for punitive damages in an amount not less than Fifty Million Dollars ($50,000,000.00);

(c)     That Nicholas recover his reasonable attorneys' fees and expenses from the Times;

(d)     Trial by jury on all issues so triable;

(e)     That all costs of this action be taxed to the Times; and

(f)     That the Court grant all such other and further relief that the Court deems just and proper, including equitable relief.


Respectfully submitted this 2nd day of March, 2020.


**L. LIN WOOD, P.C.**

*/s/ L. Lin Wood*
L. Lin Wood (will seek admission *pro hac vice*)
lwood@linwoodlaw.com

1180 W. Peachtree Street, Ste. 2040
Atlanta, GA 30309
Tel: 404-891-1402
Fax: 404-506-9111


**PETERSON BAKER, PLLC**

*/s/ Nikki L. Baker*
Nikki L. Baker (will seek admission *pro hac vice*)
nbaker@petersonbaker.com

701 South Seventh Street
Las Vegas, Nevada 89101
Tel: 702-786-1001


**HEMMER DEFRANK WESSELS, PLLC**

*/s/ Todd V. McMurtry*
Todd V. McMurtry (82101)
Kyle M. Winslow (95343)
tmcmurtry@hemmerlaw.com
kwinslow@hemmerlaw.com

250 Grandview Drive, Ste. 500
Ft. Mitchell, KY 41017
Tel: 859-344-1188
Fax: 859-578-3869