UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | |
|---|---|
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | Civil Action No. 2:20-cv-00023-WOB-CJS |
| Plaintiff, | |
| | Judge William O. Bertelsman |
| | Magistrate Judge Candace Smith |
| v. | **DEFENDANT THE NEW YORK TIMES COMPANY'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT (Doc. 1)** |
| **THE NEW YORK TIMES COMPANY d/b/a THE NEW YORK TIMES** | |
| Defendant. | |

Defendant The New York Times Company d/b/a The New York Times ("NY Times"), by its undersigned counsel, respectfully moves this Court to dismiss the Complaint of Plaintiff Nicholas Sandmann, by and through his parents and natural guardians, Ted Sandmann and Julie Sandmann ("Sandmann") (Doc. 1) for failure to state a claim upon which this Court may grant relief, pursuant to Fed. R. Civ. P. 12(b)(6). A memorandum in support of the NY Times's Motion to Dismiss, and a proposed entry, are attached.

The NY Times further requests that the Court set this Motion to Dismiss for oral argument pursuant to LR 7.1(f).

Respectfully submitted,

s/ John C. Greiner
John C. Greiner (*Pro Hac Vice*)
GRAYDON HEAD & RITCHEY LLP
312 Walnut St.
Suite 1800
Cincinnati, OH 45202
Phone: (513) 629-2734
Fax: (513) 333-4316
jgreiner@graydon.com

&

J. Stephen Smith (KBA #86612)
Darren W. Ford (KBA #95373)
GRAYDON HEAD & RITCHEY LLP
2400 Chamber Center Drive
Suite 300
Ft. Mitchell, KY 41017
Phone: (859) 578-3070
Fax: (859) 578-3071
ssmith@graydon.com
dford@graydon.com

ATTORNEYS FOR DEFENDANT

10226928.3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | |
|---|---|
| **NICHOLAS SANDMANN**, by and through his parents and natural guardians, **TED SANDMANN** and **JULIE SANDMANN**,<br><br>        Plaintiff,<br><br>v.<br><br><br><br>**THE NEW YORK TIMES COMPANY d/b/a THE NEW YORK TIMES**<br><br>        Defendant. | Civil Action No. 2:20-cv-00023-WOB-CJS<br><br><br>Judge William O. Bertelsman<br>Magistrate Judge Candace Smith<br><br>**DEFENDANT THE NEW YORK TIMES COMPANY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT (Doc. 1)** |

## I.        INTRODUCTION

        This lawsuit—like the seven other lawsuits Plaintiff Nicholas Sandmann ("Sandmann") has filed—arises out of a viral internet video that captured Sandmann's encounter with Native American elder Nathan Phillips ("Phillips") on the steps of the Lincoln Memorial in Washington, D.C. In this action, Sandmann has sought $15,000,000 in compensatory damages, and $50,000,000 in punitive damages against Defendant The New York Times Company d/b/a The New York Times ("NY Times") for one sentence in its reporting on the video, adding to the combined grand total of $1,250,000,000 in compensatory and punitive damages he has sought from the eight media defendants he has sued for defamation based on their reporting about the video.

1

Sandmann bases his claim in this case on a single statement made by Phillips to the Washington Post ("The Post") and republished by the NY Times in a January 19, 2019 article about the viral video ("Article"). (Doc. 1-7 (Ex. G to Compl.).) Far from the focus of the Article, Phillips's statement to The Post does not appear until the seventeenth paragraph, and is presented clearly as Phillips's personal perspective on the events captured by the viral video. The NY Times Article did not purport to be a definitive report on what in fact occurred on the steps of the Lincoln Memorial, and indeed, the Article states that the viral video did not fully capture those events. The NY Times Article does not contain any endorsement of Phillips's statement describing what he experienced. And when read in context, the statement is presented merely as information the NY Times obtained from another reliable news source, The Post, about a developing story.

The NY Times moves to dismiss Sandmann's Complaint on two grounds. First, when read within the context of the Article as a whole, Phillips's statement to The Post is not defamatory as a matter of law and constitutes protected opinion. A reasonable reader would interpret the Article as a standard breaking news story, capturing—to the best of the paper's ability—the facts as they are known at the moment in an evolving story. Nothing in the Article purports to endorse Phillips's characterization of his encounter with Sandmann, or otherwise suggest that the Article is a definitive account of what occurred.

Second, Sandmann's Complaint against The NY Times comes more than a year after the NY Times published the January 19, 2019 Article, and more than a year after he filed his first complaint against The Post for its publication of the same statement. As Sandmann proved himself capable of filing suit against those he claims injured him through their reporting on the

viral video more than a year ago, the Court should find Sandmann's defamation claim time-barred under KRS 413.140(1)(d).

