**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

| | | |
|---|---|---|
| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | : | CASE NO. 2:20-cv-00023-WOB-CJS |
| | : | |
| | : | JUDGE WILLIAM O. BERTELSMAN |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE NEW YORK TIMES COMPANY d/b/a THE NEW YORK TIMES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION TO DISMISS**

## INTRODUCTION

This lawsuit arises from events that occurred on January 18, 2019 at the Lincoln Memorial and the media's subsequent world-wide campaign to assassinate the character of Nicholas Sandmann ("Nicholas").  At the time, Nicholas was a 16-year-old Catholic high school student who was falsely accused of "blocking" the advance and preventing the "retreat" of a prayerful Native American elder and Vietnam veteran named Nathan Phillips ("Phillips") from a racially-threatening encounter on the steps of the Lincoln Memorial as the March for Life and Indigenous Peoples' March were concluding (the "January 18 Incident").  The New York Times (the "Times") negligently republished Phillips' false "blocked/retreat" narrative in its January 19 Article.[1]

In 2019, Nicholas filed three lawsuits in this Court arising from the January 18 Incident related to statements that Nicholas "blocked" Phillips' "retreat" (the "2019 Sandmann Cases").[2] In March of 2020, Nicholas filed five more lawsuits in this Court arising out of the January 18 Incident related to identical statements or substantially similar statements (the "2020 Sandmann Cases").  One of the 2020 Sandmann Cases is the instant action against the Times.  Now, the Times has filed a Motion to Dismiss the Complaint for failure to state a claim [Doc. 18] ("Motion" or "D. Brief").[3] Nicholas submits this memorandum in opposition (his "Response") to argue that the Times' Motion should be denied.

Because this Court is familiar with the facts of the January 18 Incident, this Response will not repeat them.  However, this Response will briefly summarize the Times' January 19 Article and this Court's previous rulings on identical issues already resolved in the 2019 Sandmann Cases.

---

[1] Complaint ("Compl.") ¶¶ 199–211.

[2] Sandmann v. WP Company, LLC d/b/a The Washington Post, No. 2:19-CV-00019 (the "Washington Post Litigation"); Sandmann v. Cable News Network, Inc., No. 2:19-CV-00031 (the "CNN Litigation"); Sandmann v. NBCUniversal Media, LLC, No. 2:19-CV-00056 (the "NBC Litigation").

[3] Sandmann v. The New York Times Company d/b/a The New York Times, No. 2:20-CV-00023 (the "Times Litigation"), Doc. 18, Page ID#: 134–161.

## THE JANUARY 19 ARTICLE & THE BLOCKED/RETREAT NARRATIVE

This Court has previously held that statements conveying that Nicholas "blocked" Phillips and "would not allow him to retreat" (the "Blocked/Retreat Narrative") survive the motion to dismiss stage, are subject to discovery, and are defamatory per se as a matter of Kentucky law.[4] The Times negligently republished the Blocked/Retreat Narrative in its January 19 Article (referred to herein as the "Article" or "January 19 Article"). This is the same statement that this Court previously considered and ruled on:

> "It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial," Mr. Phillips told The Post.  "I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."[5]

This Blocked/Retreat Narrative is unequivocally false.  The January 19 Article's original headline read, "Boys in 'Make America Great Again' Hats Mob Native Elder at Indigenous Peoples March."[6]  Then, in a demonstrable admission of wrongdoing, the Times diluted the headline—but still sensationalized it—to read, "Viral Video Shows Boys in 'Make America Great Again' Hats Surrounding Native Elder."[7]  The substance of the January 19 Article remained unchanged.[8] The January 19 Article was the Times' rush to judge and attack Nicholas for conduct that he did not commit, all based on the unverified accusations of Nathan Phillips and on the selectively-edited Viral Video designed to stir political reaction.  The Times did not conduct the "reasonable investigation" required by Kentucky law. It ignored the longer Banyamyan Video, which was online and available concurrently or before the Viral Video.  The Banyamyan Video showed that

---

[4] *See* Washington Post Litigation, Doc. 64, Page ID#: 861; CNN Litigation, Doc. 43, Page ID#: 597; NBC Litigation, Doc. 43, Page ID#: 754–55 ("[T]he Court finds that the statements that plaintiff 'blocked' Phillips or did not allow him to retreat, if false, meet the test of being libelous *per se* [under the quoted definition].").

[5] Compl. ¶ 206.

[6] *Id.* at ¶ 200.

[7] *Id.* at ¶¶ 201–03.

[8] The Times did not add editorial notes correcting the Article's misinformation until three days later (on Jan. 22, 2019).

the Blocked/Retreat Narrative was unequivocally false. In addition, even a cursory internet search would have made evident Phillips' utter unreliability and his history of fabrication.

### THIS COURT'S PREVIOUS ORDERS

This Court has already given "careful review" of the amended complaints filed in the 2019 Sandmann Cases, which contain identical allegations to those at issue here.  This Court has already held that "'justice requires' that discovery be had regarding [Phillips' Blocked/Retreat Narrative] and [its] context."[9]  This Court has already held that allegations made in the amended complaints "pass the requirement of 'plausibility.'"[10]  This Court has already held that "all parties [should] be given sufficient leeway to explore the issues presented" in these cases because, ultimately, "if some of the statements made by Mr. Phillips are false, they are also potentially libelous."[11]  This Court has already held that Phillips' Blocked/Retreat Narrative is capable of a defamatory meaning and is defamatory per se as a matter of Kentucky law.[12]

### ARGUMENT

I.   **The Times' Publications are Capable of Defamatory Meaning as a Matter of Law.**

The Times argues that its January 19 Article was not capable of a defamatory meaning as a matter of law.[13]  It relies heavily on the Sixth Circuit's opinion in *Croce v. New York Times*, 930 F.3d 787 (6th Cir. 2019) to argue that the presence of other statements in the Article, coupled with the alleged neutrality of the Times itself in declining to "adopt" or "endorse" one of the statements, means that the Times' quotation of Phillips' statement cannot be defamatory.  This argument is misplaced.  As the Sixth Circuit made clear repeatedly, *Croce* is an Ohio case, applying Ohio law. *Croce* actually applied the "neutral reportage" defense under the guise of lack of "defamatory meaning"; Ohio has adopted the "innocent construction" doctrine.  But the instant case is a

---

[9] Washington Post Litigation, Doc. 64, Page ID#: 861.
[10] *Id.* (internal citations omitted).
[11] CNN Litigation, Doc. 43, Page ID#: 596.
[12] *See* NBC Litigation, Doc. 43, Page ID#: 754–55.
[13] Times Litigation, Doc. 18, Page ID#: 144.

