# EXHIBIT B

EXHIBIT ▮

Craige Roberts
501 W 123rd St., Apt 20F
New York, NY 10027

November 10, 2021

Todd V. McMurtry
HEMMER DEFRANK WESSELS, PLLC
250 Grandview Drive, Suite 500
Ft. Mitchell, KY 41017-5649

> Re:  *Sandmann v. NBCUniversal* Media, *LLC,* E.D. Ky. Case No. 2:19-cv-00056; *Sandmann v. The New York Times Company, et al.,* E.D. Ky. Case No. 2:20-cv-00023; *Sandmann v. CBS News, et al.,* E.D. Ky. Case No. 2:20-cv-00024; *Sandmann v. ABC News,* Inc., et *al.,* E.D. Ky. Case No. 2:20-cv-00025; *Sandmann v. Gannett Co.,* Inc., *et al.,* E.D. Ky. Case No. 2:20-cv-00026; *Sandmann v. Rolling Stone, et al.,* E.D. Ky. Case No. 2:20-cv-00027

Dear Mr. McMurtry,

This is the report you asked me to write, giving my expert witness opinion in the above-captioned cases.

## I.   Nature of Engagement

I am a U.S. citizen residing in New York, NY. I have been retained by Nicholas Sandmann as an expert in the following six cases:  *Sandmann v. NBCUniversal Media, LLC,* E.D. Ky. Case No. 2:19-cv-00056; *Sandmann v. The New York Times Company, et al.,* E.D. Ky. Case No. 2:20-cv-00023; *Sandmann v. CBS News, et al.,* E.D. Ky. Case No. 2:20-cv-00024; *Sandmann v. ABC News, Inc., et al.,* E.D. Ky. Case No. 2:20-cv-00025; *Sandmann v. Gannett Co., Inc., et al.,* E.D. Ky. Case No. 2:20-cv-00026; *Sandmann v. Rolling Stone, et al.,* E.D. Ky. Case No. 2:20-cv-00027.

I have been retained to answer the following two questions pertaining to the above cases, basing my answers on the videos provided to me (listed in section IV) below:

### QUESTION 1: Would a reasonable reader understand the following statement to be false?

"It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial' ... I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."

1

**QUESTION 2: Would a reasonable reader understand the following statement to be false?**

Phillips said Sandmann "positioned himself" in front of him, stopping his exit. Phillips said he sang in front of Sandmann for about three minutes. "When the others were moving aside and letting me go, he decided that he wasn't going to do that. When I was coming up the steps, I seen him start putting himself in front of me, so I slided to the right, and he slided to the right. I slided to the left and he slided to the left – so by the time I got up to him, we were right in front of him. He just positioned himself to make sure that he aligned himself with me, so that sort of stopped my exit."

My compensation in this case is $300 per hour of work.


## II.    Qualifications

I have a Ph.D. in Linguistics from the University of Massachusetts at Amherst (1987). As part of my graduate training, in 1979-1980 at Indiana State University I studied Lexicography with Professor Edward Gates, a former Associate Editor of Webster's Third New International Dictionary (The G. & C. Merriam Company, Springfield, MA) and the Secretary of the Dictionary Society of North America. After my graduate work, I had a post-doctoral fellowship for two years at the Center for the Study of Language and Information at Stanford University (1986-1988). I then accepted a position at The Ohio State University, Columbus, Ohio, where I was on the faculty from 1988 until my retirement in 2016. During that time, I was promoted from Assistant Professor to Associate Professor (1994) and then to Full Professor (2007). During that period, I also served as a Visiting Research Fellow in the Faculty of Philosophy at the University of Amsterdam in the Netherlands (1992, 2002), as a Visiting Professor in the Department of Philosophy at the University of Michigan (2009), and as a Fellow at the National Humanities Center, Durham, NC (2012-2013) and a Senior Fellow at the Institute for Advanced Studies of Central European University, Budapest, Hungary (2014-2015). Recently, I was a Visiting Professor in the Linguistics Department at New York University (2016-2019). I am currently a Professor Emerita at OSU, and an Affiliate of the Rutgers University Center for Cognitive Science.

My area of specialization in linguistics is semantics and pragmatics. Semantics is the study of the underlying regularities in lexical meaning and syntactic form that permit native speakers to convey (sometimes complex) meaning. Pragmatics is the study of how context influences interpretation (for example, how context permits us to understand what a speaker means in using a pronoun). In these areas, I have published the following articles and chapters in the past ten years:

"*only*: A case study in projective meaning". In Barbara H. Partee, Michael Glanzberg & Jurgis Skilters (ed.) (2011) *Formal Semantics and Pragmatics: Discourse, Context and Models*. Special issue of the *Baltic International Yearbook of Cognition, Logic and Communication*, Riga, Lattvia.

"Topics". In Claudia Maienborn, Klaus von Heusinger & Paul Portner (eds.) (2012) *Semantics: An International Handbook of Natural Language Meaning*. Mouton de Gruyter. Reprinted in Portner, Maienborn & von Heusinger (eds.) (2019) *Semantics: Sentence and Information Structure*, Berlin/Boston: Mouton de Gruyter, 381-412.

"Information Structure: Toward an integrated theory of formal pragmatics". *Semantics and Pragmatics* 5.6:1-69. (Invited as a classic unpublished paper.) . http://dx.doi.org/10.3765/sp.5.6.

"Information Structure: Afterword" with bibliography of related work. *Semantics and Pragmatics* 5.7:1-19. http://dx.doi.org/10.3765/sp.5.7.

"Towards a taxonomy of projective content", with Judith Tonhauser, Mandy Simons & David Beaver. *Language* 89.1:66-109, 2013. Awarded the Linguistic Society of America's award for Best Paper in Language 2013.

"Accommodation in a Language Game". In Barry Loewer & Jonathan Schaffer (eds.) *A Companion to David Lewis*. Blackwell/Wiley, Hoboken, NJ, 2015.

"Plans and imperatives: A semantics and pragmatics for imperative mood". *Proceedings of the Amsterdam Colloquium 2015*. ILLC, University of Amsterdam.

"Review of Robert Stalnaker, *Context*, Oxford University Press, 2014". *Notre Dame Philosophical Reviews* 2016.06.20: http://ndpr.nd.edu/news/67831-context-2/, 2016.

"The best question: Explaining the projection behavior of factives". *Discourse Processes* 54.3:187-206, a special issue on the Question In Discussion, 2017. With Mandy Simons, David Beaver & Judith Tonhauser.

"Questions Under Discussion: Where information structure meets projective content". *Annual Review of Linguistics* 3, 2017. With David Beaver, Mandy Simons & Judith Tonhauser.

"Ontology via semantics?: Introduction to the special issue on the semantics of cardinal numbers". With Stewart Shapiro. *Linguistics and Philosophy* 40.4:321-329, 2017.

"Linguistic convention and the architecture of interpretation". *Analytic Philosophy* 58.4:418-439, 2017.

"Speech acts in discourse context". In Daniel Fogal, Daniel Harris & Matt Moss (eds.) *New Work on Speech Acts*. Oxford University Press, 2018, 317-359.

"Contextual influences on reference". In Barbara Abbott & Jeannette Gundel (eds.) *Oxford Handbook of Reference*, Oxford University Press, 2018, 260-280.

"Open texture and analyticity". With Stewart Shapiro. In Dejan Makovec & Stewart Shapiro (eds.) *Friedrich Waismann: The Open Texture of Analytic Philosophy*. Palgrave Macmillan, Cham, Switzerland, 189-210, 2019.

"Modal Subordination: *It would eat you first!*". In Daniel Gutzmann, Lisa Matthewson, Cécile Meier, Hotze Rullmann & Thomas Ede Zimmermann (eds.) *The Wiley Blackwell Companion to Semantics*. Wiley. 2021.

"Open Texture and Mathematics", with Stewart Shapiro. *Notre Dame Journal of Formal Logic* 62(1):173-192, 2021.

I also co-edited the following during this period:

*Special issue on the Semantics of Cardinals*. Edited with Stewart Shapiro. *Linguistics & Philosophy* 40.4, 2017.

During my career, I have also been awarded six grants from the U.S. National Science Foundation for advanced research in linguistics, as noted in my Curriculum Vitae ("Selected Grants").

During my time on the faculty at The Ohio State University, I developed and taught a course on Language and the Law for advanced undergraduates, from 2005 through 2016.

I attach my Brief Curriculum Vitae as Exhibit A. My full Curriculum Vitae, along with most of my publications, are available on my professional website: https://www.asc.ohio-state.edu/roberts.21/.