## II.     STATEMENT OF FACTS

Most of Sandmann's 260-paragraph Complaint against the NY Times (Doc. 1) repeats the same allegations found in his earlier-filed complaints against the WP Company LLC  (E.D. Ky. Case No. 2:19-cv-00019-WOB-CJS, filed February 19, 2019) (the "Post Case"), Cable News Network, Inc. ("CNN") (E.D. Ky. Case No. 2:19-cv-00031-WOB-CJS, filed March 12, 2019), and NBCUniversal Media, LLC ("NBCUniversal") (ED. Ky. Case No. 2:19-cv-00056-WOB-CJS, filed May 1, 2019). As the Court is familiar with Sandmann's allegations describing the events that transpired on the steps of the Lincoln Memorial, *see Sandmann v. WP Company LLC*, 401 F. Supp. 3d 781 (E.D. Ky. 2019) ("*Post Decision*"), the NY Times will constrain its recitation of Sandmann's allegations to those specific to the NY Times Article on which he bases his defamation claim in this case.[1]

### A.     The January 19 Article

The NY Times published the Article on January 19, 2019, the day after the video depicting Sandmann standing face-to-face with Phillips went viral on the internet ("Viral Video"). (*See* Doc. 1 (Compl.), Page ID#: 15, 40; Doc. 1-7 (Ex. G to Compl.).) The images depicted in the Viral Video drew widespread commentary from public officials, religious leaders, and others, prompting extensive media coverage. (Doc. 1-7 (Ex. G to Compl.); Doc. 1 (Compl.), Page ID#: 32-33.)

---

[1] For purposes of a motion under Fed. R. Civ. P. 12(b)(6), the allegations in the complaint must be taken as true. By reciting Sandmann's allegations, or referring to those recited by the Court in its *Post Decision*, the NY Times neither admits, nor waives its right to challenge the alleged facts in a later pleading or other filing in this action.

Like many other media outlets, the NY Times focused its coverage in the Article on the reaction engendered by the images depicted in the Viral Video. The Article opens with a description of the involved parties ("Catholic high school students" and Phillips); provides a general characterization of the event captured in the Viral Video; and notes that the incident was being investigated by the students' school, and that the students could face disciplinary action. (Doc. 1-7 (Ex. G to Compl.), Page ID#: 85.)

Next, the Article describes the images depicted in the Viral Video:

> In video footage that was shared widely on social media, one boy, wearing the red hat that has become a signature of President Trump, stood directly in front of the elder [Phillips], who stared impassively ahead while playing a ceremonial drum.

(*Id.*) Following that description, the Article provides information about the students' high school, and the school trip to the March for Life Rally that led the students to Washington. (*Id.* at Page ID#: 85-86.)

The focus then turns to the reactions engendered by the Viral Video. The Article reports statements on the incident made by the Diocese of Covington, Covington Catholic High School, U.S. Representative Deb Haaland, and the Sisters of Mercy. (*Id.* at Page ID#: 86.) None of the statements reported in the Article mention Sandmann, or specifically refer to his face-to-face encounter with Phillips.

Turning next to the incident itself, the Article reports on the statement made by the Indigenous Peoples Movement identifying Phillips as the Native American elder involved in the incident. (*Id.*) After stating that Phillips could not be reached for comment prior to publication, the Article republishes Phillips's statement to The Post about the incident:

> "It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial,'" Mr. Phillips told The Post. "I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."

(hereinafter "Phillips Statement" or "Phillips's Statement") (*Id.*) The Article then describes another video of Phillips recounting the incident, in which he states that he heard the students saying "Build that wall! Build that wall!" (*Id.* at Page ID#: 86-87.)

From there the Article describes an interview with Darren Thompson of the Indigenous Peoples Movement ("IPM"), an organizer of the Indigenous Peoples March, which is the event Phillips was participating in on the day of the incident. (*Id.* at Page ID#: 87.) Thompson describes the purpose of the march as to "raise awareness about Native Americans and other indigenous groups around the world." He is then quoted as saying that "[t]he exchange between the students and Mr. Phillips 'clearly demonstrates the validity of our concerns'" and that "'traditional knowledge is being ignored by those who should listen most closely.'" (*Id.*)

Immediately following the interview with Thompson, the Article points out that the IPM itself had offered a different perspective of the event in a public statement, and that the videos did not provide a complete picture:

> But in its statement, the Indigenous Peoples Movement also said that ***there was more to the rally at steps of the Lincoln Memorial — and the encounter with the high school students — than was shown in the videos.***

(*Id.* at Page ID#: 87 (emphasis added).) The Article then quoted another Native American organizer's view that Sandmann, far from being hostile, actually supported Phillips and the other Native American protesters.

> "What is not being shown on the video is ***that the same youth and a few others became emotional because of the power, resilience and love we inherently carry in our DNA[.]***"

(*Id.* (emphasis added).) The Article then closes with a statement from another participant in the march, and a reaction to the Viral Video by then-Kentucky Secretary of State Alison Lundergan Grimes. (*Id.*)

5

### B.  Sandmann's Allegations

Sandmann alleges that the Phillips Statement republished by the NY Times was false because he "did not block Phillips from retreating or escaping" the face-to-face encounter. (*Id.* at Page ID#: 42.) He further alleges that the statement conveyed a defamatory meaning because it imputed to Sandmann "conduct constituting an aggressive intent-to-intimidate assault and hate crime because . . . the [Article] is specific that Nicholas' alleged aggression occurred '*at* the Indigenous Peoples March' at the Lincoln Memorial." (*Id.* (emphasis in original).) Sandmann further pleads that the NY Times's republished the Phillips Statement "negligently and with actual malice" by failing to investigate Phillips's background before publication. (*Id.* at Page ID#: 43-50.)