Kentucky case, founded on diversity of jurisdiction.  Nicholas is a citizen of Kentucky, and Kentucky law governs this litigation.[14]  Like nearly every state in the U.S., Kentucky has declined to adopt the "innocent construction" doctrine.  Like most states, it has emphatically rejected the "neutral reportage" defense.  In Kentucky, publishers are liable for re-publishing defamatory statements of others.  In Kentucky, negligent re-publication creates defamation liability.  In Kentucky, publishers are required to conduct a "reasonable investigation" of defamatory statements prior to publication.  The Times has made no argument that this case should be resolved under the law of Ohio.  Instead, the defendant has cited Ohio law, without justifying its application, apparently in the hope that a court sitting in Kentucky will unthinkingly adopt it.

As the following discussion will establish, Kentucky law obligates a publisher to conduct a reasonable investigation before publishing defamatory statements.  In Kentucky, the publisher cannot hide behind the rejected defense of "neutral reportage" or the "innocent construct rule," both of which were applied in *Croce v. New York Times* (applying Ohio law).  Next, as this Court has determined in the 2019 Sandmann Cases, Phillips' statements—the same statements at issue on this Motion—constitute "defamation per se."  Any discussion of "the entirety of the publications" or some "innocent account" of the matter are irrelevant in a defamation per se case.  Finally, even on the terms applied in *Croce*, the Times loses. The Times' claim that it published a full, fair reporting of the January 18 Incident is simply inaccurate.  In reality, the January 19 Article conveys that the Times agreed with Phillips, and that Nicholas was actually guilty of blocking Phillips and not allowing Phillips to retreat.  And contrary to the Times' assertions, the January 19 Article does not publish any opposing perspective of Phillips' claim: at no point in the January 19 Article—even after the Times made several amendments to it—did it provide the "whole story" capable of immunizing the specific defamatory per se accusations made by Phillips.

---

[14] *See, e.g.,* Bank of New York v. Janowick, 470 F.3d 264, 271 (6th Cir. 2006) (noting that a federal court sitting in diversity has a duty to apply the law of the forum state as announced by its highest court) (internal citations omitted).

## A. Kentucky law obligates publishers to conduct a reasonable investigation before publishing defamatory statements.

At the heart of the matter, the Times simply disagrees with Kentucky's rejection of the "neutral reportage" defense.[15]  This defense allows for the publication of defamatory statements made by one public figure against another public figure, as long as the publication of the defamatory statement was presented accurately and disinterestedly.[16]  Even if this exception were available in Kentucky, it would not apply here, as Nicholas is not a public figure. Regardless, the Times' Brief alludes to its factors repeatedly, asserting that the news article did not "endorse" Phllips' account nor "adopt" it.  It claims the rush of time on this "breaking news story" precluded reasonable investigation.  Even if true, neither argument matters in Kentucky.  A publisher, whether in a rush or not, has a duty to act with due care, in this setting to conduct a "reasonable investigation" prior to publication.  As a matter of policy, the exercise of due care should be especially important in the context of publishing defamatory statements about a minor, private citizen. A "rush to publish" condemns, not exonerates.  In Kentucky, simply reporting defamatory statements "without adopting" or without "endorsing" them similarly does not excuse the publisher from liability.  That is the "neutral reportage" defense.  Kentucky, like most states, has rejected this defense, instead adhering to the traditional rule that the publisher of defamatory statements is as liable as the person who uttered those statements, whether the publisher adopted them or not.[17]

*Croce* is not Kentucky law.  Kentucky law adheres to the traditional rule of negligence in defamation cases. Media outlets in Kentucky cannot with impunity publish or re-publish defamatory statements.  Were the neutral reportage defense adopted, media outlets could publish baseless defamatory statements with impunity, converting responsible journalism to tabloid clickbait containing scurrilous accusations and unfounded claims.  In Kentucky, unlike Ohio, re-publishing a defamatory statement is defamation, even if the article as a whole is "neutral" in some

---

[15] McCall v. Courier-Journal and Louisville Times Co., 623 S.W.2d 882, 886 (Ky. 1981) (rejecting neutral reportage doctrine).

[16] *See, e.g.,* Barry v. Time, Inc., 584 F. Supp. 1110, 1126–27 (N.D. Cal. 1984).

[17] *McCall*, 623 S.W.2d at 886.

sense.[18]   Quoting the statements of other participants or bystanders, or "following up" with more balanced reportage does nothing to alter the unequivocal application of Kentucky law.   The document is to be judged from within its four corners, stripped of all innuendo or other added meanings from subsequent qualifications or publications.[19]   The *Croce* holding, if adopted in Kentucky, would effectively ring the death knell of the defamation tort, in essence conferring on media publishers a privilege to publish false and defamatory accusations about private figures (such as Nicholas) so long as the publisher states an opposing viewpoint or simply couches the accusation with token qualifying language such as "alleged."[20]

Kentucky's rejection of the "neutral reportage" doctrine does not mean, as the defendants complain, that they may not publish controversial statements made by public figures without incurring liability for defamation.   They may publish those statements, and may do so without the need for quoting others, or with other elaboration.   What they may not do, however, is publish such statements negligently, that is, without first undertaking a "reasonable investigation" to determine the veracity of the statements.[21]   The defendant's argument is with Kentucky law, not

---

[18] During oral argument in the Washington Post Litigation, this Court acknowledged that notion:

> JUDGE BERTELSMAN: "The way this goes, as I understand it, [Phillips] made the [Blocked/Retreat Statement], he repeated it to your reporter, to the Post reporter rather, and they published it.  And since we don't have in Kentucky the Neutral Reportage Act, they are responsible as if they had said it."
>
> TODD [MCMURTRY]: "Right …."

Washington Post Litigation, Doc. 46, Page ID#: 421.

[19] "In determining whether a writing is libelous per se [under Kentucky law], courts must stay within the four corners of the written communication." *Roche v. Home Depot U.S.A.*, 197 F. App'x 395, 398 (6th Cir. 2006) (citations and internal quotation marks omitted). "The words must be given their ordinary, natural meaning as defined by the average lay person. The face of the writing must be stripped of all innuendoes and explanations." *Id.*; *Dermody v. Presbyterian Church*, 530 S.W.3d 467, 475 (Ky. Ct. App. 2017).

[20] Because *Croce* does not reflect Kentucky law, it is not necessary for this Court to revisit it. Nonetheless, *Croce* is an ill-advised decision.  It ignores the principal question as articulated by the U.S. Supreme Court that must be asked in a defamation case, specifically: was the publisher negligent?  Did the publisher publish with actual malice?  *Croce* would in effect terminate this essential inquiry into the publisher's negligence with regard to defamatory statements, instead allowing publishers to publish defamation with impunity, as long as the publisher did not adopt the statement.