As listed in the Curriculum Vitae ("Legal Work"), I have been hired as an expert witness for several law firms since 2004, rendering opinions and giving testimony in cases pertaining to trademark law and the interpretation of an advertising slogan, the interpretation of statutes in law, the interpretation of several types of contracts, and the interpretation of a passage of email. The following is a list of the firms who have retained my services, along with case information for those cases where I wrote an opinion or gave testimony:

> Dinsmore & Shohl, LLP, Cincinnati, OH, to provide testimony in August, 2004 in Columbus, OH, in the case of Nationwide Mutual Insurance Company vs. Sovereign Bank and Sovereign Bankcorp., Inc., in a Civil matter pertaining to trademark law and the interpretation of an advertising slogan. Testified in court.
> Deters, Benzinger & LaVelle, p.s.c., Crestview Hills, KY, regarding the interpretation of Kentucky Revised Statute 216B.020(2)(a), pertaining to licensure of health care facilities. Testified at a magistrate's hearing of the Kentucky Cabinet for Health and Family Services, September, 2004, Frankfort, KY, in the case of John W. Gilbert, M.D., et al. v. Commonwealth of Kentucky, Cabinet for Health and Family Services, et al. Commonwealth of Kentucky Franklin Circuit Court Division II Civil Action No. 05-CI-00275.
> Deters, Benzinger & LaVelle, p.s.c., Crestview Hills, KY, in October, 2004, on the interpretation of a legal contract.
> Deters, Benzinger & LaVelle, p.s.c., Crestview Hills, KY, in May, 2006 on the interpretation of a legal contract.
> Parry, Deering, Futscher & Sparks, p.s.c., Covington, KY, on the interpretation of an insurance contract.
> Cull, Hayden & Vance, p.s.c., Frankfort, KY, August, 2006, on the interpretation of statutes in Kentucky law pertaining to licensure of health care facilities.
> Zeiger, Tigges & Little, LLP, Columbus, OH, September, 2006 and July 2007, on the interpretation of contracts.
> Keating, Meuthing & Klekamp PLL, Cincinnati, OH, October 2007, on the interpretation of a statute pertaining to contracts.
> Cull, Hayden & Vance, p.s.c., Frankfort, KY, September, 2009, on the interpretation of a statute of Kentucky law pertaining to licensure of health care facilities.
> Sparks PLL, Covington, KY, September, 2010, on the interpretation of a commercial contract.

Dritz, PLL, Columbus, OH, May, 2012, on the interpretation of email correspondence at-issue in a criminal case.

Deters, Benzinger & LaVelle, Crestview Hills, KY, in June, 2016, on the interpretation of a Kentucky statute pertaining to the licensure of health care facilities.

Zeiger, Tigges & Little LLP, Columbus, OH, in 2019, expert witness report on the interpretation of a legal contract in Kestra Investment Services, LLC v. The Ohio National Life Insurance Company, et al., US District Court, Western District of Texas, Case No: 1:19-cv-0687. In 2020, prepared a Rebuttal to the report of an expert witness for the plaintiff.

Zeiger, Tigges & Little LLP, Columbus, OH, in 2020, expert witness report on the interpretation of a legal contract in RBC Capital Markets, LLC v. The Ohio National Life Insurance Company, et al., US District Court, District of Minnesota, Case No: 1:19-cv-00062. Recently retained to provide a report in a related case.

Apart from this legal work, I have served as a linguistic consultant for Motorola, Inc. (from 1998-2000) and was invited to give professional presentations at SRI International, Menlo Park, CA (1987) and Google (2020).

I am a member of the Linguistic Society of America.


## III.    Summary of Opinions

After studying the videos of the encounter between Nick Sandmann and Nathan Phillips at the Lincoln Memorial in Washington, D.C. on January 18, 2019, in my professional opinion the answers to the questions posed in §I above are as follows:

Question 1:  A reasonable native speaker of English reading this passage would take it to be false in the circumstances captured in the videos of the encounter which have been provided to me.

Question 2:  A reasonable native speaker of English reading this passage would take it to be false in the circumstances captured in the videos of the encounter which have been provided to me.

I am more than reasonably certain that these opinions are correct, based on the videos provided to me (section IV below) and standard methods of analysis in my professional field, linguistic semantics.


## IV.    Bases for Opinions and Materials Considered

I have been provided with the following materials on which to base my opinion:

Videos of the scene in front of the Lincoln Memorial on January 18, 2019:

    Video 1.Viral Video.N.S. 000118.mpr:                                    1:01

5

| | |
|---|---|
| Video 2.Second Taitano Video.N.S. 000119.mp4 | 4:45 |
| Video 3. Video Cited by CovCathStudent.N.S. 000121.mp4 | 9:14 |
| Video 4.Banyamyan Video.N.S. 000116.mp4 | 1:46:18 |
| Video 5.First Portion of WhatsApp Video.(Proposed by Def…lly 0010-0… | 5:24 |
| Video 6.KC Noland Video 1.(Part of N.S. 128 at 1040).mp4 | :59 |
| Video 7.Taitano Video 3.mp4 | 1:00 |
| Video 8.Hooligan Instagram Video 1.mp4 | :50 |
| Video 9.Time.com Clip (Proposed by Defendants).mp4 | :35 |
| Video 10.First Portion of N.S. 128.N.S. 000128.mp4 | :27 |
| Video 11.Second Portion of WhatsApp Video.(Originally 070…e N.S. 00… | 2:24 |
| Video 12.Twitter Video 1.N.S. 001802.mp4 | :37 |
| Video 13.Twitter Video 3.N.S. 001804.mp4 | :20 |
| Video 14.Fries Video 1.N.S. 001735.mov | :23 |
| Video 15.Miscellaneous Video 1.N.S. 000125.mp4 | 1:18 |
| Video 16.Aerial View.GCI 000018.mp4 | :59 |
| Video 17.Miscellaneous Video 2.mp4 | 7:37 |
| Video 18.Maria Judy Video.mp4 | :20 |

Newspaper Articles reporting on the incident of interest:

ABC's First Online Article:  "Teen accused of taunting Native American protesters in viral video says he's receiving death threats: Sandmann was accused of mocking a Native American protester on Friday". Karma Allen. ABC News on-line article, January 20, 2019, 10:16pm. https://absnews.go.com/US/teen-accused-taunting-native-american-protesters-breaks-silence/story?id=60512874.

ABC's Fourth Online Article:  "Viral video of Catholic school teens in 'MAGA' caps taunting Native Americans draws widespread condemnation: prompts a school investigation". ABC News on-line article, Chris Francescani & Bill Hutchinson. January 20, 2019, 9:49pm. https://abcnews.go.com/US/viral-video-catholic-school-teens-taunting-native-americans/story?id=60498772.

CBS's Online Article:  "Native American veteran in viral video of confrontation speaks out". CBS News on-line article, January 20, 2019. Justin Carissimo.

Enquirer's First Online Article:  "NKY Catholic school faces backlash after video of incident at Indigenous Peoples March surfaces". Max Loudberg & Sarah Brookbank, *Cincinnati Enquirer*. January 19, 2019, 11:45am. https://ww.cincinnati.com/story/news/2019/01/19/video-shows-apparent-incident-indigenous-peoples-march/2623820002/.

Enquirer's Second Online Article:  "Analysis: What the video from the incident at the Indigenous Peoples March tells us about what happened". Sarah Brookbank, *Cincinnati Enquirer*. January 20, 2019, 5:34pm. https://www.cincinnati.com/story/news/2019/01/20/analyzing-video-incident-indigenous-peoples-march/2631412002/.

Louisville Courier-Journal's Online Article:  "Stormy Daniels calls out 'disgusting punks' from Covington Catholic". Billy Kobin, *Louisville Courier Journal*, January 19, 2019, 7:58pm. On-line article.

NBC's First Article: "Catholic diocese apologizes after students in 'MAGA' hats mock Native American: Videos circulating online show a youth standing extremely close to an

elderly Native American as he chanted and played a drum". Adam Beam & Brian Melly, *NBC News*, January 19, 2019, 2:42pm. On-line article: https://www.nbcwashington.com/news/local/Kentucky-Diocese-Investigates-After-Students-Mock-Native-Americans-Indigenous-Peoples-March-DC-50....

NBC's Fifth Article:  "Nathan Phillips, Native American activist in D.C. standoff, forgives Catholic school students: "Even though I'm angry, I still have that forgiveness in my heart for those students," said Nathan Phillips." Elisha Fieldstadt, *NBC News*, January 24, 2019, 7:46am. https://www.nbcnews.com/news/us-news/nathan-phillips-native-american-activist-d-c-standoff-forgives-catholic-n962131.