Sandmann seeks $15,000,000 in compensatory damages from the NY Times as a result of its publication of the Article, and $50,000,000 in punitive damages. (*Id.* at Page ID#: 51.)

### C.  Prior Lawsuits

Sandmann filed his first complaint against a news organization for reporting on the Viral Video and his encounter with Phillips on February 19, 2019 through his parents, Ted and Julie Sandmann. *See Sandmann v. WP Company LLC*, E.D. Ky. Case No. 2:19-cv-00019-WOB-CJS (Feb. 19, 2019). Over the next few months, Sandmann also brought suits, through his parents, against CNN on March 12, 2019, and NBCUniversal on May 1, 2019. *See Sandmann v. Cable News Network*, E.D. Ky. Case No. 2:19-cv-00031-WOB-CJS & *Sandmann v. NBCUniversal Media, LLC*, ED. Ky. Case No. 2:19-cv-00056-WOB-CJS.

In each of the three cases, Sandmann filed voluminous complaints contending that virtually anything the defendants reported even remotely critical of him (or the group with whom he travelled) was actionable. This Court dismissed all but one of the claims, preserving only the

6

allegation that the media defendants' republication of the Phillips Statement constituted defamation and that he suffered damages as a result of that publication. Although this Court originally concluded that the Phillips Statement was not defamatory as a matter of law, on reconsideration, the Court concluded that in the context of those three accounts, Sandmann's claims satisfied the "plausibility" standard. Accordingly, on that narrow basis, the Court allowed those claims to proceed to discovery. That ruling is not, of course, binding on a separate account that portrays the incident in a fundamentally distinct manner.

## III.    ARGUMENT

Sandmann's claim against the NY Times is based on a single statement in a single article published in the immediate wake of the online controversy sparked by the Viral Video. Although Sandmann may not like the statement Phillips made about his encounter with him, it was not defamatory as a matter of law, and the statement was presented as part of a balanced piece of breaking news reporting, that detailed both sides of a controversy. Moreover, Sandmann's claim against the NY Times could have, and should have been brought before the expiration of the one-year statute of limitations for defamation claims, and as such, the Court should find that it is time-barred.

### A.    Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Smith v. Tipton Cty. Bd. of Educ.*, 916 F.3d 548, 552 (6th Cir. 2019) (internal quotations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than

7

the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal quotations omitted). And although the court must accept as true all of the allegations contained in a complaint, this rule is inapplicable to legal conclusions. *Id.* at 678. Moreover, "it is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated . . . laws in ways that have not been alleged." *Assoc. Gen. Contractors of Cal, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Sandmann has incorporated the January 19 Article by attachment to his Complaint. (Doc. 1-7 (Ex. G to Compl.).) As such, it forms part of the pleadings and may be considered in deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) without converting it to a motion for summary judgment. *See Greenberg v. Life Ins. Co.,* 177 F.3d 507, 514 (6th Cir. 1999). *See also Hazime v. Fox TV Stations, Inc*., No. 12-15072, 2013 U.S. Dist. LEXIS 116909, at **3-4 (E.D. Mich. Aug. 19, 2013) (holding that court could consider two television broadcasts for purposes of motion to dismiss defamation claim based on those broadcasts). And when a written instrument or other exhibit to a complaint contradicts allegations in a complaint, the exhibit trumps the allegations. *See Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) ("if a factual assertion in the pleadings is inconsistent with a document attached for support, the Court is to accept the facts as stated in the attached document" (internal quotations omitted)).

## B.    Elements of Defamation

To state a claim for defamation under Kentucky law, a plaintiff must prove four elements: "(a) a false and defamatory statement concerning [the plaintiff]; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher;

and (d) actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 281-82 (Ky. 2015) (original formatting altered). "'Defamatory language' is broadly construed as language that 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Ball v. E.W. Scripps Co.*, 801 S.W.2d 684, 688 (Ky. 1990) (quoting Restatement (Second) of Torts, § 563) (internal quotations omitted). "All other defamatory statements are merely libelous . . . per quod, and special damages, *i.e.*, actual injury to reputation, must be affirmatively proved if a comprehension of the defamatory nature of the written or spoken words requires extrinsic evidence of context or circumstances." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795 (Ky. 2004), *overruled in part by*, *Toler*, 458 S.W.3d at 287.

In his Complaint, Sandmann alleges that the Article is defamatory *per se*, and makes no claim that he suffered any special damages as a result of the Article. (Doc. 1 (Compl.), Page ID#: 43.)

### C.     Defamatory Meaning

1.     ***The Article Considered in its Entire Context is not Defamatory as a Matter of Law***.

This Court must decide, as a matter of law, whether the Article is capable of a defamatory meaning. *McCall v. Courier Journal and Louisville Times Company,* 623 S.W. 2d 882 (Ky. 1981). If the Court concludes it is not, then the Court must dismiss the action. In considering whether the Article is capable of a defamatory meaning, the NY Times urges the court to view the Article and the Complaint in light of the guidance provided by the U.S. Court of Appeals for the Sixth Circuit in *Croce v. The New York Times Company,* 930 F.3d 787 (6th Cir. 2019).  In doing so, this Court should conclude that the Article is not actionable.