[21] *McCall*, 623 S.W.2d at 886.

this Court.[22]   Under Kentucky law, it does not matter whether the statement was made quoting another person, another media outlet, or was later qualified, short of a retraction.  It does not matter if the article, taken as a whole, appears "neutral."  Like most states, Kentucky has expressly and flatly rejected the doctrine of "neutral reportage."[23]   A newspaper is liable for quoting "newsworthy statements" of third parties.[24]   Media publishers cannot simply repeat defamatory accusations made by third persons and then claim they remained "neutral," and did not "adopt or endorse" the accusation.  Kentucky law requires reporters and publishers to perform a reasonable investigation of the truthfulness of defamatory accusations before publishing them.

The crux of Nicholas' Complaint is that the Times published or re-published Phillips' defamatory statements of fact—the Blocked/Retreat Narrative—without first conducting a reasonable investigation.  That reasonable investigation would have included viewing the longer-length video account of the event (the Banyamyan Video), which was widely available online.  The longer video clearly and unequivocally belies Phillips' mendacious claim.  A reasonable investigation of popular internet search engines would also, again easily given his public record, have produced an account of Phillips' untrustworthy character and known proclivity to fabricate events to suit his political wishes.  Kentucky law requires this reasonable investigation.  Had the Times conducted it, Nicholas would not have been made the object of obloquy and contempt.  Merely surrounding Phillips' quote with different accounts of the event or other qualifications is irrelevant.  It does not constitute the reasonable diligence required by Kentucky law, a requirement that must be met before a defamatory statement is published.

### B.  The Blocked/Retreat Narrative Constitutes Defamation Per Se.

In the NBC Litigation, this Court held that "the statements that plaintiff 'blocked' Phillips

---

[22] *Cf.* 1 RODNEY A. SMOLLA, LAW OF DEFAMATION § 4:97 (2d ed.) ("Those who advocate for the sweeping neutral reportage privilege are effectively asserting the need for a 'super-sized' defamation privilege that radically upends the carefully calibrated balance of competing interests reflected in modern defamation law.").

[23] *McCall*, 623 S.W.2d at 886.

[24] *Id.* at 886–87.

or did not allow him to retreat, if false, meet the test of being libelous *per se* …."[25]  The Times published the same statement verbatim.[26]  Now, the Times suggests that the Blocked/Retreat Narrative, independent of the January 19 Article, is not capable of a defamatory meaning as a matter of law.[27] This Court should adhere to its previous ruling on this issue and find that the Blocked/Retreat Narrative is defamatory per se.  The January 19 Article and the Blocked/Retreat Narrative are capable of a defamatory meaning as a matter of law.

Defamatory statements are divisible into two categories, defamation per se and defamation per quod. "Defamation per quod" means that the defamatory meaning is not apparent on the face of the document, but rather resort to some fact external or extrinsic to the document itself is required to understand or explain the defamatory meaning.  In contrast, "defamation per se" refers to a statement that is defamatory in and of itself, where the defamatory fact is apparent without reference to extrinsic information. Clearly, as the Court ruled in the 2019 Sandmann Cases, Phillips' statement constitutes defamation per se.[28]  No reader of the Article would need to consult any extrinsic factors to understand the obvious substance of Phillips' accusation: he claims Nicholas blocked him and precluded his freedom of movement during what Phillips alleged to be a prayerful, ceremonial procession on the steps of the Lincoln Memorial.  This is defamation per se: no extrinsic information is needed to find that this statement is capable of a defamatory meaning.  No matter what the context or situation, to block another person's lawful progress and to prevent his retreat is an act of aggression and an act of belligerence.  The defamatory nature of Phillips' claim is apparent, without more.

To accuse someone of "blocking" another and not "allow[ing]" a person to "retreat" is to accuse him of assaultive behavior that could, with an exercise of prosecutorial discretion, be

---

[25] NBC Litigation Doc. 43, Page ID#: 755 (emphasis in original).
[26] Compl. ¶ 206.
[27] Times Litigation, Doc. 18, Page ID#: 148–151.
[28] NBC Litigation Doc. 43, Page ID#: 755.

charged criminally, even as a hate crime in this instance.[29]  Yet the Times, without trying to make the implausible argument that Phillips' statement is merely defamation per quod, nonetheless treats it as such, arguing that we must resort to other facts or statements, even facts and statements made in other subsequent articles, to determine its defamatory character.

In a nutshell, the Times is again resorting to Ohio law, raising the "innocent construction" defense, without identifying it as such.  It is not defense recognized in Kentucky.  Two state courts, neither one Kentucky, have created this judicial exception to defamation per se.  Contrary to the common law followed in Kentucky, these courts have held that, if a defamatory per se statement may reasonably be given an "innocent" construction (in addition to the defamatory one), the Court must assume that, as a matter of law, the reader would interpret the statement to be innocent and not capable of a defamatory meaning.[30]  As a matter of logic, this defense makes no sense: defamation "per se" by definition means a statement is defamatory in all contexts.  Unsurprisingly, this defense has been rejected by a majority of jurisdictions, is only recognized in Ohio and Illinois, and has been subjected to intense scholarly criticism.[31]  Indeed, in *Tuite v. Corbitt*, Justice Freemen of the Illinois Supreme Court argued that Illinois courts should repeal their innocent construction defense because it is misaligned with United States Supreme Court precedent and is "inherently flawed."[32]  "The fact that the rule has been rejected by an overwhelming majority of jurisdictions reinforces [my] belief."[33]  In any event, this exception is not the law in Kentucky.  Defendant's lengthy argument that Phillips' defamatory per se statement and the January 19 Article should be

---

[29] It is enough if the conduct could have constituted a crime.  *Yancey v. Hamilton*, 786 S.W.2d 854, 858 (Ky. 1989) (calling plaintiff, a preacher, a "con artist" "could be found to imply that the speaker had particular and articulable reasons for believing movant practiced the art of obtaining money or property from another by fraud . . ..  It is possible that a jury could find the statements impute criminal conduct on the movant's part.").

[30] 1 RODNEY A. SMOLLA, LAW OF DEFAMATION § 4:22 (2d ed.).

[31] *See id.* ("The [innocent construction] rule, which is often internally contradictory, confusing, and on the whole significantly biased in favor of defendants, has produced some bizarre results, and has come in for substantial criticism.").

[32] Tuite v. Corbitt, 866 N.E.2d 114, 130 (Ill. 2006) (Freeman, J., concurring in part and dissenting in part).

[33] *Id.* at 129.

given an innocent construction is, as a matter of law and logic, utterly irrelevant in the context of defamation per se.