NBC's Sixth Article:  "Nathan Phillips on viral encounter with Nick Sandmann: 'I forgive him': The Native American elder said Nick Sandmann's responses seemed "coached" but said he has forgiven him." Eun Kyung Kim, *NBC News Today*, January 24, 2019, 8:01am. https://www.today.com/news/nathan-phillips-talks-today-show-s-savannah-guthrie-about-viral-t147369.

NY Times' January 19 Article:  "Boys in 'Make America Great Again' Hats Mob Native Elder at Indigenous Peoples March". Sarah Mervosh, *New York Times*, January 19, 2019.

NY Times' Second Version of January 19 Article:  "Viral Video Shows Boys in 'Make America Great Again' Hats Surrounding Native Elder". Sarah Mervosh. *New York Times*, January 19, 2019.

Rolling Stone's January 22 Article:  Trump Comes to the Rescue of the MAGA Teens: Right-wing media is using confusion over what exactly happened to paint the Covington Catholic teenagers as victims". Ryan Bort, *Rolling Stone*, January 22, 2019.

Other materials:

Final Investigative Report from Greater Cincinnati Investigation, Inc., February 11, 2019.

Letter from Nick Sandmann to Bob Rowe, January 19, 2019, 1:59:54pm.

Transcription of Nick Sandmann's Deposition, Planet Depos, September 13-14, 2021 in the case of Sandmann, et al. -v- NBCUniversal Media, LLC, et al.

"Statement of Nick Sandmann, Covington Catholic High School Junior, Regarding Incident at the Lincoln Memorial", on Twitter: https://twitter.com/jaketapper/status/1087137470670663680?lang=en

Here is how these materials are relevant to my opinion: In contemporary linguistic semantics, the meaning of a declarative sentence (one in the indicative mood, as opposed to a question or directive) is characterized as its *truth conditions*—what a situation would have to be like in order for the sentence to truthfully describe that situation. In determining truth conditions, the science of linguistics is purely descriptive—aiming to determine the plain meaning of an expression as that is understood by ordinary speakers of the language in which it is couched. In reaching my decision, I relied on the videos provided to acquaint me in as much detail as possible with the situation in which the confrontation between Mr. Phillips and Mr. Sandmann occurred. I then considered whether, given the plain meanings of the passages in question—their truth conditions, those passages were true or false in the situation depicted in the videos.

In determining the truth conditions for sentences in the passages in question I used standard methods in linguistic semantics and pragmatics. For example, to ascertain the plain meaning of

words in the passages of interest, I consulted several of the most respected dictionaries of modern English, including the most up-to-date online versions of:

> *The Oxford English Dictionary on Historical Principles*, Oxford University Press, Oxford, England, 2021 version on-line (first published 1899).
> *Merriam-Webster's Collegiate Dictionary* (11th Edition), Merriam-Webster Company, Springfield, MA, 2012.
> *The American Heritage Dictionary of the American Language*, 6th Edition, Houghton Mifflin, Boston, MA, 2016.

The best lexicographic practice since the early 20th century has emphasized that lexicography is the art of *describing* the plain meanings of expressions as evident to native speakers; it does not prescribe what those meanings should be. Accordingly, a lexicographer studies the plain meaning of a word by first gathering examples of its use both in printed material (for example, from fiction, official documents, or journalism) and in spoken usage (for example, from radio and television usage), and also, in current practice, from the internet. The Oxford English Dictionary has collected such uses from the earliest known published work in English, documenting how the meanings of our words have evolved over the centuries; Merriam Webster and American Heritage focus solely on contemporary American English. The collected examples of usage are then sorted into groups reflecting different senses, often closely related but slightly different in their truth conditional contributions. On the basis of such collections, dictionary definitions are then developed to reflect those different senses.

In addition to lexicographic resources, in preparation for this report I considered the syntactic structure of the sentences in the passage, since that, of course, matters to truth conditions: *John loves Mary* might be false while *Mary loves John* is true, though both sentences contain the same words. And, as native speakers do, I used the context in which a given sentence occurs in the passages in question to determine the meanings of pronouns like *I*, *my, he, him* and other context-sensitive expressions like *that guy in the hat* and *to the left*.

Use of all of these resources and techniques is standard in contemporary semantics and pragmatics. I used them, as described in more detail in §VII below, to determine the truth conditions of the sentences which I took to be crucial in these passages. Then I considered the video evidence provided to me to understand the situation in which the confrontation occurred, and on the basis of that understanding, I considered whether the truth conditions of the passages were satisfied in that situation. Although I subsequently read statements, interviews and depositions by Mr. Phillips and Mr. Sandmann pertaining to their encounter, I endeavored to form my opinion not on the basis of those subsequent statements, but solely on the basis of the evidence in the videos. Someone's memory or construal of an event may not correspond to the facts about the situation in which it occurred. It is only the situation itself that is relevant to the truth of a statement purporting to describe it. The only other materials I considered relevant to my opinion are those providing background for the event: information about who was involved (the students from Covington Catholic School, the Black Hebrew Israelites, and the Native Americans) and about what were they doing in D.C. and at the Lincoln Memorial (protesting, marching, etc.), as well as the names of the individuals in the confrontation at issue, Mr. Nathan Phillips and Mr. Nicholas Sandmann.

V.    **Facts**

Here are the facts about the January 18, 2019 incident as I am aware of them from the materials provided to me, principally the videos listed in §IV above.

Three different groups interacted in the event in question, as well as various bystanders who seemed to be unrelated to any of these groups.  The groups were:

- a small group who called themselves the Black Hebrew Israelites, African Americans who were there to preach a religious and political message. I think there may have been five or six of them standing together, perhaps others circulating in the crowd in front of the Lincoln Memorial. One had a microphone and amplifier, another filmed their activities, and others held up signs and engaged informally with passers-by. Throughout the period in the videos, they engaged with a number of people and other groups in the area, often using incendiary language to insult or degrade those they engaged with, including stray passersby of several races and apparent ethnic backgrounds, the Native Americans, and the boys from Covington Catholic School.
- a larger group of people who (according to the articles that I read about the event, cited in section IV above) had come to D.C. for the Indigenous Peoples March. Mr. Phillips was a member of this group, as (it seems) at least one of those who made videos of the interaction with the boys from Covington Catholic School. These people sang, danced, and chanted to drums, sometimes forming a large circle as they did so. During the circle dance, there appeared to be at least as many people participating as there were boys from Covington, though I cannot give a reliable estimate of their number.
- a group of boys, possibly 30 – 50 of them, from Covington Catholic School, Covington, Kentucky, who had come to D.C. that morning to participate in a Right to Life march earlier that day. They were free to explore the city after the march, and had been told by the school chaperones to meet on the Lincoln Memorial steps by 5pm, where they would board buses to return home. For some minutes before and throughout the encounter between Phillips and Sandmann, the boys were ranged up the stairs to the Monument and spilling down onto the flat area in front of them.

The Hebrew Israelites had set up their tables and equipment in front of the Lincoln Memorial steps, facing the Memorial. One could see behind them the reflecting pool with the Washington Monument in the distance. Prior to the encounter of interest, the Native Americans seemed to perform their chanting and dancing a bit further away from the Memorial, perhaps toward the pool (not clear exactly where they were in the early parts of the videos). The Covington boys gathered on the steps of the Memorial, about 30 – 40 feet from the Hebrew Israelites, facing them. (I cannot judge distances from the videos, so this is a very rough impression.)

At various points, as filmed by the Hebrew Israelite cameraman [I believe this is Video 4.Banyamyan Video.N.S. 000116.mp4], the Israelites had engaged in verbal sparring with the Native Americans, calling them names and insulting them with racist slurs, similarly with several African American bystanders, and then as the afternoon wore on, with the Covington boys, in each case using racist and insulting language. Finally, one of the Covington boys raced down the

steps in front of the school group, faced the boys, tore off his shirt and led what seemed to be a sports cheer, which the boys enthusiastically took up, making a lot of noise and cheering, jumping up and down as if at a pep rally. After that, the boys cheered and generally acted as if they were rowdy spectators in a sports encounter between their team and the Hebrew Israelites, laughing and making rah-rah gestures, while the Israelites continued to insult them.

Not long after the cheer, one hears drumming and chanting from somewhere off behind the Hebrew Israelites, approaching the scene on the Memorial steps, and soon Mr. Phillips appears, walking between the Israelites and the steps to the Memorial, beating his upraised hand drum rhythmically and chanting loudly in a language other than English, leading a group of Native Americans toward the boys. It is not clear how many are in Mr. Phillips' group at this point and how many are mere onlookers following the show, but I might guess there are ten or twenty people in that entourage, including a cameraman filming the situation. Mr. Phillips walks right up to the group of boys on the stairs, ignoring the Hebrew Israelites, and walks along the front of the group; the Monument faces east, so Mr. Phillips was walking roughly northeast to south along the front of the group of boys, at close range. I couldn't see whether he climbed any of the steps, but if so, he was still down near the the flat area in front of the stairs, with most of the boys either higher on the steps as he moved along or in front of him to the south.