9

The facts of the *Croce* case are instructive. Dr. Carlo Croce was a professor and the Chair of Human Cancer Genetics at The Ohio State University. *Id.* at 790. In a forty-five-year career as a cancer researcher, Dr. Croce published over 650 papers. *Id.* Dr. Croce brought a defamation suit in the United States District Court for the Southern District of Ohio. He claimed that he was defamed by a March 8, 2017 article published by the New York Times entitled "Years of Ethics Charges, but Star Cancer Researcher Gets a Pass." *Id.* at 791. The article detailed various allegations against and criticisms of Dr. Croce—all casting him in an unfavorable light. *Id.*

The article quoted several of Dr. Croce's critics and stated that numerous allegations and complaints had been lodged against Dr. Croce. *Id.* Further, the article raised concerns about various errors in Dr. Croce's papers, as well as concerns about OSU's ability to investigate effectively allegations against him. *Id.* at 794.

Finding as a matter of law that the article as a whole was not defamatory, the District Court granted summary judgment in favor of the New York Times. The Sixth Circuit affirmed. The court's analysis applies to the Times' reporting here as surely as it did to the Croce article.

In determining whether the statements at issue in the case were capable of a defamatory meaning the Sixth Circuit noted that the "court must review the totality of the circumstances and ... read[ ] the statement in the context of the entire publication to determine whether a reasonable reader would interpret it as defamatory." *Id.* at 793 (internal quotations omitted) (applying Ohio law).

The Sixth Circuit's statement of the law is consistent with Kentucky law, as set forth in *McCall* where the Kentucky Supreme Court noted,

> It is an elementary principle of the law of libel that the defamatory matter complained of should be construed as a whole. The alleged defamatory words

10

must be measured by their natural and probable effect on the mind of the average lay reader and not be subjected to the critical analysis of the legal mind. We must, therefore, analyze the article in its entirety and determine if its gist or sting is defamatory.

623 S.W.2d at 884 (citations omitted).

In applying this standard to the *Croce* article, the court concluded

[p]ut simply, the article does not say that Dr. Croce is guilty of any of these allegations and charges of scientific misconduct, nor does the article suggest that these allegations are true. If the article suggested that these allegations were true, or if the article did not use language that qualified the statements made by others as allegations, then the Defendants potentially could be liable for reporting third-party statements. . . . . In its full and proper context, however, the article reports newsworthy allegations with appropriate qualifying language.

*Croce*, 930 F.3d at 794-95. The court noted, "[i]n full context, a reasonable reader would interpret the article as a standard piece of investigative journalism." *Id.* at 793.

The *Croce* ruling is based on sound policy. To report fully on a controversy, reporters need to report on the observations of the participants in the dispute. That is the very nature of a controversy. When the report sets out these conflicting observations without endorsement, there can be no liability. If it were otherwise, publications would in all cases be subject to a flurry of lawsuits from all sides. The doctrine underpinning the *Croce* ruling ensures this is not the case.

Applying this standard to the NY Times reporting on the Sandmann incident compels the same result. The Article is an account of the different reactions of various parties, including Nathan Phillips, a participant in the incident. As of the publication of the Article, Sandmann had not issued a statement. But in reporting on these reactions, the NY Times merely documented them and did not endorse them or adopt them in any way. Each statement reported in the article was expressly attributed to the maker of that statement, and thus clearly presented as an allegation, not an adopted fact.

11

The Article provides a range of commentary about the incident: from the diocese and the high school, a member of the House of Representatives, the Sisters of Mercy, and the Kentucky Secretary of State. In reporting on those reactions, the NY Times did not employ any language to suggest that the comments were anything more than opinions and subjective perceptions of interested observers.

In keeping with the article's commitment not to adopt a particular point of view, the updated version expressly noted: "*Interviews and additional video footage have offered a fuller picture of what happened in this encounter, including the context that the Native American man approached the students amid broader tensions outside the Lincoln Memorial.*" (Doc. 1-8 (Ex. H to Compl.), at Page ID#: 91 (emphasis in original).) In the updated story published the next day, the NY Times quoted Sandmann at length, presenting his account of the events without contradiction. And despite the unavailability of a statement from Sandmann for the first day's account, the Article endeavored to depict two sides to the story.

To this point, a critical piece is the statement from the representative of the IPM, which said the video did not capture the full event and that in fact Sandmann ("the same youth") became sympathetic to the movement's message:

> But in its statement, the Indigenous Peoples Movement also said that **there was more to the rally at steps of the Lincoln Memorial — and the encounter with the high school students — than was shown in the videos**.*"**What is not being shown on the video is that the same youth and a few others became emotional because of the power, resilience and love** we inherently carry in our DNA,"* another organizer, Nathalie Farfan, said. *"Our day on those steps ended with a round dance, while we chanted, 'We are still here.'"*

(Doc. 1-7 (Ex. G to Compl.), at Page ID#: 87 (emphasis added).) Far from adopting as fact that Sandmann acted in a racist fashion throughout the incident, the quote demonstrates that Sandmann acted in a manner sympathetic to the IPM. This demonstrates the Article's

commitment to reporting on both sides of the controversy, much as the NY Times did in the *Croce* case.