If this Court, on the contrary, reverses its prior decision that Phillips' statements constitute "defamation per se," then the question of "defamatory meaning" goes to the jury. "Although it is usually the court's function to determine whether a crime imputed by published statements is actionable as libel per se, where the words at issue are capable of more than one meaning, . . . the jury should decide which of the meanings a recipient of the message would attribute to it."[34]  In *Yancey*, the question was whether the statement "con artist" indicated criminality, which would constitute defamation per se, or instead was just a colloquial way to convey the idea of a slick or persuasive talker.  The court determined there was ambiguity, and the matter went to the jury. Here, there is no ambiguity.  No benign interpretation of the blocking and trapping maneuvers of which Phillips accused Nicholas is possible.  It is defamation per se.

### C. The Times' January 19 Article and the Blocked/Retreat Narrative Are Capable of Subjecting Nicholas to Hatred, Ridicule, and Contempt and Are Capable of Causing Nicholas to be Shunned and Avoided.

As this Court previously held, a communication is capable of a defamatory meaning "if it tends to (1) bring a person into public hatred, contempt or ridicule; [or] (2) cause[s] him to be shunned or avoided …."[35]  This test is "well established."[36] There is no doubt that Phillips' accusation against Nicholas meets this test, as it appears was exactly Phillips' intent.  Because of the Times' January 19 Article, Nicholas was actually and demonstrably subjected to widespread and verifiable hatred, ridicule and contempt in the form of death threats, harassment, and harsh, combative criticism by countless individuals and organizations on a national and international scale. To ignore these irrefutable facts would be contrary to justice and common sense. To somehow argue, as does the Times, that its publication of Phillips' statements did not subject

---

[34] Yancey v. Hamilton, 786. S.W. 2d 854, 858 (Ky. 1989).
[35] NBC Litigation Doc. 43, Page ID#: 754.
[36] *Id.*

Nicholas to public contempt or ridicule belies plausibility.

Yet even on the terms applied in *Croce*, the Times loses. The Times' claim that it published a full, fair reporting of the January 18 Incident is simply inaccurate.  In reality, the January 19 Article conveys that the Times agreed with Phillips, and that Nicholas was actually guilty of blocking Phillips and not allowing Phillips to retreat.  The headline starts the narrative: "Boys in 'Make America Great Again' Hats Mob Native Elder at Indigenous Peoples March."  People who "mob" a single person are impliedly hindering their advance or retreat.  The amended headline underscores the same point: "Viral Video Shows Boys in 'Make America Great Again' Hats Surrounding Native Elder."  Phillips claims that Sandmann blocked him and prevented his retreat. The Times' headlines endorse that statement of fact; they are hardly "neutral."

Note the beginning of the Article. The Covington students, which included Nicholas, are portrayed as "jeering" and "surrounding" Phillips, obviously suggesting that the Times did in fact "adopt" Phillips' claims.

> They intersected on Friday in an unsettling encounter outside the Lincoln Memorial—a throng of cheering and jeering high school boys, predominantly white and wearing "Make America Great Again" gear, surrounding a Native American elder.

The Times' Article does indeed, as argued, quote other persons in the Article.  But all of the persons quoted either underscore Phillips' accusation or impliedly adopt it as the truth. To wit:

> The episode was being investigated and the students could face punishment, up to and including expulsion, their school said in a statement on Saturday afternoon….[37]
>
> [Democratic Congresswoman Deb Haaland said] "The students' display of blatant hate, disrespect, and intolerance is a signal of how common decency has decayed under this administration. Heartbreaking."  […]
>
> Sisters of Mercy … condemned the behavior in the videos as disturbing and bigoted. […]

---

[37] Compl. Ex. G, H (emphasis added).

> Alison Lundergan Grimes … said in statements on social media that she was alarmed to see the students from her state taunting and harassing Mr. Phillips … "In spite of these horrific scenes, I refuse to shame and solely blame these children for this type of behavior…." She called on Covington Catholic to denounce the behavior.[38]

Further fueling the fire, the Article termed the January 18 Incident "the latest touchpoint for racial tensions in America," implied that Nicholas and the students were inspired by President Trump to "goad minorities," and further embedded a parenthetical into the Article comparing it to other historical episodes of Native American strife:

> Read more about the Wounded Knee massacre, the Battle of Little Bighorn and why the president invoked them to attack Senator Elizabeth Warren, a 2020 presidential candidate.  And a new book by David Treuer, "The Heartbeat of Wounded Knee," shows the history of American Indians as more than victimhood.

Contrary to the Times' assertions, the January 19 Article did not include any statement opposing Phillips' claim: at no point did the January 19 Article—even after the Times made several amendments to it—provide the "whole story" capable of negating the specific defamatory per se accusations made by Phillips against Nicholas. The Times cannot now whitewash its reporting after-the-fact.[39]  The truth is that, when read as a whole in the view of the "reasonable lay reader," the January 19 Article conveys that the Times' did indeed adopt the statement that Nicholas was guilty of the conduct of which Phillips accuses him.

## II.    The Blocked/Retreat Narrative is a Statement of Fact, Not Opinion.

In the 2019 Sandmann Cases, which arose out of the very same event, involve the same people, same statements, and nearly identical reporting, this Court has already ruled that a news report that published the statement that Nicholas "blocked" Mr. Phillips and "would not allow his retreat" constitutes a "statement of fact," and is not mere opinion.[40]  As a statement of fact, it is

---

[38] *Id.*
[39] *See* Times Litigation, Doc. 18, Page ID#: 147.
[40] *See* Washington Post Litigation, Doc. 64, Page ID#: 861; NBC Litigation, Doc. 43, Page ID#: 755.

actionable defamation, and not constitutionally protected.  Nonetheless, the Times wishes to re-litigate this issue, even though it published the same statement verbatim.  The Times claims that the Blocked/Retreat Narrative constitutes "mere opinion."[41]

Under Kentucky law, each defendant of course is free to raise and argue this same issue, as have the previous defendants.[42]  The Times and the other defendants complain of the multiplicity of legal actions, but most assuredly would have spent years litigating joinder, were one sought by Nicholas.  It is not Nicholas' fault that he was defamed so widely and by so many media outlets. Indeed, the prospect of suing all these defendants in a single action or series of single actions is daunting and overwhelming; these defendants, even standing individually, are among the most powerful, wealthy, and well-represented media corporations in the world. Although Nicholas will not argue that the "offensive" application of issue preclusion bars the defendant from re-litigating the same legal issues, common sense and prudence suggest that this Court need not tarry long on a matter it has already determined.  This Court has already held that Phillips' statements that Nicholas blocked Phillips and prevented his retreat constitute a statement of fact sufficient to survive a motion to dismiss.  If a judicial precedent is to have any value in precluding re-litigation of decided matters, it should matter here.

**A.  The Court's Prior Ruling Remains Correct: "Block" is a Statement of Fact.**

After much deliberation, this Court previously ruled that the statements made about Nicholas' alleged blocking of Phillips constitute "statements of fact" sufficient to move the

---

[41] Times Litigation, Doc. 18, Page ID#: 151.