At the beginning of Video 2 (Second Taitano Video.N.S. 000119.mp4), shot from in front of the Hebrew Israelites and facing the Lincoln Memorial, Mr. Phillips walks from the right along the front edge of the group of boys, drumming and chanting loudly. At about :41 seconds in the video, one sees Mr. Sandmann one or two steps above Phillips in the crowd of boys, wearing his red MAGA hat, laughing and grinning at his companions. Phillips (continuing south) nearly walks past Sandmann, who is on his right and slightly above, still grinning. But then Phillips pulls up and turns right to face Sandmann. By :46 seconds, Phillips has walked directly up to face Sandmann on a step above him. Phillips brings the hand drum up to approximately 4"- 6" immediately in front of Sandmann, so that the drum stick appears to come very close to Sandmann's face while Phillips beats the drum, continuing to chant loudly. (In Video 17, one can see at several points that the bottom of Phillips' drum was touching Phillips' jacket collar, for example at 5:50 and 6:50.) Sandmann doesn't move, but stands stock still, grinning and blinking slightly at the drum beat directly in his face. At 1:30 Sandmann looks down slightly, but then back up to Phillips. In another short video (Video 14.Fries Video 1.N.S. 001735, shot from above and behind Sandmann to his left), one can see that Sandmann has his hands clasped behind his back. This confrontation is still on-going at 3:20 when Video 2 ends, approximately two minutes and 34 seconds from when Phillips turns to face Sandmann.

Early in the encounter, when Phillips has turned to face Sandmann, there is room to Sandmann's left/Phillips' right going up the stairs to the Memorial. There is at least a 3 foot corridor between Sandmann and the group of students to his left going up the stairs; you can see this clearly in Video 16 (Aerial View.GCI 000018.mp4), starting at 0:06. In none of the eighteen videos of the incident that I reviewed did find any evidence (a) that Phillips tries to move up the stairs after he turns to face Sandmann, (b) that he moves to one side or the other to go around Sandmann, (c) that he attempts to continue along his previous north-south trajectory, or (d) that he turns to see whether he could retrace his path either back to the north the way he had come or east toward the Hebrew Israelites. Instead, as he turns to face Sandmann, Phillips immediately locks eyes with

10

the young man and stands drumming and chanting in very close proximity throughout the confrontation.

When Phillips' group first approaches them, the Covington boys continue their spectator cheers. Then many of them begin clapping their hands in rhythm with the drum, or joining the chant in an awkward way. Just before Phillips confronts Sandmann, some of the boys make the Tomahawk Chop (a controversial gesture seen in Atlanta baseball games and other sporting events) and do more sports cheers, still laughing, some jumping up and down. After a couple of minutes of the face-to-face confrontation, one of Phillips' companions (judging by his apparel and what he says) starts to argue with another boy standing a couple of steps up behind Sandmann, saying that the boys should "go back to Europe", that this is not their land, etc., as documented in the videos. By this point Sandmann had stopped smiling, and during the argument he turns to look up behind him at the arguing schoolmate to make a gesture that I took to be a suggestion to back off from the argument; we can see this in Video 3 (Video Cited by CovCathStudent.N.S. 000121.mp4) at about 2:26. Then Sandmann turns back to Phillips, who continues as he had throughout. At about 3:36 in Video 3, we see Sandmann walking away to the south, the main group of the boys walking to the south (toward what they later said was waiting buses).

Phillips continues to drum and chant as the boys are leaving, turns to face the east and the Washington Monument, and one of his companions yells something like "We won!". After a few more moments, Phillips stops drumming, and the group around him cheers and raises their arms in triumph at about 3:27 on Video 3, congratulating him. Phillips raises his arms and calls something to the crowd around 4:00. Then the crowd gradually moves away. The Hebrew Israelites stay where they were throughout, continuing to interact with the remaining visitors.

## VI.    Relevant Law

The firm that retained me has provided me with the following explanations of falsehood under the law:

> A statement is false when it has a different effect on the mind of the reader from that which the truth (i.e., the truth pled by the plaintiff, Nicholas Sandmann) would have produced. *Masson v. New Yorker Magazine,* 501 U.S. 496, 517 (1991) (internal citations omitted). In the instant matter, the "pleaded truth" is that Nick did not block Nathan Phillips' path or prevent his retreat.

> Truth is a defense to a libel action. *Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 776 (1986). The defense of truth overlooks minor inaccuracies and concentrates upon substantial truth. *E.g., Masson,* 501 U.S. at 517 (internal citations omitted). A statement containing minor inaccuracies is substantially true when "the substance, the gist, the sting, of the libelous charge [is] justified." *Id.* (internal quotations omitted).

I have kept these explanations in mind in forming my opinion on the questions posed, as reported in §III above, and explained in §VII below.


## VII.     Analysis and Reasoning

Here is my analysis of the passage in question 1. The passage is a quotation from Nathan Phillips, describing the encounter with Sandmann:

> "It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial' ... I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."

Consider the following entry for the verb *block* in the Oxford English Dictionary (see Appendix A for full list of senses of *block* in that dictionary and comparable entries from the Merriam-Webster and American Heritage dictionaries):

*block*, verb
1.  a. *transitive*. To obstruct or close with obstacles (a passage). Predicated either of the personal agent, or of the obstructions. Also *figurative*.
    b. [not applicable]
2.  To shut *up* or *in* by obstructing ingress and egress, to prevent access to or exit from. Predicated of the agent or the obstruction, as in sense 1.
3.  [not applicable]
4.  a. To obstruct the way or course of.
. . .[other definitions not applicable]

As definition 1a makes clear, an entity can block someone's passage either passively (to 'be in the way of', possibly accidentally or inadvertently) or as an agent, intentionally. I take it in the passage quoted that Phillips has in mind the active, intentional type of blocking, because he says of the same situation that "that guy in the hat" (Sandmann) "wouldn't let me retreat". Here *would* is the past tense of the auxiliary verb *will*, with the following relevant sense, from the *Oxford English Dictionary* (again, see the full entry for auxiliary *will* in Appendix A, as well as entries from the Merriam-Webster and American Heritage dictionaries; other senses are not applicable here):

*will*, auxiliary verb
II.  As an auxiliary verb, usually with a following bare infinitive. . .
12. Expressing determination, wish, or intention to bring about some action, event, or state of things in the future: intend to, mean to. In the negative: refuse or decline to.

In the passage under analysis, *will* is used in the past tense negative form, *wouldn't*, and the following bare infinitive is *allow*, so that Phillips is attributing to Sandmann a determination in the past situation under discussion to refuse to allow Phillips to retreat. Presumably Phillips also takes this determination to be present in Sandmann's blocking Phillips' desired path up the steps

to the Memorial, so that Phillips has in mind the agentive sense 1 or 4 of *block*. (Note that this is also consistent with the analysis of the second passage, provided below.]

OED sense 2 of *block* would also pertain to Phillips' claim that the two men were "at an impasse", so that Phillips could not exit the situation. Here the noun *impasse* is used figuratively, as in the following definition from the *Oxford English Dictionary*:

*impasse*, noun
A road or way having no outlet; a blind alley, 'cul-de-sac'. Also *figurative*, a position from which there is no way of escape, a 'fix'.

When *be at an impasse* has a subject which denotes two or more agents (here *we* in Phillips' claim "We were at an impasse"), it is typically used to imply a situation in which the agents are unable to negotiate movement, real or figurative, in this case about whether Phillips could proceed up the stairs to make his exit. Definition 4 of *block* with the agentive sense is related to definition 2, in that it implies that the agent doing the blocking is doing so intentionally by using his body to obstruct the other individual's progress.

So in the passage, Phillips claims:
  a. that he intended to exit the situation and finish his song at the Lincoln Memorial, so that he intended to go up to the top of the stairs to get away from the group of boys;
  b. that he started going up toward the Memorial and found himself in an impasse with Sandmann;
  c. that Sandmann intentionally blocked his way,
  and therefore
  d. that Sandmann intentionally refused to allow Phillips to retreat (presumably up the stairs).

But as noted in my rehearsal of the facts in §V, when Phillips turned toward Sandmann, Sandmann did not move from where he had been standing prior to Phillips' approach. Moreover, shortly after Phillips turned, there was a clear passage up the stairs to the Memorial to Sandmann's left/Phillips' right. This argues that Sandmann did not serve as a block to Phillips' progress should Phillips have wished to go up the stairs, so that there was no impasse in that sense.