Including the quote from Nathan Phillips does not change the analysis. Phillips's quote was presented as the perception of a key participant to the event. It was the very nature of an allegation, not an adopted fact. As the court noted in *Croce,* an allegation critical of the subject of an investigative piece, presented as an allegation, is not defamatory.

The fact that the NY Times did not adopt Phillips's allegation as fact is further supported by its description of the encounter between Sandmann and Phillips as depicted in the video footage. In that description, the NY Times noted "[i]n video footage that was shared widely on social media, one boy, wearing the red hat that has become a signature of President Trump, stood directly in front of the elder, who stared impassively ahead while playing a ceremonial drum." (Doc. 1-7 (Ex. G to Compl.), at Page ID#: 85.) This passage offers another description of the event, by omitting any characterization of Phillips's behavior as evincing an effort to elude a "block" or to "retreat," and instead depicting him as "star[ing] impassively ahead while playing a ceremonial drum." Readers may choose to adopt one or the other narrative, which is the case in every report of a controversy, but the NY Times did not choose a narrative for the reader. And according to the holding in *Croce*, that editorial decision precludes a finding that the Article was defamatory. On this basis, the Court should dismiss the Complaint with prejudice.

### 2.   *The Phillips Statement is Not Capable of a Defamatory Meaning*

When considered in the full context of the Article, the Phillips Statement—Phillips's description of the incident—"*I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat*"—is not capable of a defamatory meaning as a matter of law. Given the Article's description of the

interaction—that Phillips "stared impassively ahead while playing a ceremonial drum" while Sandmann stood directly in his path—a reasonable reader would conclude that Phillips was not describing some sort of aggressive action by Sandmann, but merely a circumstance where two people occupied a single space, such that each was "blocking" the other. That type of interaction occurs daily on crowded streets, sporting events, and anywhere that a crowd congregates.

This is especially the case given that the NY Times Article included the observation that Sandmann acted sympathetically to the indigenous people present. The description of his conduct Nathan Phillips offered must be read in conjunction with this observation. To ascribe to the Phillips Statement some overarching accusation of assault, or "racist conduct" would require the court to ignore the full context of the Article, or to apply an interpretation that is unreasonable on its face. The *Croce* case and Kentucky case law make it clear the court may not do so. *See Post Decision*, 401 F. Supp.3d at 794; *Digest Pub. Co. v. Perry Pub. Co.*, 284 S.W.2d 832, 834 (Ky. 1955); *Sweeney & Co. v. Brown*, 60 S.W.2d 381 (Ky. 1933).

In its *Post Decision*, this Court set forth the analysis that applies here: "There is nothing defamatory about being a party to a stubborn 'impasse.' . . . [T]o be libelous per se the defamatory words must be of such a nature that courts can presume as a matter of law that they do tend to degrade or disgrace [the plaintiff], or hold him up to public hatred, contempt or scorn.' The words in the article fall short of that mark." *Post Decision*, 401 F. Supp. 3d at 794. (internal citations and quotations omitted). This standard poses a high bar for Sandmann. Mere criticism of Sandmann, especially when presented in a context that makes it clear the comments are merely criticism, is not actionable.

As this Court noted in the *Post Decision*, "the [statement] cannot reasonably be read as charging Sandmann with physically intimidating Phillips or committing the criminal offense of

assault." *Id.* at 794. This is especially the case here, when considering the statement in context. The Article described the encounter as one where Phillips "stared impassively ahead" while face to face with Sandmann, who stood in Phillips's path. When considered in that context, describing the incident as one where one party was "blocked" is not reasonably capable of a defamatory meaning.

In an attempt to avoid this result, Sandmann arbitrarily assigns to the actual words a "meaning" that bears no relationship to the words or the Article's context:

> 5. Moreover, the Times' reporting conveyed that, during the January 18 Incident, Nicholas committed conduct that could constitute, among other things, a hate crime, punishable by 18 U.S.C. § 245 (b), and an assault by aggressively interrupting song and prayer "at the Indigenous Peoples March," at the Lincoln Memorial—a national park.

> 6. The Times accused Nicholas of behavior constituting menacing racial intimidation of Phillips, a Native American political activist, while Phillips was purportedly engaged in peaceful song and prayer at the Lincoln Memorial. (Doc. 1 (Compl.), Page ID#: 2)

But this effort to expediently rewrite the Article must fail as a matter of law. As this Court noted in the *Post Decision*: "[i]n determining whether a writing is libelous per se [under Kentucky law], courts must stay within the four corners of the written communication. The words must be given their ordinary, natural meaning as defined by the average lay person. The face of the writing must be stripped of all innuendoes and explanations." *Roche v. Home Depot U.S.A.*, 197 F. App'x 395, 398 (6th Cir. 2006) (emphasis added) (citations and internal quotation marks omitted); *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 863 (6th Cir. 2003). *Post Decision*, 401 F. Supp. 3d at 794.