[42] In *Semtek International, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 499 (2001), the court held that federal common law requires federal courts to adopt the state rule of res judicata to determine the preclusive effect of an earlier judgment of a federal court that exercised diversity jurisdiction. The Supreme Court explained that "[t]his is . . . a classic case for adopting, as the federally prescribed rule of decision," state law, because "state, rather than federal, substantive law is at issue . . . [a]nd indeed, nationwide uniformity in the substance of the matter is better served by having the same claim-preclusive rule (the state rule) apply whether the dismissal has been ordered by a state or a federal court." *Id.* Similar to this approach with respect to the doctrine of res judicata, after *Semtek* state law also supplies the rule of decision with respect to collateral estoppel, also known as issue preclusion. *CSX Transportation, Inc. v. General Mills, Inc.*, 846 F.3d 1333 (11th Cir. 2017).

litigation forward. That determination remains correct, and is dispositive of this issue.

The distinction between fact and opinion in the context of defamation law is a subtle one, and requires nuanced judicial reasoning. On one extreme, one could argue that all statements about the factual world are, in some abstract sense, "mere opinion."  As the philosopher George Berkeley once wrote, "[i]t is indeed an opinion strangely prevailing amongst men, that houses, mountains, rivers, and in a word all sensible objects have an existence natural or real, distinct from their being perceived by the understanding."[43] Were the good bishop alive today, he could have testified for the Times.  Courts of law, however, are not afforded the epistemological conceit of thinking it a "strange opinion" that the material world of houses and mountains has a "natural or real existence."  Courts are required to resolve close questions in real time, to separate statements that are opinions in the everyday world from those that are factual, to apply the perspective of the "average reader" to distinguish fact and opinion, to separate what is capable of being "true or false" from what is just another perspective in an ongoing debate.[44]

To state that one person "blocked" another is a statement of fact.  It is a statement about the physical world, taken directly from our sensory perception of it.  The "block" happened or it didn't.  It is true or it is false.  It is a matter that is readily observable by a bystander; it involves the oppositional position of two human bodies; it requires a certain pose of belligerence on the part of one toward another.  If asked, we would describe such an activity without the need for elaboration: "Then Adam blocked Ben from leaving," one might say.  No listener, hearing this description, would be left with a need for additional explanation to understand the speaker.  We could all immediately picture the scene, with Adam standing in Ben's way as Ben tried to leave.  It is a factual description of reality and commonly understood as such.

---

[43] GEORGE BERKELEY, A TREATISE CONCERNING THE PRINCIPLES OF HUMAN KNOWLEDGE (1892).

[44] The alleged defamatory words must be measured by their natural and probable effect on the mind of the average lay reader and not be subjected to the critical analysis of the legal mind. *Digest Publishing Company v. Perry Publishing Co.*, 284 S.W.2d 832, 834 (Ky. Ct. App. 1955) (internal citations omitted).

14

The statement that one has "blocked" another is a direct observation taken from sensory data.  It is of no significance that the statement describes the conduct of another; in fact, that is typically the case.  The Restatement (Second) of Torts § 565 defines "statements of fact" for defamation law: "Statements of fact, the communication of which is defamatory, usually concern the conduct or character of another."[45]  It does not matter if one might have added, "I believe" or "I think" something happened.  As Judge Friendly cautioned, "it would be destructive of the law of libel if a writer could escape liability for accusation of [defamation] simply by using, explicitly or implicitly, the words 'I think.'"[46]

An analogy is useful on this point.  When a person says, "I smell smoke," the speaker of course could be truthful or untruthful, or mistaken or lying.  But the speaker cannot be accused of uttering an opinion, because no additional explanation or "what do you mean by that?" is expected or possible.  We first observe through our senses, then our senses identify the observation to our mind, and next we speak: "I smell smoke."  How else could we explain such a thing?  What does smoke smell like?  No one can say, except circularly, that smoke smells like smoke.  The same is true of "blocking."  We can add words to the explanation, thus using other words to define "blocking," but in the end all we can say is that "blocking" means that one person purposely stood in the way of another, or "blocked" her.  It is a circular explanation, and it's circular because it is a statement of fact.  We don't have words in common usage that explicate facts at a more basic level than the fact itself.  A fact drawn from direct sensory data is a human being's most basic unit of description.  It would be nonsensical to ask a speaker who said another blocked his path, "what do you mean by "blocked"?"  The answer could only repeat the word "block" or provide the dictionary definition of it, along the lines of "he moved into my way to prevent me from advancing," which is "blocked" in so many words.  Statements of fact are the way we describe matters that are rationally based on perception.  Statements of fact can be true or false, or the

---

[45] RESTATEMENT (SECOND) OF TORTS (hereinafter "RESTATEMENT") § 565 (1977).
[46] *See* Milkovich v. Lorain Journal Co., 497 U.S. 1, 19 (1990).

speaker could be lying or mistaken, but in no sense does a statement of fact become an opinion just because people disagree about what they did or saw or smelled. Contrary to the Times' position,[47] the necessary subjectivity of our sensory perceptions does not convert a sense impression into a matter of opinion.  If it did, then no statements of fact would exist.

Judicial opinions from other jurisdictions provide examples of "statements of fact" that involve far more subjective perceptions than "blocking."  The statement that plaintiff was a "liar" was a statement of fact.[48]  The statement "[e]mployee is extremely confrontational and exhibiting constant insubordinate behavior" comprised a statement of fact.[49]  A supervisory attorney's statement that an associate "did nothing" to solve a statute of limitations problem constituted a statement of fact.[50]  A statement to a newspaper that an employee was terminated for "poor performance" was a statement of fact.[51]  A statement that the plaintiff "told anti-Semitic jokes" was a statement of fact.[52]  Just a few days ago, on July 15, 2020, the Second Circuit Court of Appeals ruled, on facts similar to those at issue here, that "[a] reader could have understood [the defendant's Twitter post] as equating the plaintiff's conduct with archetypal racist conduct, which is a provable assertion of fact, and therefore actionable."[53]

As this Court has stated, even hearsay statements and rumors can be statements of fact.[54] Like any other fact, a hearsay statement either was made or was not made; a rumor existed or it

---

[47] Times Litigation, Doc. 18, Page ID#: 151.

[48] *Id.* at 18–20, 27.

[49] McCray v. Infused Solutions, LLC, No. 4:14-cv-158, 2017 WL 4111958, at *4 (E.D. Va. Sep. 15, 2017) ("These statements clearly … contain factual connotations that could be proved false.") (internal citations omitted).

[50] Mittelman v. Witous, 552 N.E.2d 973, 983, 985–86 (Ill. 1989)

[51] Samuels v. Tschechtelin, 763 A.2d 209, 242 (Md. Ct. Spec. App. 2000) (internal citations omitted).