Phillips ignored the available passage and instead appeared to intentionally approach Sandmann at close range, locking eyes. Phillips made no movement to turn either right or left, to go up or to back away from the stairs in the direction from which he had come.

Moreover, since Phillips stood still confronting Sandmann, there was no publicly evident indication that Phillips wanted to go up the steps, no reason that Sandmann should have recognized that this was his intention. In other words, Phillips' outward behavior was consistent with his merely intending to confront Sandmann. Hence Phillips' claim that Sandmann intended to block Phillips' way seems to be a conjecture on his part.

13

Thus, I find Phillips' statement not to be a true description of the situation as it appears in the available videos.

Here is my analysis of the passage in question 2:

> Phillips said Sandmann "positioned himself" in front of him, stopping his exit. Phillips said he sang in front of Sandmann for about three minutes. "When the others were moving aside and letting me go, he decided that he wasn't going to do that. When I was coming up the steps, I seen him start putting himself in front of me, so I slided to the right, and he slided to the right. I slided to the left and he slided to the left – so by the time I got up to him, we were right in front of him. He just positioned himself to make sure that he aligned himself with me, so that sort of stopped my exit."

In the videos I reviewed, I saw no evidence that Sandmann moved as Phillips passed by and then turned back and approached him. Hence, the videos show no evidence that Sandmann "positioned himself" in front of Phillips, or "start[ed] putting himself in front of [Phillips]". Moreover, I saw no evidence that Phillips himself slided to the left or the right after he turned to face the unmoving Sandmann. So far as I could see, Sandmann stood in one place throughout the incident, never moving or (re)positioning himself in any way with regard to Phillips. Similarly, Phillips stood still throughout, drumming and chanting. Hence, though it is true that some of the other boys moved away from Phillips as the latter approached, while Sandmann stayed in one place, it seems to have been Phillips who aligned himself with Sandmann, and not the other way around. Just after Phillips turned, he could have proceeded up the steps to his right/to the left of the unmoving Sandmann.

Finally, as discussed above, I saw no reason for the Covington boys to think that Phillips was attempting to exit the situation. Phillips waded directly into the crowd, turned to move face-to-face with Sandmann, made no evident attempt to continue on up the stairs, and made no evident attempt to come back the way he had come. He stayed in position facing Sandmann until the latter left to go to the buses; only then did Phillips turn around to complete his drumming and interact further with his colleagues in place.

## VIII.   Conclusion

In my analysis, I have endeavored to be completely neutral about the apparent views of the individuals involved, not speculating about their motives, intentions, or understanding of what transpired on that occasion. I have paid attention solely to the facts as evident in videos of the encounter and to standard linguistic analysis of the plain meanings of the passages in question.

My careful linguistic analysis of the passages in questions 1 and 2 yields meanings whose truth is inconsistent with the facts as evident in multiple videos of the encounter between Nathan Phillips and Nicholas Sandmann on January 18, 2019, in front of the Lincoln Memorial.

Please let me know if you have any questions about my analysis.

## IX.   Signature

Sincerely,

Craige Roberts, Professor Emerita, The Ohio State University

Attachments:

Appendix A:   Full Dictionary definitions for the expressions under analysis.
Exhibit A:     Craige Roberts' current curriculum vitae.
Exhibit B:     Table of Videos viewed by Craige Roberts, with dropbox links

**Appendix A: Full dictionary definitions for the expressions under analysis.**

Dictionaries consulted:

**AH**: *The American Heritage Dictionary of the American Language*, 6th Edition, Houghton Mifflin, Boston, MA, 2016.

**MW**: *Merriam-Webster's Collegiate Dictionary* (11th Edition), Merriam-Webster Company, Springfield, MA, 2012.

**OED**: *The Oxford English Dictionary on Historical Principles*, Oxford University Press, Oxford, England, 2021 version on-line (first published 1899).

Throughout, I have ignored senses with the dictionaries label as *Obsolete*, since these are not used in plain contemporary American English.

Definitions of the transitive verb *block*:

AH:

*block*, v. tr.

**1. a.** To stop or impede the passage of or movement through; obstruct: block traffic; mud that blocked the pipe.

  **b.** To prevent from happening, succeeding, or progressing: blocked every attempt to reform the rules.

  **c.** To shut out from view: a curtain blocking the stage.

  **d.** To stop the passage of (a motion or bill) in a legislative assembly.

  **e.** Sports To prevent or slow the movement of (an opponent) by using one's body, as by making a block in football.

  **f.** Sports To stop or deflect (a ball or puck) by using one's body.

  **g.** Medicine To interrupt or obstruct the functioning of (a physiological process), especially by the use of drugs.

  **h.** Psychology To fail to remember.

MW:

*block²*, transitive verb

**1 a :** to make unsuitable for passage or progress by obstruction

  **b** *archaic* **:** blockade

  **c :** to hinder the passage, progress, or accomplishment of by or as if by interposing an obstruction

  **d :** to shut off from view

  **e :** to interfere usu. legitimately with (as an opponent) in various games or sports

  **f :** to prevent normal functioning or action of

  **g :** to restrict the exchange of (as currency or checks)

**2:** to mark or indicate the outline or chief lines of  *block* out a design

**3:** to shape on, with, or as if with a block   *block* a hat

**4:** to secure, support, or provide with a block        *blocking* a plate for printing      *block* up the rear wheels

16

**5:** to work out (the principal positions and movements) for the performers (as of a play )*also* **:** to work out the players' positions and movements for (a scene or a play) — often used with *outblock* out a scene before the actors arrive on set

**6** *typesetting* **:** to make (two or more lines of writing or type) flush at the left or at both left and right

**7** *golf* **:** to hit (a ball or shot) inaccurately toward the right from a right-handed swing or toward the left from a left-handed swing **:** PUSH

OED:

**block, v.**

5. a. *transitive*. To obstruct or close with obstacles (a passage). Predicated either of the personal agent, or of the obstructions. Also *figurative*.

6. To shut *up* or *in* by obstructing ingress and egress, to prevent access to or exit from. Predicated of the agent or the obstruction, as in sense 1.

7. *spec*.
   a. To blockade, invest.
   b. *Draughts*. To force (one's opponent's men) into such a position that they cannot move.
   c. *Cards*.

8. a. To obstruct the way or course of.
   b. *Neurology*. To obstruct the passage of a nervous or muscular impulse.
   c. **to block off**: to stop, to head off. *U.S. colloquial.*
   d. To restrict the use or conversion of currency of other assets. Cf. FREEZE.
   e. *American Football*. To obstruct (an opponent, esp. a defensive player) by interposing one's body. Also *absol.* or *intransitive*.

5. *Cricket*. To stop (a ball) with the bat, so as merely to protect the wicket, without attempting to hit so as to score runs; also *absol*. and with wicket as object.

6. *Parliament*. To prevent or postpone the passage of a bill; *spec*. to give notice of opposition to a bill in the House of Commons, which prevents it from being taken after half past twelve (midnight).

7. *intransitive*. To bargain. *Scottish*.

8. a. *transitive*. To shape on a block. See BLOCK *n*. 4.
   b. To hammer smooth or into a particular shape on a block.
   c. To emboss the covers of books by pressure from a block.

9. a. To sketch out, mark out roughly (work to be finished afterwards); to lay out, plan. Now usually with *out*; also *in*.
   b. *Theatre*.

10. a. To cut *out* or make into blocks…
    b. *Drapery*. To make into a block…

11. a. To support or fit with blocks of wood.
    b. To pave (a street) with blocks.

12. *Sheep-shearing. To block out*. . .

We see that each of these entries covers roughly the same range of meanings. In particular, AH 1a + 1b together cover something like the same range of meanings as MW 1a + 1c and OED 1a + 2 + 4.  Thus, the lexicographers in each case found senses that could be paraphrased 'be in the

17

way of', for a non sentient entity, not necessarily indicate any agency or intent on the part of the individual or entity blocking the path of the individual denoted by the direct object. And each found a sense in which the verb's subject denotes an agent who intentionally prevents the direct object from progressing.

Definitions of the noun *impasse*:

AHD:
1. A road or passage having no exit; a cul-de-sac.
2. A situation that is so difficult that no progress can be made; a deadlock or stalemate: *reached an impasse in the negotiations*.

MW:
1. a. A predicament affording no obvious escape
   b. deadlock
2. an impassable road or way: cul-de-sac

OED:
A road or way having no outlet; a blind alley, 'cul-de-sac'. Also *figurative*, a position from which there is no way of escape, a 'fix'.