Kentucky law also provides that "innuendo ... cannot enlarge or add to the sense or effect of the words charged to be libelous, or impute to them a meaning not warranted by the words themselves[.]" *Dermody v. Presbyterian Church,* 530 S.W.3d 467 (Ky. App. 2017), citing

*Cullen v. South East Coal Co.*, 685 S.W.2d 187, 190 (citation and internal quotation marks omitted).

Given the Article's context, Sandmann's construction goes substantially beyond the four corners of the publication, leading to a legally unreasonable construction.  The Article described Sandmann and Phillips as having "intersected on Friday in an unsettling encounter" and described Sandmann as a boy who "stood directly in front of the elder [Phillips], who stared impassively ahead while playing a ceremonial drum." (Doc. 1-7 (Ex. G to Compl.), at Page ID#: 85.).   Nothing in the Article reasonably suggests Sandmann committed "menacing racial intimidation" or criminal "assault," much less a hate crime.  As this Court also noted in the *Post Decision*, "[a]s the Restatement and Kentucky law make clear: if individuals, 'by an unreasonable construction' attach a derogatory meaning' this 'does not render the language defamatory.'" 401 F. Supp. 3d at 790 (quoting Restatement (Second) of Torts, § 559 cmt. c).

When considered in the full context of the Article, Phillips's Statement is not capable of a defamatory meaning. To attach such a meaning to Phillips's Statement, as presented in the Article, would be unreasonable as a matter of law.  For all of the foregoing reasons, Phillips's Statement is not capable of a defamatory meaning and the Court should dismiss the Complaint with prejudice.

### 3.    *The Alleged Defamatory Meaning is Non-Actionable Opinion*

The Complaint also should be dismissed because the NY Times did not adopt Phillips's statement as an established fact, but reported it in a way that made clear it was Phillips's opinion: he was describing his personal feelings and subjective impressions during the event.  It is well-established that statements of opinion are protected by both the First Amendment and Kentucky law.  *Washington Post*, 401 F. Supp. 3d at 791 ("Few principles of law are as well-established as

16

the rule that statements of opinion are not actionable in libel actions."); *Yancey v. Hamilton,* 786 S.W.2d 854 (1989) ("'Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.'" (quoting *Gertz v. Welch*, 418 U.S. 323 (1974)). Accordingly, Kentucky courts recognize broad protection for opinion. *See Loftus v. Nazari*, 21 F. Supp. 3d 849, 854 (E.D. Ky. 2014) & *Lassiter v. Lassiter*, 456 F. Supp. 2d 876, 882 (E.D. Ky. 2006).

A statement is nonactionable as "pure opinion" when a statement of opinion does not imply undisclosed facts, either because the facts underlying the opinion are stated, or because the readers know the facts. *Lassiter v. Lassiter*, 456 F. Supp. 2d 876, 881–82 (E.D. Ky. 2006), *aff'd,* 280 F. App'x 503 (6th Cir. 2008). In making this evaluation, the statement at issue must be assessed from the perspective of "a reasonable person reading the statement in the context of the whole article. . ." to determine whether it constitutes opinion. *Id.* at 882; *see also Washington Post,* 401 F. Supp. at [add] (emphasizing the contextual nature of the analysis). In prior decisions regarding reporting by other news organizations, the Court has ultimately found that those articles presented the "blocking" comment in a context that raised factual issues. Here, the context and presentation of Phillips's comments made clear they were his subjective opinions—opinions which were not shared by others who witnessed events.

The Article's lead paragraphs make clear that it intended to report on individuals with different perspectives and motivations: "They were Catholic high school students who came to Washington on a field trip to rally at the March for Life. He was a Native American elder who was there to raise awareness at the Indigenous Peoples March." Doc. 1-7 (Ex. G to Compl.), at Page ID#: 85 (emphasis denoting hyperlink in original). The Article explained, neutrally, that

17

the two "intersected on Friday in an unsettling encounter" when a boy "stood directly in front of the elder [Phillips], who stared impassively ahead while playing a ceremonial drum." (Doc. 1-7 (Ex. G to Compl.), at Page ID#: 85.). The Article then presented a range of comments and observations from a variety of sources about that encounter, which had become "the latest touchpoint for racial tensions in America." Some formed their opinions based on news reports and the images captured in the Viral Video. Others were present at the event. Phillips, of course, was among the latter.

The NY Times reported that Phillips felt that by standing directly in front of him without moving, Sandmann "blocked" his way. Phillips may have been mistaken in that belief. Others, as set out in the Article, saw Sandmann as passively encountering Phillips, while at least one of Phillips's fellow protesters felt that Sandmann was sympathetic to the Native Americans' cause. Far from leading readers to conclude that Phillips's opinion necessarily implied wrongdoing by Sandmann—let alone "racist conduct"—the NY Times Article underscored that Phillips's view was one interpretation of what happened. By including those differing viewpoints, the Times Article reinforced the essential subjectivity of Phillips's Statement. The fact that different witnesses drew different conclusions based on the same events is emblematic of opinion.