[52] Tech Plus, Inc. v. Ansel, 793 N.E.2d 1256, 1266 (Mass. App. Ct. 2003).

[53] La Liberte v. Reid, No. 19-3574, 2020 WL 3980223, at *9 (2d Cir. July 15, 2020).  The *La Liberte* court also implicitly held that insinuations and accusations of racist conduct are defamatory per se. *Id.* at *10 (noting that readers could interpret the tweet at issue "to mean that [the plaintiff] engaged in racist conduct," and that the defendant "is liable for what is insinuated, as well as for what is stated explicitly" (citing *Bartholomew v. YouTube, LLC*, 17 Cal. App. 5th 1217, 1226, 225 Cal.Rptr.3d 917 (2017))).

[54] Lassiter v. Lassiter, 456 F. Supp. 2d 876, 879–80 (E.D. Ky. 2006), *aff'd*, 280 F. App'x 503 (6th Cir. 2008).

did not.  Both are capable of being proved true or false, or a lie or a mistake.  All of these statements cited above could be proved true or false; in each instance, the speaker could be a liar or mistaken in his perception of reality.  Nonetheless, all were statements of fact.

### B. Phillips' Statement Stands on Its Own, Without Regard to the Rest of the January 19 Article.

The Times also asserts that the remainder of its publication—namely the opening sentences of the Article and the paragraphs containing quotes from other sources—somehow converts Phillips' factual claims into a matter of Phillips' opinion.[55]  This argument misapprehends Kentucky law.  A statement of fact stands on its own and is actionable, no matter what else is said or who else is quoted.  The Times published Phillips' statement that Nicholas "blocked" Phillips and "wouldn't allow [him] to retreat."  Nothing else said in the January 19 Article is pertinent to determining whether or not Phillips' statement should be characterized as an opinion or a fact.  As this Court has already determined in the context of the other pending lawsuits, Phillips' statement is a matter of fact.  This case survives the motion to dismiss without more.

Reading the current federal constitutional standards and Kentucky defamation law together, for ease of reference it is useful to divide statements into three categories: (1) statements of pure opinion, (2) statements of mixed opinion that imply defamatory facts or knowledge of facts, and (3) statements of fact.[56]  Only statements of pure opinion constitute speech that, without more, merit absolute constitutional protection from defamation liability.[57]  Statements that constitute mixed opinions can also merit constitutional protection as a statement of opinion, but only if the publisher discloses facts sufficient to allow the reader to judge the merits of the opinion

---

[55] Times Litigation, Doc. 18, Page ID#: 151–154.

[56] *Milkovich*, 497 U.S. at 23–36 (Brennan, J., dissenting); *see also Yancey*, 786 S.W.2d at 857 ("The *Restatement* distinguishes between 'pure' opinion and 'mixed' expressions of opinion. Pure opinion, which is absolutely privileged, occurs where the commentator states the facts on which the opinion is based, or where both parties to the communication know or assume the exclusive facts on which the comment is clearly based. In contrast, the mixed type "is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication." (citing Restatement § 566, cmt. b (1977)).

[57] Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974).

for himself or herself.[58]  The last category, statements of fact, provide unprotected grounds for actionable defamation.

All the Times' arguments about the manner in which Phillips' narrative was presented pertain exclusively to mixed opinion situations.  The Times assumes that Phillips' statements constitute mixed opinion, thus raising the question of whether or not sufficient facts were disclosed in each article to enable the reader to form an independent opinion.  Based on this assumption, the Times argues that this Court must review the entirety of the article to determine whether or not sufficient facts were disclosed to allow the reader to assess Phillips' "opinion" of the matter.

The Times' reading of the law is in error.  This is not an opinion case. Nicholas has not alleged that Phillips' statement is an opinion.  Instead, as this Court has previously determined, the Blocked/Retreat Narrative is a statement of fact, falling into the third category. Statements of fact stand on their own; no amount of other perspectives or quotations or the like needs to be consulted.  A statement of fact is not subject to contextual interpretation that can somehow morph it into an opinion.  The defendant has taken the standard it argues applies to the question of the defamatory character of the statement, namely that the Court must consult the Article as a whole, and mistakenly assumed it also applies to the fact/opinion issue.  It does not.

On the issue of fact vs. opinion, reference to the entirety of the article or publication is relevant in only two limited instances.  First, the common instance, is where the defamatory statement constitutes an opinion but is not a "pure opinion."  In mixed opinion cases, the entirety of the document must be reviewed to determine if the opinion is actionable, specifically if the opinion implies defamatory facts and fails to provide a sufficient factual basis for the reader to

---

[58] *Yancey*, 786 S.W.2d at 857.

18

assess the opinion.[59]  This Court's opinion in *Lassiter* is instructive.[60]  There, a woman accused her husband of committing adultery.  This Court first determined that the accusation was a matter of opinion,[61] as it involved judgments about sexual behavior and unwitnessed events.  Nonetheless, this statement did not constitute "pure opinion" because to accuse someone of "adultery" is to imply certain facts (specifically, a sexual liaison) that itself could be defamatory.[62]  This Court therefore proceeded to consult the publication "as a whole," and determined that the book as a whole conveyed all the facts on which the speaker based her opinion.  Because the book disclosed all the facts underlying the opinion, the statement was not actionable defamation.  As this Court wrote in italics in *Lassiter* in order to emphasize the point:

> *Thus, what the trial court must decide in "opinion cases" is whether a reasonable person reading the statement in the context of the whole article would believe it is based upon alleged facts, which, if untrue, would be defamatory.*

(emphasis in original).  As this Court tried to make clear in *Lassiter*, this rule is for "opinion cases."  The Times has mistakenly assumed this rule also applies to "fact cases."

The second instance where the Court needs to resort to the publication "as a whole" to assist in the determination of the fact/opinion issue arises infrequently.  This need to resort to the overall meaning of the publication is necessary only where there is some confusion about the content or meaning of the statement itself.  A decision out of Ohio illustrates the point nicely.  In

---

[59] Loftus v. Nazari, 21 F. Supp. 3d 849, 853 (E.D. Ky. 2014) (citing *Yancey*, 786 S.W.2d at 857); *see also* RESTATEMENT § 566 (1977) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory fact as the basis for the opinion.").

[60] *Lassiter*, 456 F. Supp. 2d at 881–82  (holding that woman's statement that her ex-husband had committed adultery was protected opinion because the facts on which she based that statement were all disclosed in the publication in question).

[61] *Id.* at 881 ("In the light of the testimony at trial and a further review of the book, however, the court now holds that the allegations concerning adultery were statements of protected opinion under Kentucky law.").