Definitions of the auxiliary verb *will* (past tense *would*, negative form *wouldn't*):

AHG:
**1.** Used to indicate simple futurity: They will appear later.
**2.** Used to indicate likelihood or certainty: You will regret this.
**3.** Used to indicate willingness: Will you help me with this package?
**4.** Used to indicate requirement or command: You will report to me afterward.
**5.** Used to indicate intention: I will too if I feel like it.
**6.** Used to indicate customary or habitual action: People will talk.
**7.** Used to indicate capacity or ability: This metal will not crack under heavy pressure.
**8.** Used to indicate probability or expectation: That will be the messenger ringing.

MW:
1. used to express desire, choice, willingness, or in negative constructions refusal
2. used to express frequent, customary, or habitual action or natural tendency or disposition
3. used to express futurity
4. used to express capability or sufficiency
5. used to express probability and often equivalent to the simple verb
6. a. used to express determination, insistence, persistence, or willfulness
   b. used to express inevitability
7. used to express a command, exhortation, or injunction

18

OED:

II. As an auxiliary verb, usually followed with a bare infinitive. . .

7. Expressing a desire: desire to, wish to, want to, have a mind to (do something); often implying intention. *Obsolete*

8. a. *Obsolete*. . .
   b. Expressing a request in the second person, in the interrogative or in a subordinate clause after a verb such as *beg*.

9. *Obsolete*…

10. Expressing habitual or characteristic action: has the habit or characteristic of willing…

11. a. Expressing ironic or critical force, expressing doubt about another person's assertion or opinion. Chiefly with *have* followed by object and infinitive or *that*. . .
    b. In emphatic use. Be fully determined to; insist on or persist in. . .

12. Expressing determination, wish or intention to bring about some action, event, or state of things in the future: intend to, mean to. In the negative: refuse or decline to.

13. *Obsolete*…

14. Expressing prediction of future events.

15. Expressive prediction of a contingent future event, or a result to be expected, in a supposed case or under particular conditions (with the condition expressed by a conditional, temporal, or imperative clause, or implied): must as a necessary consequence.

16. a. In the first person, expressing the speaker's or writer's immediate intention. . .
    b. *figurative*. *Obsolete*. . .
    c. In the first person plural, expressing a proposal…

17. Expressing potentiality, capacity, or sufficiency: can, may, be able to, be capable of –ing; is (large) enough or sufficient to.

The past tense *would* with temporal function.

18. a. *Obsolete*. . .
    b. *Obsolete*. . .

19. a. *Obsolete*. . .
    b. *Obsolete*. . .

20. Expressing habitual or characteristic action: had the habit or characteristic of –ing, had a way of –ing; was accustomed to –ing; used to.

21. In indirect reported speech or thought, or its virtual equivalent, in statements in the second and third persons reporting an original statement (esp. of intention) in the first person: intended to, meant to; was going to.

22. a. Expressing past prediction of a future event in a subordinate clause or in virtual reported speech or thought. . .
    b. Expressing past prediction of a contingent future event, or a result to be expected, in a supposed case or under particular conditions (with the condition expressed by a conditional or temporal clause, or implied): was bound to, was going to.
    c. In the past, with personal subject (usually third person singular), expressing a voluntary act or choice in a supposed case, or a conditional promise or undertaking: was bound to, undertook to. . .
    d. Expressing the past likelihood of an action or fact with little or no future reference, as in *would be* 'probably or presumably was'. . .

23. Expressing potentiality, capacity, or sufficiency: was capable of –ing; could.

19

24. *Obsolete*.

25. In emphatic use: was fully determined to; insisted on or persisted in –ing. . .

The past tense *would* with modal function.

26. a. Used with potential or conditional force to tone down the effect of the present tense in sense 7, and hence virtually equivalent to it: should like to; wish, desire, or 'want' to (sometimes implying 'intent'). . .

    b. In less assertive use: am (is, are) disposed or inclined to; often (in the first person singular) in tentative, polite, or deferential contexts with the sense 'I wish to. . .if I may'.

    c. *Obsolete*.

27. In the main clause (apodosis) of a hypothetical proposition (expressed or implied) indicating that the supposition is a possibility or contingent or conditional upon something. . . .

28. a. In the main clause (apodosis) of a hypothetical proposition (expressed or implied), with personal subject, with implication of intention or volition. . . .

29. a. In a conditional (or equivalent) clause originally and chiefly with a personal subject, with implication of intention or volition: chose to, was willing to. . .

    b. *Obsolete*.

    c. *Obsolete*.

30. a. In a conditional clause expressing a hypothetical condition or supposition, without implication of intention or volition: were to, should.

    b. *Obsolete*.

31. In a hypothetical question or indirect statement in the second or third person (where *should* was formerly usual in the corresponding direct statement in the first person. . .): could possibly,  might possibly.

32. *Rare.*

33.  *colloquial*.

III. With ellipsis of the dependent infinitive clause.  [Since this is not the syntactic structure of the passage in question in question 1, I ignore this here.]

IV. Special uses of the past participle as an auxiliary verb.  [These are either *Obsolete* or regional in the U.S. south, so not relevant here.]

November 2021

# Craige Roberts
Brief Curriculum Vitae

## Education

1979, A.B., Indiana University

1979 – 1980, studied Lexicography with Professor Edward Gates (former Associate Editor of Webster's Third New International Dictionary, The G. & C. Merriam Company, Springfield, Massachusetts), Indiana State University.

February 1987, Ph.D. in Linguistics, University of Massachusetts at Amherst. Dissertation: *Modal Subordination, Anaphora, and Distributivity*. Supervisor: Barbara H. Partee.

## Academic Positions

**Current**:  Professor Emerita, Linguistics Department, The Ohio State University.
Visiting Professor, New York University, 2016 to 2019.
Affiliate, Rutgers University Center for Cognitive Science, May 2016 to present.

Full Professor with tenure, Linguistics Department, Ohio State University, 2007 - 2016: undergraduate and graduate courses and seminars in syntax, semantics, and pragmatics. Associate Professor 1994 – 2007, Assistant Professor 1988 – 1994.

Postdoctoral Fellow, Center for the Study of Language and Information, Stanford University, 1986 – 1988.

Visiting Research Fellow, Faculty of Philosophy, University of Amsterdam, The Netherlands, Spring 1992, and again Autumn 2002.

Visiting Professor, Department of Philosophy, University of Michigan, Autumn, 2009.

## Honors

Fellow, National Humanities Center, Durham, North Carolina, 2012-2013.

Senior Fellow, Institute for Advanced Studies, Central European University, Budapest, Hungary, 2014-15.

## Legal Work

I developed and regularly taught a course on Language and the Law, Linguistics 597.02, at the Ohio State University, from 2005 through 2016.

I have been retained as an expert witness in a variety of legal matters, including work for:

Dinsmore & Shohl, LLP, Cincinnati, OH, to provide testimony in August, 2004 in Columbus, OH, in the case of Nationwide Mutual Insurance Company vs. Sovereign Bank and Sovereign Bankcorp., Inc., in a Civil matter pertaining to trademark law and the interpretation of an advertising slogan. **Testified in court**.

Deters, Benzinger & LaVelle, p.s.c., Crestview Hills, KY, regarding the interpretation of Kentucky Revised Statute 216B.020(2)(a), pertaining to licensure of health care facilities. Testified at a magistrate's hearing of the Kentucky Cabinet for Health and Family Services, September, 2004, Frankfort, KY, in the case of John W. Gilbert, M.D., et al. v. Commonwealth of Kentucky, Cabinet for Health and Family Services, et al.

Commonwealth of Kentucky Franklin Circuit Court Division II Civil Action No. 05-CI-00275.

Deters, Benzinger & LaVelle, p.s.c., Crestview Hills, KY, in October, 2004, on the interpretation of a legal contract.

Deters, Benzinger & LaVelle, p.s.c., Crestview Hills, KY, in May, 2006 on the interpretation of a legal contract.

Parry, Deering, Futscher & Sparks, p.s.c., Covington, KY, on the interpretation of an insurance contract.

Cull, Hayden & Vance, p.s.c., Frankfort, KY, August, 2006, on the interpretation of statutes in Kentucky law pertaining to licensure of health care facilities.

Zeiger, Tigges & Little, LLP, Columbus, OH, September, 2006 and July 2007, on the interpretation of contracts.

Keating, Meuthing & Klekamp PLL, Cincinnati, OH, October 2007, on the interpretation of a statute pertaining to contracts.

Cull, Hayden & Vance, p.s.c., Frankfort, KY, September, 2009, on the interpretation of a statute of Kentucky law pertaining to licensure of health care facilities.

Sparks PLL, Covington, KY, September, 2010, on the interpretation of a commercial contract.

Dritz, PLL, Columbus, OH, May, 2012, on the interpretation of email correspondence at-issue in a criminal case.