Finally, in reporting those different perspectives, the NY Times Article did "not imply the existence of any undisclosed facts." *Loftus*, 21 F. Supp. 3d at 853. The Article accurately describes the events and hyperlinks to relevant materials, including the video footage of the event that sparked the controversy. Based on that information, "the reader was in as good a position as Phillips to judge whether the conclusion he reached – that he was "blocked" – was correct," what Sandmann might have been thinking during the encounter, and whether Phillips could have maneuvered around Sandmann (as Sandmann now asserts). For all of the foregoing

18

reasons, the Phillips Statement is non-actionable opinion and on this basis also the Complaint should be dismissed with prejudice.

### D.    Sandmann's Claim Is Barred By the Statute of Limitations

The Court should also dismiss the Complaint because Sandmann did not bring it within the one-year statute of limitations for defamation claims.  KRS § 413.140(1)(d).  The limitations period here expired on January 20, 2020. Sandmann filed this Complaint on March 2, 2020.

Sandmann cannot escape this reality by relying on KRS § 413.170(1). That statute provides that where "a person entitled to bring" a defamation action is an infant "at the time the cause of action accrued," the claim "may be brought within the same number of years after the removal of the disability or death of the person," *see* KRS § 413.170(1). But the Kentucky Court of Appeals has held that this tolling provision does not apply to plaintiffs like Sandmann who are under no disability.  *See Tallman v. City of Elizabethtown*, No. 2006-CA-00712, 2007 Ky. App. Unpub. Lexis 835 (Ky. Ct. App. Nov. 2, 2007) (unpublished). In his complaint in this case, Sandmann notes that he has already sued "The Washington Post, Cable News Network and NBCUniversal" for their coverage of this incident.  (Doc. 1 (Compl.) Page ID#: 8.)

In *Tallman*, plaintiffs, a decedent's estate and minor children, filed federal and state law claims arising from a fatal police shooting against various government defendants. *Id.*, at *2. The district court dismissed with prejudice the federal claims and dismissed without prejudice the state law claims. *Id.* The Sixth Circuit affirmed. *Id.*, at *3. Later, and after the relevant limitations period had run, the estate filed a wrongful death action in state court, and the minors filed claims for loss of parental consortium. *Id.*

The trial court granted summary judgment in the defendants' favor. The court of appeals affirmed, concluding it need "only address the statute of limitations issue because it is dispositive to this appeal." *Id.* The court found the minors' claims time-barred:

> The Estate alternatively argues that the minor children's claims for loss of parental consortium were not barred by the statute of limitations. The Estate contends that KRS 413.170(1) tolls the limitations period of a minor's state law claim until the minor reaches majority. Here, however, the children's claims were prosecuted on their behalf by their mother, as guardian and next friend. In light of the procedural history of this case, we are not persuaded that KRS 413.170(1) tolled the children's claims, and the Estate offers no other authority to support its position. Consequently, we find this argument to be without merit."

*Id.* at *8-9. The Kentucky Supreme Court denied discretionary review. *See Tallman v. City of Elizabethtown*, No. 2007-SC-000907-D, 2008 Ky. LEXIS 620, at *1 (Sep. 10, 2008).

KRS 446.080(1) requires that "[a]ll statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature." KRS 413.170 protects parties with incapacities who cannot sue, so they can sue when the incapacity is removed. But the statute's protections cease when the disability ceases. *See Lowther v. Moss*, 39 S.W.2d 501, 503 (Ky. 1931) (where "the reason for complying with [Code] provisions . . . does not exist, because the purpose of the Legislature in enacting the Code rule . . . was complied with," rule's "requirements would also necessarily cease"); *cf. Asher v. Hartlage*, 336 S.W.2d 335 (Ky. 1960) (where grantor was found "mentally competent" the "reason for the rule" that a grantor's "mental weakness" shifts the burden to the grantee "ceases to exist and it has no application").

The same policy considerations apply here. Sandmann has been aggressively litigating (and waging a public relations offensive on social media) since February 2019. He has demonstrated no disability. But despite demonstrating the will and ability to bring his claims within the statute of limitations, Sandmann (along with his parents and legal counsel) made a strategic decision not to file suit against the NY Times until more than one year after the Article

was published. The court in *Tallman* made it clear that minors could not aggressively litigate their case in federal court, but then rely on the tolling statute to bring an otherwise expired claim after an adverse result**.**

In this case, the court should hold that Sandmann cannot aggressively litigate his claim on the one hand, but keep any number of other defendants in reserve to be named whenever whim or strategy dictates. The tolling statute is intended to protect minors who cannot litigate, not minors and their lawyer who pursue oppressive litigation strategies. Sandmann clearly suffers no incapacity here, and his claims are time barred.