[62] In *Lassiter*, this Court quoted Professor Leibson's learned treatise on this point: "Pure opinion ... occurs where the commentator states the facts on which the opinion is based, or where both parties to the communication know or assume the exclusive facts on which the comment is based."  *Lassiter*, 456 F. Supp. 2d at 881 (quoting 13 David J. Leibson, Kentucky Practice (Tort Law) §15:2 at 449 (1995)) (alteration in original).

*Scott v. News-Herald*, 496 N.E.2d 699 (Ohio 1986), the question was whether or not a reporter had made a factual allegation that the plaintiff was guilty of perjury, or instead had written an editorial article that provided his opinion to the same effect.   To resolve this issue, the court examined the publication as a whole, including its context:

> A review of the context of the statements in question demonstrates that [the reporter] Diadiun is not making an attempt to be impartial and no secret is made of his bias. The strongest statement made in the article, "Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, *knows in his heart* that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth" (emphasis added [in original]), further indicates that the question of whether or not a lie was actually made is ultimately a subjective determination.[63]

The *Scott* court had to review of the entire context of the article to determine whether the speaker, the reporter, was uttering a factual claim or merely expressing an opinion.   The court reasoned that, because the article appeared in the sports pages, a place of common jocularity, was headlined in an editorial style, and contained a great deal of qualifying language, the speaker was uttering an opinion.   In *Scott*, the speaker was the reporter, and resort to the entire context was necessary to determine what the reporter had said.

In this case, the speaker is Nathan Phillips. There is no reason to read any other materials or "context" because Phillips did not provide any.  He was the speaker; not a Times' journalist. No confusion about the nature or meaning of Phillips' statement is presented.  He was not speaking jocularly nor offering a comment.  There is no need to review other people's statements to decide whether or not Phillips himself accused the plaintiff of blocking him and preventing his retreat. He did so state, without qualification or ambiguity. As the Restatement makes plain, the factfinder must resort to the overall "gist" or "context" only if there is a question as to the meaning of the communication.[64]  Phillips spoke clearly, directly, and unambiguously, and was quoted in the same way.  There is no ambiguity in Phillips' statement; he did not mince words, try to hide his meaning,

---

[63] *Scott*, 496 N.E.2d at 708.
[64] RESTATEMENT § 563 (1977).

or stop short of accusatory language. Phillips' statement accusing Nicholas of blocking his way and preventing his departure is a statement of fact needing no contextual interpretation.

It does not matter that other observers and participants described the scene differently. It does not matter that Phillips' statement might be one expressing his "belief" in what happened. What does matter is that Phillips described a real event in factual terms and that the Times published his factual statement negligently and with reckless disregard of the truth. Nothing else the Times published, no other words or descriptions, change the character of Phillips' account. Under Kentucky law, to publish a defamatory statement is itself defamatory, unless reasonable investigation is first made.

### III.   Nicholas' Defamation Claim is Not Barred by the Statute of Limitations.

#### A.   KRS 413.170(1) is unambiguous and allows Nicholas until his 19th birthday to file claims for libel and slander.

Seventeen-year-old Nicholas, whose claims are for an injury incurred when he was age sixteen, has until his nineteenth (19th) birthday to bring claims against the media defendants and others. A minor is defined as an "infant or person who is under the age of legal competence."[65] Fed. R. Civ. P. 17(c) permits actions on behalf of minors to be brought by a guardian or next friend. KRS 2.015 sets Kentucky's age of majority at eighteen years of age, which converts the right to sue from one held by a legal guardian or next friend to the emancipated person.[66] Here, the action is properly brought by Nicholas' parents as his legal guardian and next friends.

Nicholas has until he turns nineteen to bring his libel claim. KRS 413.140(d) permits an injured party one year to bring claims for libel and slander. KRS 413.170(1) is unambiguous in its intent that a minor shall benefit from the applicable statute of limitations after he turns 18 until the statute runs. It states:

> (1) If a person entitled to bring any action mentioned in KRS

---

[65] BLACK'S LAW DICTIONARY 997 (6th ed. 1990).
[66] Vandiver v. Hardin Cnty. Bd. of Educ., 925 F.2d 927, 930 (6th Cir. 1991).

> 413.090 to 413.160, except for a penalty or forfeiture, was, at the
> time the cause of action accrued, an infant or of unsound mind, the
> action may be brought within the same number of years after the
> removal of the disability or death of the person, whichever happens
> first, allowed to a person without the disability to bring the action
> after the right accrued.[67]

The Kentucky legislature was specific: this statute of limitations for the benefit of minors

applies to all causes of action arising under KRS 413.090 to 413.160; Nicholas' suit is brought

pursuant to KRS 413.140(d), which is covered explicitly by the statute. The legislature made no

exception to the coverage of this statute of limitations.

The Times fundamentally misconstrues this statute. It argues that, because Nicholas has

sued other defendants, he has demonstrated that he is no longer under a "disability" and therefore

should not enjoy the right conferred by the statute.[68] For this proposition the defendant cites a case

involving a question not of the plaintiff's age, but the plaintiff's "mental competence." This is

error. As a more careful reading of KRS 413.170(1) makes evident, a plaintiff can be under a

"disability" for one of two reasons: her age or her mental incompetence.  The "removal of the

disability" of mental incompetence can occur, obviously, by plaintiff's gaining "mental

competence."[69] But the only way to "remove the disability" of minority is to attain the age of

majority, which is eighteen.[70] Citing a decision that holds that a plaintiff who is mentally

competent is no longer "under a disability" is irrelevant.  No one has claimed that Nicholas is

mentally incompetent. Nicholas is a minor, and for purposes of KRS 413.170(1), he remains under

a disability to this day.

Absent an ambiguity, this Court must interpret KRS 413.170(1) literally and without

reference to outside aids.[71]  Put another way, courts have no discretion to employ equitable

considerations to alter unambiguous statutes.  In Kentucky, "[t]he words of the statute are to be

---

[67] KRS § 413.170.
[68] Times Litigation, Doc. 18, Page ID#: 155–56.
[69] Asher v. Hartlage, 336 S.W.2d 335 (Ky. 1960).
[70] Vandiver v. Hardin Cnty. Bd. of Educ., 925 F.2d 927, 930 (6th Cir. 1991).
[71] Smith v. McGill, 556 S.W.3d 552, 555 (Ky. 2018) (citations omitted).

given their plain meaning unless to do so would constitute an absurd result."[72] Here, KRS 413.170(1) and KRS 413.140(d) when read together are unambiguous and entirely reasonable. These provisions allow Nicholas until his 19th birthday to bring his claims.