Deters, Benzinger & LaVelle, Crestview Hills, KY, in June, 2016, on the interpretation of a Kentucky statute pertaining to the licensure of health care facilities.

Zeiger, Tigges & Little LLP, Columbus, OH, in 2019, expert witness report on the interpretation of a legal contract in Kestra Investment Services, LLC v. The Ohio National Life Insurance Company, et al., US District Court, Western District of Texas, Case No: 1:19-cv-0687. In 2020, prepared a Rebuttal to the report of an expert witness for the plaintiff.

Zeiger, Tigges & Little LLP, Columbus, OH, in 2020, expert witness report on the interpretation of a legal contract in RBC Capital Markets, LLC v. The Ohio National Life Insurance Company, et al., US District Court, District of Minnesota, Case No: 1:19-cv-00062.

Hemmer, DeFrank, Wessels, Attorneys at Law, Ft. Mitchell, KY, 2021, retained as expert witness in a defamation suit, preparing a report.

## Books

Albert Valdman, Sarah Yoder, Craige Roberts & Yves Joseph: *Haitian Creole - English - French Dictionary*. Bloomington, Indiana: Indiana University Creole Institute, 1981. [Volume One, 582pp.; Volume Two: French - Creole and English - Creole Indices, 156pp.]

*Modal Subordination, Anaphora, and Distributivity*. Garland Press, Outstanding Dissertations in Linguistics Series, New York, 1991. [255 pp., revised Ph.D. thesis.]

Special issue of *Linguistics & Philosophy* on the semantics of cardinals. Editor with Stewart Shapiro. To appear, August, 2017.

## Selected Refereed Publications

"Modal Subordination and Pronominal Anaphora in Discourse". *Linguistics and Philosophy* 12.6:683 - 721, 1989. Also CSLI Report No.88-127, May 1988. Reprinted in Javier Gutíerrez-Rexach (ed.) (2003) *Semantics: Critical concepts in linguistics*, Routledge.

"Domain Selection in Dynamic Semantics". In Emmon Bach, Eloise Jelinek, Angelika Kratzer, and Barbara H. Partee (eds.) (1995), *Quantification in Natural Languages*, Kluwer, Dordrecht, pp.661-700.

"Anaphora in intensional contexts". In Shalom Lappin (ed.) (1996) *The Handbook of Contemporary Semantic Theory*, Basil Blackwell, pp.215-246.

"Focus, the Flow of Information, and Universal Grammar". In Peter Culicover and Louise McNally (eds.) (1998), *The Limits of Syntax*, Academic Press, pp.109-160

"Spanish *imperfecto* and *preterito*: Truth conditions and aktionsart effects in a situation semantics". With Alicia Cipria. *Natural Language Semantics* 8.4:297-347, 2000.

"Demonstratives as definites". In Kees van Deemter and Roger Kibble (eds.) (2002) *Information Sharing: Reference and Presupposition in Language Generation and Interpretation*, CSLI Press, pp.89-196.

"Uniqueness in definite noun phrases". *Linguistics and Philosophy* 26:287-350, 2003.

"Discourse context in dynamic interpretation". In Laurence Horn and Gregory Ward (eds.) (2004) *Handbook of Contemporary Pragmatic Theory*, Blackwell, pp.197-220.

"Pronouns as definites". In Anne Bezuidenhout and Marga Reimer (eds.) (2004) *Descriptions and Beyond*, Oxford University Press, pp.503-543.

"*know-how*: A compositional approach". In Erhard Hinrichs & John Nerbonne (eds.) Theory and Evidence in Semantics. CSLI Publications. 183-213.

"*only*: A case study in projective meaning". In Barbara H. Partee, Michael Glanzberg & Jurgis Skilters (ed.) (2011) *Formal Semantics and Pragmatics: Discourse, Context and Models*. Special issue of the *Baltic International Yearbook of Cognition, Logic and Communication*, Riga, Lattvia.

"Topics". In Claudia Maienborn, Klaus von Heusinger & Paul Portner (eds.) (2012) *Semantics: An International Handbook of Natural Language Meaning*. Mouton de Gruyter.

"Information Structure: Toward an integrated theory of formal pragmatics". *Semantics and Pragmatics* 5.6:1-69. (Invited as a classic unpublished paper.) . http://dx.doi.org/10.3765/sp.5.6.

"Information Structure: Afterword" with bibliography of related work. *Semantics and Pragmatics* 5.7:1-19. http://dx.doi.org/10.3765/sp.5.7.

"Accommodation in a Language Game". In Barry Loewer & Jonathan Schaffer (eds.) *A Companion to David Lewis*. Blackwell/Wiley, Hoboken, NJ, 2015.

"Plans and imperatives: A semantics and pragmatics for imperative mood". *Proceedings of the Amsterdam Colloquium 2015*. ILLC, University of Amsterdam.

"Review of Robert Stalnaker, *Context*, Oxford University Press, 2014". *Notre Dame Philosophical Reviews* 2016.06.20: http://ndpr.nd.edu/news/67831-context-2/, 2016.

"The best question: Explaining the projection behavior of factives". *Discourse Processes* 54.3:187-206, a special issue on the Question In Discussion, 2017. Available open-access at: http://www.tandfonline.com/doi/pdf/10.1080/0163853X.2016.1150660?needAccess=true. With Mandy Simons, David Beaver & Judith Tonhauser.

"Questions Under Discussion: Where information structure meets projective content". *Annual Review of Linguistics* 3, 2017. With David Beaver, Mandy Simons & Judith Tonhauser.

"Linguistic convention and the architecture of interpretation". *Analytic Philosophy* 58.4:418-439, 2017.

"Ontology via semantics?: Introduction to the special issue on the semantics of cardinal numbers". With Stewart Shapiro. *Linguistics and Philosophy* 40.4:321-329, 2017.

"Speech acts in discourse context". In Daniel Fogal, Daniel Harris & Matt Moss (eds.) (2018) *New Work on Speech Acts*. Oxford University Press.

"Contextual influences on reference". In Barbara Abbott & Jeannette Gundel (eds.) *Oxford Handbook of Reference*, Oxford University Press, 2018, 260-280.

"Open texture and analyticity". With Stewart Shapiro. In Dejan Makovec & Stewart Shapiro (eds.) *Friedrich Waismann: The Open Texture of Analytic Philosophy*. Palgrave Macmillan, Cham, Switzerland, 189-210, 2019.

"Modal Subordination: *It would eat you first!*". In Daniel Gutzmann, Lisa Matthewson, Cécile Meier, Hotze Rullmann & Thomas Ede Zimmermann (eds.) *The Wiley Blackwell Companion to Semantics*. Wiley. 2021.

"Open Texture and Mathematics", with Stewart Shapiro. *Notre Dame Journal of Formal Logic* 62(1):173-192, 2021.

## Selected Recent Invited Talks and Colloquia

MayFest, invited talk, University of Maryland Cognitive Science, May 6, 2016, "Context in Linguistic Pragmatics".

Institute on Reasoning, University of Quebec at Montreal, June, 2016: "Constrained practical reasoning in linguistic interpretation".

North American Summer School on Logic, Language and Information (NASSLLI), Rutgers University, New Brunswick, NJ, July, 2016, Intensive short course: "The Question Under Discussion", joint with David Beaver, Mandy Simons and Judith Tonhauser.

CUNY GradCenter Cognitive Science Colloquium, October, 2016: "Agreeing and Assessing: Epistemic modals and the question under discussion".

Cornell Workshop on Speech Acts, November, 2016: "Speech acts in discourse context."

NY Philosophy of Language Colloquium, December, 2016 (at NYU): "Character assassination: *de se* semantics for indexicals".

NYU short course on Indexicality, January – February, 2017.

UMass/Amherst Linguistics Department invited talk (Seminar on anaphora, Daniel Altshuler and Barbara H. Partee): "*de se* semantics for indexicals". March, 2017.

Conference on What Contexts Can and Cannot Do, University of Hamburg, invited speaker: "Indexicality: Center and Perspective". April, 2017.

Zentrum für Allgemeine Sprachwissenschaft (ZAS) Colloquium, Berlin: "Indexicality: Center and Perspective". April, 2017.

Yale University Linguistics and Philosophy Colloquium: "Agreeing and Assessing: Epistemic modals and the question under discussion." April, 2017.

UIO-XPrag.de Workshop on Non-At-Issue Meaning and Information Structure, Oslo, invited speaker: "Agreeing and Assessing". May, 2017.

Universitat Pompeu Fabra, Barcelona, Spain: "Agreeing and Assessing". May, 2017.

University of São Carlos, Brazil, September, 2017, Short course on "Anaphora in Discourse".

Rutgers University Linguistics Department Colloquium: "*de se* semantics for indexicals". October, 2017.