This court should decline to follow those federal courts that have impermissibly failed to apply *Tallman* to cases such as this one.[2] The Sixth Circuit rule is clear: "'a federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court.'" *Mroz v. Lee*, 5 F.3d 1016, 1019 (6th Cir. 1993) (citation omitted); *Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 932 (6th Cir. 2020) (restating rule). This is true "even though [the federal court] thinks the rule is unsound in principle or that another is preferable," *Mroz*, 5 F.3d at 1019, because "[a]fter a state supreme court's decisions, 'intermediate state appellate court decisions constitute the next best indicia of what state law is,'" *United States v. Burris*, 912 F.3d 386, 398 (6th Cir. 2019) (citation omitted). A federal court may only depart from an intermediate appellate court's ruling where "it is convinced"—not by its own reasoning—but by "*persuasive data* that the highest court of the state would decide otherwise."[3] *Mroz*, 5 F.3d at 1019 (emphasis added). Because none of the courts that rejected *Tallman* applied these principles, they erred in

---

[2] *See Newton v. Dennison*, No. 4:14-CV-15-JHM, 2014 U.S. Dist. LEXIS 104594, *6 (W.D. Ky. July 30, 2014); *Bradford v. Bracken Cty.*, 767 F. Supp. 2d 740, 752 (E.D. Ky. 2011); *T.S. v. Doe*, No. 5:10-CV-217-KSF, 2010 U.S. Dist. LEXIS 107088, *12 (E.D. Ky. Oct. 6, 2010); *see also Martin v. Celadon Trucking Servs., Inc.*, No. 5:05-CV-00101-R, 2006 U.S. Dist. LEXIS 4923, *2 (W.D. Ky. Jan. 17, 2006).

[3] This is true even whether or not a decision is published. *Aarti Hosp., LLC v. Grove City*, 350 F. App'x 1, 8 (6th Cir. 2009).

rejecting it. *Bradford*, 767 F. Supp. 2d at 753; *Newton*, 2014 U.S. Dist. LEXIS 104594, at *7; *T.S.*, 2010 U.S. Dist. LEXIS 107088, at *11-12.

Because no data demonstrates that the Kentucky Supreme Court would disagree with *Tallman*, *Tallman* controls. *See Davis v. Marriott Int'l, Inc.*, No. 04-4156, 2005 U.S. App. LEXIS 21789, at *7 (6th Cir. Oct. 4, 2005) (finding court "obliged" to follow the "[o]ne Ohio intermediate appellate court has addressed this precise issue"); *Matulin v. Lodi*, 862 F.2d 609, 616 (6th Cir. 1988) (same); *see also West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) (reversing Sixth Circuit's rejection of a single state intermediate appellate court ruling that it thought "unsound").

It is important to note that the Kentucky Supreme Court did not disagree with *Tallman*; it denied discretionary review of the case altogether. *See Lukas v. McPeak*, 730 F.3d 635, 638 (6th Cir. 2013) (holding intermediate appellate court precedent "particularly persuasive" where state supreme court "refused to review the decision."). As this Court observed last year, the "binding effect of [a] state appellate decision on federal court making an *Erie* 'guess' is greater where state's highest court has refused to review that decision." *Deane v. Quest Diagnostics Inc.*, No. 1:18-cv-880, 2019 U.S. Dist. LEXIS 103908, at *3 (S.D. Ohio June 21, 2019) (Bertelsman, J.) (citation omitted).

No countervailing Kentucky Supreme Court precedent requires this Court to reject *Tallman*. The 1939 Kentucky Supreme Court case, *Newby's Administrator v. Warren's Administrator* ("*Newby's*"), 126 S.W.2d 436 (1939), in no way compels rejection of *Tallman*. *See T.S.*, 2010 U.S. Dist. LEXIS 107088, at *11-12 (citing 227 K.Y. 338 (1939)). The *Newby's* court considered the question whether the "*right to proceed* by a next friend" removed the protections of the tolling statute for a person of unsound mind. *Newby's*, 126 S.W.2d at 438 (emphasis added).

The Court found that it did not.  But unlike the *Newby's* court, the *Tallman* court did not deal with whether a minor's *right to proceed* by a next friend interrupted the tolling statute. The *Tallman* court considered whether a minor who had *actually proceeded* by a next friend could still claim the protections of the statute. *Tallman*, 2007 Ky. App. Unpub. Lexis 835, at *8-9.[4]  The *Tallman* court answered that question "*No*."

There is no persuasive case law suggesting that the Kentucky Supreme Court would disagree with the *Tallman* ruling. Accordingly, *Tallman* dictates the resolution of this question of state law and this Court should dismiss Sandmann's Complaint.

## IV.    CONCLUSION

For the reasons set forth, the NY Times respectfully requests that the Court GRANT its Motion, and dismiss Sandmann's Complaint with prejudice.

---

[4] At any rate, *Newby's* was construed under a prior statutory scheme that required strict construction of statutes of limitation, unlike today's rule under KRS § 446.080(1).  *Plaza Bottle Shop, Inc. v. Al Torstrick Ins. Agency, Inc.*, 712 S.W.2d 349, 351 (Ky. Ct. App. 1986).

Respectfully submitted,

s/ John C. Greiner
John C. Greiner (*Pro Hac Vice*)
GRAYDON HEAD & RITCHEY LLP
312 Walnut St.
Suite 1800
Cincinnati, OH 45202
Phone: (513) 629-2734
Fax: (513) 333-4316
jgreiner@graydon.com

&

J. Stephen Smith (KBA #86612)
Darren W. Ford (KBA #95373)
GRAYDON HEAD & RITCHEY LLP
2400 Chamber Center Drive
Suite 300
Ft. Mitchell, KY 41017
Phone: (859) 578-3070
Fax: (859) 578-3071
ssmith@graydon.com
dford@graydon.com

ATTORNEYS FOR DEFENDANT

10226928.5

24