### B. The Times relies on the incorrectly decided *Tallman* case.

The Times relies on an unpublished, unfollowed, and heavily criticized opinion to attempt to circumvent the unambiguous application of KRS 413.170(1) and dismiss the claims of a 17-year old plaintiff. The unpublished opinion the defendant cites, *Tallman v. City of Elizabethtown*, ignored the plain language of KRS 413.170(1) and instead created, without citation to authority, an equitable exception to a statute that leaves no room for one.[73] In *Tallman*, in a single paragraph at the very end of its opinion, the Kentucky Court of Appeals stated that where minors' claims were prosecuted by their guardian and next friend, KRS 413.170(1) did not apply.[74] Instead, the court in *Tallman*, referring to KRS 413.170(1) as a "tolling statute," stated that "we are not persuaded that KRS 413.170(1) tolled the children's claims ...."[75]

In point of fact, the precise apparent purpose of KRS 413.170(1) is to "toll" the claims of children until they reach the age of majority. That's what it literally says. Titled "Limitations of Actions in KRS 413.090 to 413.160 Do Not Run Until Removal of Disability or Death," KRS 413.170(1) states, "[i]f a person entitled to bring any action mentioned in KRS 413.090 to 413.160 . . . was, at the time the cause of action accrued, an infant or of unsound mind, the action may be brought within the same number of years after the removal of the disability . . . allowed to a person without the disability to bring the action after the right accrued." Notably, it was a small misnomer by the *Tallman* court to term this provision a "tolling statute," as if this issue were a matter of equity instead of statutory application. Yet even small errors have consequences. Terming the

---

[72] Executive Branch Ethics Comm'n v. Stephens, 92 S.W.3d 69, 73 (Ky. 2002).
[73] *Tallman*, No. 2006-CA-002542, 2007 Ky. App. Unpub. LEXIS 835 at *5, (Ky. Ct. App. Nov. 2, 2007)
[74] *Id.* at *9.
[75] *Id.*

matter a question of "tolling" suggests the idea of the chancellor sitting in equity applying the discretionary tolling factors to determine if an otherwise applicable statute of limitations should be lifted.[76]  Here, the legislature has left no discretion to the trial judge; no application of the multiple factors to assess equitable tolling is appropriate.   Instead, KRS 413.170(1) states a statutory command.  It creates a special statute of limitations for plaintiffs under disability: "the action may be brought within the same number of years after the removal of the disability."  KRS 413.170(1) does not authorize a trial court to search for "extraordinary" tolling factors.

It should not surprise that the unpublished opinion in *Tallman* has been rejected, explicitly and repeatedly.  *Bradford v. Bracken County*, 767 F. Supp. 2d 740, 752–753 (E.D. Ky. 2011) (Bunning, J.) (dismissal of minor's claims rejected because trial court concluded it would have had to add an exception to KRS 413.170(1) that the legislature did not provide); *T.S. v. Doe*, 2010 S.S. Dist. LEXIS 107088, at *13 (E.D. Ky. 2011) ("the Supreme Court of Kentucky would not remove a minor's statute of limitation protection simply because a suit was filed by a next friend"); and *Newton v. Dennison*, No. 4:14-CV-15-JHM, 2014 U.S. Dist. LEXIS 104594, at *6–7 (W.D. Ky. July 31, 2014) (concluding the minor, not the next friend, was the plaintiff, negating the defendant's assertion that initiation of litigation by a next friend triggers the running of the limitations period).

The holding in *Tallman* is also inapposite as a factual matter.  In the *Tallman* case, the previous suit had been brought during the plaintiffs' minority against the city police department; having lost, upon reaching majority, the plaintiffs then sued the city itself.  It was that latter claim that the court dismissed.  Here, the plaintiff has not previously sued the Times nor any entity associated with the Times.   The Times is essentially arguing that, because Nicholas'

---

[76] An illustrative case of equitable tolling is *Williams v. Hawkins*, 594 S.W.3d 189, 194–95 (Ky. 2020).  In *Williams*, "[t]he Supreme Court clarified and reiterated that to be entitled to equitable tolling, a litigant must establish: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing,' with those circumstances being beyond the litigant's control." *Williams*, 594 S.W.3d at 194–95 (Ky. 2020) (citing *Menominee Indian Tribe v. United States*, 136 S. Ct. 750, 755–56, 193 L. Ed. 2d 652 (2016)).

representatives have sued someone else, now Nicholas cannot sue the Times. This is not the situation that confronted the court in *Tallman*. Any policy concerns about having "two bites at the apple" are absent. Instead, public policy militates in the opposite direction, in favor of vindicating the plain meaning of the Kentucky statute.

Interpreting the statute to mean what it says makes sense in this instance. As the federal court for the Eastern District of Kentucky made clear in *T.S. v. Doe*: "To the extent a state law question is undecided, a federal court 'must make "the best prediction, even in the absence of direct state precedent, of what the Kentucky Supreme Court would do if it were confronted with [the] question."[77] In Kentucky, the statute of limitations is suspended during a period of disability regardless of the fact that a next friend or guardian might have sued.[78] The *Newby* court stated that "[i]t is a generally accepted rule that the statute of limitations does not begin to run until there is a person in being capable of bringing a suit."[79] Nicholas is now seventeen years old and is not a "person in being capable of bringing a suit." Although a next friend or guardian is permitted to bring a claim on behalf of the person under disability, this does not negate the fact that the minor "himself is the plaintiff."[80] Nicholas is "himself the plaintiff." He cannot initiate any claim until he turns eighteen. The limitations period will begin to run then.

## CONCLUSION

The Times' Motion should be DENIED for the reasons stated herein.

---

[77] *See* Combs v. International Ins. Co, 354 F.3d 568, 577 (6th Cir. 2004) (quoting Welsh v. United States, 844 F.2d 1239, 1245 (6th Cir. 1988).

[78] Newby's Adm'r v. Warren's Adm'r, 126 S.W.2d 436, 438 (Ky. Ct. App. 1939).

[79] *Id.* at 437.

[80] Branham v. Stewart, 307 S.W.3d 94, 97–98 (Ky. 2010) (citations omitted).

Respectfully submitted this 17th day of July, 2020.

HEMMER DEFRANK WESSELS PLLC      L. LIN WOOD, P.C.

/s/ Todd V. McMurtry      L. Lin Wood (*pro hac vice*)
Todd V. McMurtry (KBA #82101)      L. LIN WOOD, P.C.
HEMMER DEFRANK WESSELS, PLLC      1180 W. Peachtree St., Ste. 2040
250 Grandview Drive, Ste. 500      Atlanta, GA 30309
Ft. Mitchell, KY 41017      Phone: (404) 891-1402
Phone: (859) 344-1188      Fax: (404) 506-9111
Fax: (859) 578-3869      lwood@linwoodlaw.com
tmcmurtry@hemmerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2020, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to registered CM/ECF participants.

/s/ Todd V. McMurtry
Plaintiff's Counsel

26