Carnegie Mellon University seminar, invited speaker: "Anaphora and Coherence". October, 2017.

Logic and Engineering of Natural Language Semantics (LENLS) 14, Hokkaido University, Tokyo, invited speaker: "Character Assassination". November, 2017.

University of Connecticut Philosophy Department Colloquium: "Character Assassination: *de se* semantics for indexicals". March, 2018.

University of Pennsylvania Department of Linguistics Colloquium: "Character Assassination: *de se* semantics for indexicals". April, 2018.

Society for Exact Philosophy Annual Meeting, University of Connecticut, invited keynote: "The Character of Epistemic Modality". May, 2018.

University of Toronto Philosophy Department Colloquium: "The Character of Epistemic Modality". November, 2018.

New York Philosophy of Language Workshop, NYU: "The character of epistemic modality". April, 2019.

Philosophy of Language and Mind Biannual Meeting, St. Andrews, Scotland: "The character of epistemic modality". August, 2019.

University of Tübingen Workshop on Information structure and ambiguity, Tübingen, Germany, invited speaker: "The Question Under Discussion in anaphora resolution". October, 2019.

Google, invited on-line talk: "What are you talking about? Expectation and the architecture of interpretation". June, 2020.

SemDial 24 (WatchDial), invited keynote: "Perspective and indexicality: A NeoLocalist approach". Virtual workshop organized by Brandeis University, July, 2020.

OSU Pragmatics Group: "Slurs". November 30, 2020 (on-line).

EXPRESS workshop on Non-Assertoric Speech Acts, invited talk: "Imperatives in a dynamic pragmatics". January 28, 2021, Amsterdam, Netherlands (on-line).

Workshop on QUD annotation, Zentrum für Allgemeine Sprachwissenschaft (ZAS), Berlin (invited talk): "Some desiderata for QUD annotation". October, 2021 (on-line).

MECORE Workshop on Approaches to the semantics of clause-embedding predicates, at the Universities of Edinburgh, Konstanz and Amsterdam (invited talk): "Background content, meaning postulates, and presuppositions". October, 2021 (on-line).


## Ph.D. Dissertations Supervised

Katherine A. Welker (1994) *Plans in the Common Ground: Towards a generative account of conversational implicature*, Linguistics Department, The Ohio State University.

Jae-Hak Yoon (1996) *Temporal Adverbials and Aktionsarten in Korean*. Linguistics Department, The Ohio State University.

Alicia Cipria (1996) *The Interpretation of Tense in Spanish Complement Clauses*, Department of Spanish and Portuguese, The Ohio State University (co-advisor with Professor Dieter Wanner).

Svetlana Godjevac (2000) *Word Order, Intonation, and Focus Projection in Serbo-Croatian*. Linguistics Department, The Ohio State University.

Jean Godby (2001) *English Compound Nominals: a Study of Lexicalization*. Linguistics Department, The Ohio State University.

E. Allyn Smith (2010) *English Correlational Comparatives*. Linguistics Department, The Ohio State University.

Scott Martin (2013) *The Dynamics of Projective Meaning*, Linguistics Department, The Ohio State University.

Jefferson Barlew (2016) *The semantics and pragmatics of perspectival expressions in English and Bulu: The case of deictic motion verbs* (co-advisor with Judith Tonhauser).

## Selected Grants

Principal Investigator, National Science Foundation Grant #NBS-9022934, for $59,714: "Semantic Interactions between Modality and Tense", 1991 – 1995. Awarded supplement to National Science Grant #NBS-9022934, for $7,876, to organize and conduct a research workshop on the Semantic Interactions between Modality and Tense, Ohio State University, 1993.

Principal Investigator (co-PI with Robert T. Kasper of OSU during 1998-00), Motorola, Inc. University Partnership in Research grant, $46,250: "Modeling Natural Language Dialogue for a Voice-Mail System", 1998 – 2001.

Principal Investigator (co-PI with Donna Byron, OSU CSE), National Science Foundation Grant #60006402, $26,371, "Presupposition Accommodation Conference and Intensive Course", 2006 – 2007.

Principle Investigator (co-PI with David Beaver, University of Texas, Mandy Simons, Carnegie Mellon University, and Judith Tonhauser, OSU), National Science Foundation Grant (# pending), $396,000, "Projective Meanings", 2010-2012.

Principal Investigator (co-PI with David Beaver (Texas/Austin), Mandy Simons (Carnegie Mellon) and Judith Tonhauser (OSU)), National Science Foundation Collaborative Grant, $530,000 total (#1452674 to OSU for $286,420), "What's the question? A cross-linguistic investigation into compositional and pragmatic constraints on the question under discussion", 2015-2021.  June, 2015: supplement for $11,900 for project-related workshops.

6

**Table of Videos viewed by Craige Roberts**

| Video Title | Dropbox Link to Video | Description |
|---|---|---|
| Video 1 | https://www.dropbox.com/s/wz29kgpvi5szx57/Video%201.Viral%20Video.N.S.%20000118.mp4?dl=0 | "Viral Video" |
| Video 2 | https://www.dropbox.com/s/hlo0r6pnckijus4/Video%202.Second%20Taitano%20Video.N.S.%20000119.mp4?dl=0 | "Second Taitano Video" |
| Video 3 | https://www.dropbox.com/s/ccj1jri6nwam0np/Video%203.Video%20Cited%20by%20CovCath%20Student.N.S.%20000121.mp4?dl=0 | "Video Cited by CovCath Student" |
| Video 4 | https://www.dropbox.com/s/r669sphtcafllx1/Video%204.Banyamyan%20Video.N.S.%20000116.mp4?dl=0 | "Banyamyan Video" |
| Video 5 | https://www.dropbox.com/s/dncy7g5c419p3mu/Video%205.First%20Portion%20of%20WhatsApp%20Video.%28Proposed%20by%20Defendants%29%20%28Originally%200010-0534%29.mp4?dl=0 | "First Portion of WhatsApp Video" |
| Video 6 | https://www.dropbox.com/s/bssh229je1socwq/Video%206.KC%20Noland%20Video%201.%28Part%20of%20N.S.%20128%20at%201040%29.mp4?dl=0 | "KC Noland Video 1" |
| Video 7 | https://www.dropbox.com/s/1z1a7kcj4hr6wn0/Video%207.Taitano%20Video%203.mp4?dl=0 | "Taitano Video 3" |
| Video 8 | https://www.dropbox.com/s/asi18roehztkj56/Video%208.Hooligan%20Instagram%20Video%201.mp4?dl=0 | "Hooligan Instagram Video" |
| Video 9 | https://www.dropbox.com/s/3yg38oolsap3iac/Video%209_%20TIME.com%20Clip.mp4?dl=0 | "Time.com Clip" |
| Video 10 | https://www.dropbox.com/s/7xj6mish81ezr2s/Video%2010.First%20Portion%20of%20N.S.%20128.N.S.%20000128.mp4?dl=0 | "First Portion of N.S. 128" |
| Video 11 | https://www.dropbox.com/s/3ej3nk9saqlxe4k/Video%2011.Second%20Portion%20of%20WhatsApp%20Video.%28Originally%200705-0930%29%20%28also%20appears%20to%20be%20N.S.%20000117%29.mp4?dl=0 | "Second Portion of WhatsApp Video" |
| Video 12 | https://www.dropbox.com/s/aje87abzyuxfyn8/Video%2012.Twitter%20Video%201.N.S.%20001802.mp4?dl=0 | "Twitter Video 1" |
| Video 13 | https://www.dropbox.com/s/y5z0lbtuo2tnx28/Video%2014.Twitter%20Video%203.N.S.%20001804.mp4?dl=0 | "Twitter Video 3" |

| Video 14 | https://www.dropbox.com/s/1mmb5jt0ee906fx/Video%2014.Fries%20Video%201.N.S.%20001735.mov?dl=0 | "Fries Video 1" |
| Video 15 | https://www.dropbox.com/s/z4ntolz5w2qs7vi/Video%2015.Miscellaneous%20Video%201.N.S.%20000125.mp4?dl=0 | "Miscellaneous Video 1" |
| Video 16 | https://www.dropbox.com/s/kgeelapduuw0wxx/Video%2016.Aerial%20View.GCI%20000018.mp4?dl=0 | "Aerial View" |
| Video 17 | https://www.dropbox.com/s/j4okqo8wz7228m9/Video%2017.Miscellaneous%20Video%202.mp4?dl=0 | "Miscellaneous Video 2" |
| Video 18 | https://www.dropbox.com/s/3mgfjlic4vsd9zn/Video%2018.Maria%20Judy%20Video.mp4?dl=0 | "Maria Judy Video" |