UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

| | | |
|---|---|---|
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | : | **CASE NO. 2:20-cv-23-WOB-CJS** |
| Plaintiff, | : | |
| v. | : | |
| **THE NEW YORK TIMES COMPANY d/b/a THE NEW YORK TIMES,** | : | |
| Defendant. | : | |
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | : | **CASE NO. 2:20-cv-24-WOB-CJS** |
| Plaintiff, | : | |
| v. | : | |
| **CBS NEWS, INC., et al.,** | : | |
| Defendants. | : | |
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | : | **CASE NO. 2:20-cv-25-WOB-CJS** |
| Plaintiff, | : | |
| v. | : | |
| **ABC NEWS, INC., et al.,** | : | |
| Defendants. | : | |

| | |
|---|---|
| **NICHOLAS SANDMANN,** | : CASE NO. 2:20-cv-26-WOB-CJS |
| Plaintiff, | : |
| v. | : |
| **GANNETT CO., INC., et al.,** | : |
| Defendants. | : |
| | |
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | : CASE NO. 2:20-cv-27-WOB-CJS |
| Plaintiff, | : |
| v. | : |
| **ROLLING STONE, LLC, et al.,** | : |
| Defendants. | : |

## NICHOLAS SANDMANN'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

### [ORAL ARGUMENT REQUESTED]

Todd V. McMurtry (KBA #82101)
Jeffrey A. Standen (*pro hac vice*)
J. Will Huber (KBA #99339)
HEMMER DEFRANK WESSELS PLLC
250 Grandview Drive, Suite 500
Ft. Mitchell, Kentucky 41017
Phone: (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
jstanden@hemmerlaw.com
whuber@hemmerlaw.com

*Trial Attorneys for Plaintiff,
Nicholas Sandmann*

I. **THE DEFENDANTS' MISCHARACTERIZATION OF THE RECORD**

In their Joint Memorandum in Opposition to Nicholas Sandmann's ("Nicholas'") Motion for Partial Summary Judgment (the "Joint Memorandum"), the Defendants cite repeatedly to a few partial phrases they gleaned from Nicholas's voluminous deposition testimony.[1] These few phrases, Defendants assert, not only call into question the fact that Nicholas did not block Phillips nor prevent his escape, but they also, Defendants assert, sway the factual question the other way, requiring this Court to deny Nicholas's motion and, in turn, grant theirs.[2] Despite the clear video evidence[3] that shows that Nicholas in no way can be said to have "blocked" Phillips,[4] and despite the unequivocal statements by Nicholas himself in his deposition that he most decidedly did not block Phillips, the Defendants argue that these few phrases comprise Nicholas' confession that he did admit to blocking Phillips. They do not; Nicholas made no such admission. Read in context, and considered along with Nicholas' many other statements where he unequivocally denies ever intending to or actually blocking Nathan Phillips ("Phillips") in any way,[5] these few phrases fall far short of establishing the truth of Phillips' defamatory declarations.

---

[1] Joint Memorandum at 7-12. Excerpts of the transcript of Nicholas' deposition are attached hereto as ***Exhibit A***.

[2] Joint Memorandum at 1.

[3] The twenty stipulated videos were filed in each of the five pending cases. For ease of reference, this Reply brief cites to the docket numbers in Nicholas' cases against the New York Times: *Sandmann v. The New York Times Co.*, No. 2:20-cv-23. In that case, the stipulation was filed as Doc. 48, and the videos were conventionally filed via a thumb drive as Doc. 49. The remainder of this Reply brief cites to the videos on that thumb drive simply by their number (Video 1, Video 2, etc.).

[4] The stipulated videos clearly show that Phillips never once attempted to move around or away from Nicholas. A reasonable juror could conclude that the videos show Phillips making a deliberate choice to stand in front of Nicholas and lock eyes with him for approximately six minutes, beating a drum violently and singing loudly in his face. (Sandmann Dep. 237-38). Phillips beat his drum so close to Nicholas that the drum made physical contact with Nicholas' jacket collar. The videos contradict the declarations attached to the Joint Memorandum because any reasonable juror would conclude that Phillips' confrontation of Nicholas was no "peaceful" gesture. Instead, the confrontation was emblematic of an adult man putting himself within inches of a high schooler's face and beating a drum violently and loudly for approximately six minutes, never trying to move away.

[5] *E.g.*, Sandmann Dep. 267 ("I did not block [Phillips]"), 263-64 ("[T]here is no way for me to block him when I'm five or six feet away from him. He waited to come up to me and then claim I blocked him."), 276 ("I never felt like I was blocking the Native American protestor.").

The entire tone and tenor of the Defendants' deposition of Nicholas shows how Defendants' counsel pushed the young plaintiff into making speculative statements which the Defendants now describe as a substantive admission. Repeatedly, Nicholas stated that the Defendants' purported description is "not what happened."[6] But would a reasonable person think it so?, the Defendants would ask. No, Nicholas answered repeatedly.[7] But "could" or "is it possible" that some other person, someone not even part of the case, "might" look at this and think otherwise? Yes, of course it is "possible," Nicholas would reply.[8] Ahah, an admission of the truth!, now reads the Joint Memorandum.[9] Such pushing and bullying into entirely imaginative answers about the possible perceptions of the hypothetical "someone" does not produce factual evidence; it produces mere useless and inadmissible speculation. *Hamilton v. AVPM Corp.*, 593 Fed. App'x. 314, 319 (5th Cir. 2014), *cert. denied,* 575 U.S. 951 (2015) (holding that, on summary judgment, it was not error to exclude employment supervisor's deposition statement about hypothetical racial bias because comment about how some unnamed, hypothetical person might perceive supervisor's remark was pure speculation).

Watch this exchange, one of many like it during Nicholas' deposition. Regarding a statement made by another student, a statement that Nicholas had already testified under oath that in fact he did not hear, the Defendants pushed Nicholas into what they call an "admission":

---

[6] *E.g.*, *id.* at 146-47, 213-14 (Q: Couldn't someone perceive that there were students who were swarming around [Phillips] at this point? MR. MCMURTRY: Objection. Go ahead. A: I mean, to me, not really.).

[7] *E.g., id.* at 137 (Q: [W]ould it be reasonable to infer that somebody might have been concerned that at least one of the students was getting too close to Phillips? A: I don't think that's reasonable).

[8] *See, e.g., id.* at 63-64 (Q: Do you think somebody seeing this … [could think] that [student] was mocking [the BHI] by doing that? A: I guess they could…), 138 (Q: I'm asking you could someone watching this honestly infer that that is what [a student] was saying to [another student], hey, don't touch him? MR. MCMURTRY: Objection. Go ahead and answer. A: Someone could infer that that is who [the student] was talking to. Yeah, I agree with that.), 213-14 (Q: Couldn't someone perceive that there were students who were swarming around [Phillips] at this point? MR. MCMURTRY: Objection. Go ahead. A: I mean, to me, not really … [replays video] Q: Somebody could perceive that there are students now who have sort of swarmed around Phillips on both sides, right? A: Yeah, I mean, someone could look at it that way if they wanted to.).

[9] Joint Memorandum at 1, 7-12.

2

> Q. Do you think that the student was trying to communicate anything to the BHI [Black Hebrew Israelites] by saying that in that context?
> A. No.
> Q. Do you think he was taunting the BHI by saying that?
> MR. MCMURTRY: OBJECTION.
> A. No.
> Q. I mean, that's your interpretation of it, right?
> A. Right. I don't –
> Q. You don't know, right?
> A. I don't – I don't know, but I don't think he was.
> Q. Okay. Is it fair to say that someone else watching the same thing could disagree with you?
> A. They could.
> Q. And I take it that they could honestly disagree with you?
> A. I suppose, yeah.[10]

This entire exchange referred to a statement that Nicholas testified, under oath, that he had in fact not heard, that was apparently uttered by a person Nicholas could not identify, and whose motivations he could but only guess.[11] This exchange is emblematic of many more like it throughout the two-day deposition, as Nicholas "conceded" only that it was entirely within the realm of possibility that some other person, unknown to him, might conceivably view a particular set of circumstances differently than did Nicholas.[12] In fact, Nicholas' reasonable statements that someone else could disagree with him about the import of a statement infect the Defendants' entire deposition and form the basis for Defendants' remarkable claims that Nicholas has in fact "conceded" the matter in their favor.[13]

The Defendants do not provide a fair account of Nicholas' testimony. If we look at what Nicholas did in fact witness, the picture becomes much clearer and free of useless speculation. Below are the factual points to which Nicholas testified. These are his sworn recollections, a product of his personal knowledge, and not useless speculation.

---

[10] Sandmann Dep. 112-113.
[11] *Id.*
[12] *See* n. 7-8, *supra*.
[13] Joint Memorandum at 1, 7-12.

3

- It was Phillips, and no one else, who first "hit up against . . . and came in physical contact with [another CovCath student]). (Sandmann Dep. 135).

- It was Phillips who first "ran into" one of the students. (*Id.*).

- It was Phillips who drew "too close" to the students, and not the other way around. (*Id.* 137).

- It was Phillips who started "40, 50 feet away" from the students while the students, who "don't have anywhere to move because of how crowded it is," stood still while Phillips advanced on them. (*Id.* 137-38).

- "I think that for Nathan Phillips to come from where he was and then to get close and then not give [a particular student] any room to move and then to say that the students weren't giving Phillips his personal space to me is a dishonest, unreasonable opinion." (*Id.* 138).

- "[H]e (Phillips) keeps moving closer and closer, . . . and he starts to walk through people." (*Id.* 147).

- It was other members of the indigenous people's group, or other adults, who stood behind Phillips, not Nicholas or his fellow students. (*Id.* 163).

- Phillips was "moving through the crowd trying to intimidate us." (*Id.* 169).

- "I perceived" Phillips trying to intimidate us [the students] "when he came to me and his drum directly came into contact with my shoulder and the drum stick that he was using to beat it was a couple centimeters from my face." (*Id.*).

- "[W]hen you look at pictures of the Lincoln Memorial, there was hundreds of feet of space to get there that did not involve walking through a group of students that had been there for some time." (*Id.* 170).

- And it is only then, with Phillips bullying the school children one by one into moving aside as he purposely tried to go through the group, that Nicholas states, "by the time he got in my face, when he could have kept – he could have even kept going through the students if he wanted to, I figured was it time for someone to plant their foot and stand there where I had been and just face up." (*Id.* 174-75).

4

- "I did not block [Phillips]." (*Id.* 267).

- "[T]here is no way for me to block him when I'm five or six feet away from him. He waited to come up to me and then claims I blocked him." (*Id.* 263-64).

- "I never felt like I was blocking the Native American protestor." (*Id.* 276).

Nicholas did not block Phillips' retreat.[14] No fair reading of his deposition can lead to the conclusion that he admitted to blocking Phillips. Instead, in entire sentences strategically omitted by the Defendants, Nicholas repeatedly described the scene as one in which it was Phillips, not Nicholas or his fellow students, who closed the wide gap between the groups; who initiated physical contact with other students and then Nicholas; who along with his fellow adults and protestors moved through the CovCath student group intimidating the children by inserting himself into their personal space, initiating contact, and beating his drum directly in their faces; and who had open to him "hundreds of feet" of open space to move around, instead choosing to wade directly into and through a group of school children.[15]

Nicholas' deposition testimony is clear: in no common sense of the word did he "block" Phillips.[16] The Defendants' assertion that he did simply is an unfair and unreasonable reading of his testimony. As Nicholas testified, it was Phillips who was "creepy and weird," because "in my experience, adults don't get that close to kids, especially for that long."[17] Nicholas was adamant that he did not block Phillips: "[Phillips] would have figured out really quickly, if he tried to move

---

[14] *See also* Stip. Video 2 at 00:51-03:45; Stip. Video 3 at 02:08-04:24; Stip. Video 11 at 00:55-02:24; Stip. Video 17 at 03:48-07:57 (collectively showing that Phillips never attempted to move around or away from Nicholas and instead chose to stand in front of him for approximately six minutes and beat a drum violently in his face as the drum touched Nicholas' jacket collar).

[15] *E.g.*, Sandmann Dep. 135, 137-38, 147, 163, 169, 170, 174-75.

[16] *See*, *e.g.*, n. 5, *supra*.

[17] Sandmann Dep. 192-93.

5

anywhere else, that I wasn't going to follow them."[18] The Defendants assert that Nicholas "moved" in order to block Phillips,[19] but again, the actual deposition testimony is to the opposite: "I'm almost positive that I did not move and the people around me shifted and that's why it looks like I'm in a different spot."[20] The Joint Memorandum, at pages 17-18, includes disconnected screenshots of Video 8, attempting to make it appear as if Nicholas "moved" in front of Phillips. Nicholas, however, unequivocally testified during his deposition that he *did not* move in front of Phillips (*id.*), and Video 8, when watched comprehensively, does not show Nicholas moving in front of Phillips. No reasonable juror watching Video 8 or the other stipulated videos could conclude that Nicholas moved in front of Phillips or blocked his retreat. "In my opinion, for me to block him, he would have had to have taken a step or a half step in another direction, other than standing there, even forward, and it would have required me to meet him in the corresponding way, wherever he went, to, you know, basically not let him go anywhere."[21] Nicholas' account is consistent from beginning to end. He did not move, he did not block, he did not advance on or intimidate Phillips. Yet the Defendants characterize Nicholas' forthright testimony as stating its exact opposite.[22]

## II. PHILLIPS HAD AMPLE ROOM TO MOVE

The Defendants argue that Nicholas blocked Phillips because Phillips had no clear pathway to proceed up the steps of the Memorial once the crowd had gathered around the spectacle of

---

[18] *Id.* 199.
[19] Joint Memorandum at 17.
[20] Sandmann Dep. 206.
[21] *Id.* 280.
[22] Joint Memorandum at 1, 7-12.

6

Phillips' beating his drum in Nicholas' face.[23] Yet that assertion puts the cart before the horse. There was no crowd, not at first.[24] There was a gathered group of high school students on a field trip, standing together waiting for their buses.[25] If Phillips thought he was in a crowd, it was of his own creation, as he chose to wade into the middle of the gathered student group beating his drum, beating it inches from people's faces one by one.[26] Eventually, Phillips came face-to-face with Nicholas.[27] Phillips had no cause to confront Nicholas and stand in front of him beating a drum for approximately six minutes as the drum touched Nicholas' jacket collar.[28] It was, as Nicholas testified, "creepy and weird" for an adult to bring himself this close to children unknown to him.[29] But it was Phillips' choice.

The video evidence is clear that Phillips had numerous open spaces to continue his ascent of the Memorial.[30] When called upon to explain his weird behavior after the fact, Phillips' invented claim that he had intended to ascend the Memorial was belied by the fact that he did not walk up the stairs once they had emptied.[31] No reasonable juror after watching the stipulated videos in their entirety could conclude that Phillips made any attempt to move around or away from Nicholas. In fact, a reasonable juror could only conclude that Phillips made a deliberate choice to stand in front

---

[23] Joint Memorandum at 1.

[24] Sandmann Dep. 47-49.

[25] *Id.*

[26] *Id.* 132-33, 163; Stip. Video 17 at 03:00-07:57; Stip. Video 2 at 00:51-03:45; Stip. Video 3 at 02:08-04:24; Stip. Video 11 at 00:55-02:24.

[27] *E.g.*, Stip. Video 2 at 00:51-03:45; Stip. Video 17 at 03:00-07:57.

[28] *E.g.*, Sandmann Dep. 262-63, 269; Stip. Video 17 at 03:30-07:57; Stip. Video 2 at 00:51-03:45; Stip. Video 3 at 02:08-04:24; Stip. Video 11 at 00:55-02:24.

[29] Sandmann Dep. 192-93.

[30] *E.g.*, Stip. Video 2 at 00:54 (showing three-foot opening to Nicholas' left and to Phillips' right); Stip. Video 16 at 00:06 (same); *see also* Sandmann Dep. 149, 166-67, 170, 277; Stip. Video 5 at 03:55-04:21; Stip. Video 12 at 00:06-00:37.

[31] Sandmann Dep. 263-64. Any reasonable juror would conclude that Phillips invented his claim after the fact because the claim is grossly inconsistent with what is clearly shown on video: Phillips' beating a drum violently within inches of Nicholas' face as the drum touched Nicholas' jacket collar for approximately six minutes, never trying to move around or away from Nicholas.

of Nicholas for approximately six minutes and beat a drum violently in his face while the bottom of the drum touched Nicholas' jacket collar. This conclusion is the only reasonable conclusion that can be reached from a comprehensive review of the stipulated videos, and the videos control the Court's consideration of this Motion. *See Hanson v. Madison Cty. Det. Crt.*, 736 Fed. App'x 521, 527 (6th Cir. 2018) ("Where, as here, there is a videotape capturing the events in question, the court must view those facts in the light depicted by the videotape."). Phillips' *ex post facto* "explanation" in the national news media and in his declaration that his purpose was to climb the stairs is dubious. The truth was that this grown man had no intended pathway at all, and his sole purpose in moving along the steps was to confront a group of children with aggression and intimidation. The video evidence speaks volumes. Even after Phillips had brought himself into Nicholas' face, the close-up video shows Phillips had several open avenues to proceed, as if "proceeding" was his purpose. Nicholas' testimony also states that Phillips had open to him other avenues to proceed. But all this discussion requires that we pretend Phillips actually sought to proceed, somewhere. In fact, as the evidence has now made plain, he did not.[32] His only procession was to the students. Phillips instigated a physical disturbance, drew a crowd of cameras and onlookers, and now claims he was "blocked" by the very person, a minor, he chose to confront and whom he tried to bully out of the way. This is shameful behavior. Phillips purposely ruined the life and reputation of a well-meaning and respectful young man, all to further his political aims.

### III.     THE "SUBSTANTIAL TRUTH" DOCTRINE IS NOT AT ISSUE

The Defendants' protracted and convoluted argument on "substantial truth" mischaracterizes Kentucky law and is, moreover, simply not relevant to this case.[33] Phillips

---

[32] Stip. Video 2 at 00:51-03:45; Stip. Video 3 at 02:08-04:24; Stip. Video 11 at 00:55-02:24; Stip. Video 17 at 03:48-07:57; Sandmann Dep. 149, 166-67, 170, 173, 277, 279-80, 339.

[33] Joint Memorandum 4-7.

claimed Nicholas blocked him and prevented his escape.[34] These are factual statements, as this Court has already determined.[35] The statements are either true or false.

The substantial truth doctrine is relevant where the statements at issue are arguably not meant to be taken literally, but figuratively: the question is whether the implied "figurative statement" is itself "substantially true," and therefore constitutes the "truth" that forms a defense to defamation. For example, where a news reporter characterized a rifle target that had a tendency to explode on impact as a "bomb," the reporter was not speaking literally, but figuratively, and thus a defamation action that claimed that the target was not actually a "bomb" failed; the "gist" or figurative meaning of calling the exploding target a "bomb" was "substantially true." *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 235 (S.D.N.Y. 2015). The substantial truth doctrine requires the court or jury to determine if non-literal statements are close enough (by their "gist" or "sting") to fall into the "true" category. *Id.* ("This does not mean that NBCU's uses of the word 'bomb' met the precise definition of the word. Rather, 'the gist or substance of the challenged statements' were true in light of the many meanings that reasonable audiences associate with the word."). It is also relevant where the reported words contain "minor inaccuracies." *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991). Despite the Defendants' convoluted argument, none of this is hard.

Every case the Defendants cite illustrates this exact point. In the principal case, *Masson*, a magazine article included a number of quotations from the plaintiff that were not literally exact. *Id.* at 502. The question before the Court was whether or not those discrepancies sufficed to

---

[34] *E.g.*, (NY Times Compl. ¶ 206 (Ex. G, H); *Sandmann v. The New York Times Co.*, Case No. 2:20-cv-23 (Doc. 28; Page ID# 217).

[35] *See* Nicholas Sandmann's Omnibus Memorandum in Opposition to the Defendants' Motion for Summary Judgment at 20-23 (*Sandmann v. The New York Times Co.*, 2:20-cv-23 (Doc. 61, Page ID# 1127-1130)) (explaining that this Court has ruled by "necessary implication" on the "opinion" issue and it should not be revisited).

constitute the "falsity" required to establish fault under the "actual malice" standard. *Id.* at 513. In finding no liability, the Court stated, "[i]f an author alters a speaker's words but effects no material change in meaning," then "the speaker suffers no injury to reputation . . . ." *Id.* at 516. Because the journalistic process inevitably involves a translation from the spoken to the written word, with added editing, punctuation, correction, and reconstruction, defamation law overlooks minor errors:

> The common law of libel . . . overlooks minor inaccuracies and concentrates upon substantial truth. As in other jurisdictions, California law permits the defense of substantial truth and would absolve a defendant even if she cannot 'justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge proved to be true, irrespective of slight inaccuracy in the details. . . . Minor inaccuracies do not amount to falsity . . ..

*Id.* at 516-17.

The case at bar has nothing to do with any "minor inaccuracies" in Phillips' statements nor in the publications of the Defendants. It has no instance of figurative language requiring interpretation: Phillips did not speak in metaphor. The Defendants' entire discussion of substantial truth simply steers the Court away from the issue presented in Nicholas' motion. The Defendants argue, even if Phillips' statements are literally false, the "gist" or "sting" of Phillips' statements are true.[36] But again, for this Court to be required to consider the alleged "gist" or "sting" of Phillips' statements, there must first be some alleged "minor inaccuracies" or some other interpretative moment requiring analysis of metaphorical language. *See Masson*, 501 U.S. at 516-17. This case presents none. The Defendants present zero evidence that there were any inaccuracies, minor or major. There is no issue of "substantial truth" for this Court to resolve.

Every Kentucky case the Defendants cite show how they have mis-stated "substantial truth" doctrine. Every one of these cases involves figurative or metaphorical language, where the

---

[36] Joint Memorandum 4-7, 23.

question was whether or not that figurative language should be understood literally or instead figuratively, with the "gist" of that figurative language being "substantially true." *Tannerite Sports*, 135 F. Supp. 3d at 235 (discussing whether "bomb" statement was meant literally or figuratively); *Estepp v. Johnson Cty. Newspapers, Inc.*, 578 S.W.3d 740, 744 (Ky. Ct. App. 2019) (holding statement that plaintiff was "removed from his position" was close enough to be substantially true where the plaintiff had actually resigned his position); *Kentucky Kingdom Amusement Company v. Belo Kentucky, Inc.*, 179 S.W.3d 785, 791-92 (Ky. 2005) (holding that statements that a amusement ride "malfunctioned" and was "too dangerous" were not figurative, and thus not substantially true).

Kentucky law on the "substantial truth" doctrine was explicated in detail by Justice Wintersheimer, writing for the court in *Kentucky Kingdom*. 179 S.W.3d at 791-92. "Substantial truth" is a narrow and limited doctrine, the Court held, one that exculpates newspapers for failing to report the exact facts or most minute details:

> The doctrine of "substantially true" is a convenient and necessary phrase invented by lawyers and judges to apply in very narrow and limited circumstances and relates only to incidental information and not to essential content. *Bell* (citation omitted) states that a newspaper is not to be held to exact facts or to the most minute details of the transaction it reports, but only to what is "substantially true." That is not the case here. Truth is a relatively easy concept to ascertain. It is generally defined as accuracy or correctness. Here, the broadcasts were fundamentally inaccurate as it related to the comments "too dangerous," "ride malfunctioned" and "removed a key component." Truth as contrasted to falsehood is the basis for a defamation claim.

*Id.* at 791-92. This is a clear restatement of Kentucky law. The Defendants read it. Yet they dismiss this entire discussion in the *Kentucky Kingdom* opinion as "dicta."[37]

---

[37] Joint Memorandum at 5.

11

This characterization is not a plausible description of the Court's opinion. Justice Wintersheimer's discussion is not dicta; the defendant in *Kentucky Kingdom*, WHAS-TV, argued on appeal that its broadcasts were "substantially true." *Id.* at 791 ("WHAS-TV contends that the broadcasts were substantially true…."). In resolving that issue, the Supreme Court of Kentucky, in a section of its opinion entitled "Not Substantially True," discussed its reasoning, quoted above, in concluding that "the legal authorities relied upon by WHAS-TV are unconvincing." *Id.* at 791-92. This is not dicta; this is a cogent and masterly restatement of Kentucky law by a respected jurist. The Court's discussion of "substantial truth" was essential to its resolution of the issue on appeal.

Instead of dealing with the unambiguous holding of the Supreme Court in *Kentucky Kingdom*, the Defendants instead rely on *Bell v. Courier-Journal*, 402 S.W.2d 84, 87 (Ky. 1966), a decision that the Court in *Kentucky Kingdom* emphatically questioned. *Kentucky Kingdom*, 179 S.W.3d at 7901 ("Any reliance by WHAS-TV on [*Bell*] is misplaced. That case is a common law defamation and contains no discussion of any First Amendment issues."). Nonetheless, even *Bell*, despite lacking any consideration of First Amendment doctrine, does not embrace the Defendants' view of the "substantial truth" doctrine. In *Bell*, the Court defined "substantial truth" by reference to the content of the reporting. *Bell*, 402 S.W.2d at 87 ("Where the defendant is a newspaper, the rule is that it is not to be held to the exact facts or to the most minute details of the transactions that it reports. What the law requires is that the publication be substantially true."). Thus, even the *Bell* opinion does not help the Defendants. The Defendants make no claim that their reporting of Phillips' statements contained "minor inaccuracies," or was mistaken as to the "exact facts" or the "most minute details." No, the Defendants reported Phillips' statements exactly right. No one, not Phillips or even the Defendants, has claimed otherwise. This case presents no minor inaccuracies or "minute" errors to consider. We have no metaphor to untangle. Phillips' statements, accurately

12

reported in every detail, form the basis of Nicholas' complaint. As the court stated in *Kentucky Kingdom*, "[t]ruth as contrasted to falsehood is the basis for a defamation claim." 179 S.W.3d at 792. "Truth is a relatively easy concept to ascertain," Justice Wintersheimer counseled, the Defendants contorted arguments notwithstanding. *Id.* The Court should not revisit them again.

### IV. NICHOLAS PRESENTS AMPLE EVIDENCE IN SUPPORT OF HIS MOTION

The Defendants argue that Nicholas has presented mere "bare allegations" and failed to "develop facts of some substance sufficient to withstand, or support, summary judgment."[38] These assertions cannot be taken seriously. Nicholas has presented the Court with literally hours of direct, video evidence;[39] he has supplemented that evidence with the opinion of an expert;[40] he has also cited to the statements that he made in his deposition.[41] It is patently misleading to characterize this voluminous evidentiary record as nothing but "bare allegations." The video evidence alone provides powerful evidence in support of Nicholas' motion. It clearly shows that it was Phillips, and not Nicholas, who instigated the encounter and who moved directly in front of and into Nicholas' personal space and stood there for several minutes while locking eyes and beating a drum and singing loudly.[42]

The Defendants seize on Nicholas' example, contained in his Memorandum in Support of his Motion for Partial Summary Judgment, that a "block" could occur when one person fails to get out of the way of another person who is advancing along a narrow hallway.[43] Defendants argue

---

[38] Joint Memorandum at 7, 10 (internal citation and quotations omitted).
[39] Stip. Videos 1-20 (*e.g.*, *Sandmann v. The New York Times Co.*, No. 2:20-cv-23 (Docs. 48-49)).
[40] *See* Deposition of Craige Roberts, relevant excerpts of which are attached as Exhibit B to the Memorandum in Support of Nicholas Sandmann's Motion for Partial Summary Judgment.
[41] *See* **Exhibit A** attached hereto, as well as Exhibit A to the Memorandum in Support of Nicholas Sandmann's Motion for Partial Summary Judgment.
[42] *E.g.*, Stip. Video 2 at 00:52-03:45; Stip. Video 17 at 05:50, 06:50; Stip. Video 14 at 00:03; Sandmann Dep. 149, 169-70, 173, 277, 279-80, 339.
[43] Joint Memorandum at 1-2 (citing Memorandum in Support of Nicholas Sandmann's Motion for Partial Summary Judgment at 22-23).

that the gathered crowd that arose on the Mall, a crowd that Phillips' created with his mischievous and aggressive conduct, constitutes this "narrow hallway."[44] This is not a claim based on the facts: an argument in a legal brief is not evidence. Even still, the Defendants misunderstand the example, leaving out a key qualifier. One can "block" another in a narrow passageway only if the other person is seeking to "advance" along that passageway. One cannot "block" another person, in any location, where that other person has no intention of advancing onward. Phillips was not seeking to "advance."[45] He later claimed he intended to proceed up the Memorial steps, yet once the CovCath students had departed, Phillips did not advance even one step upward toward the Lincoln statue.[46] In fact, the video evidence is clear that Phillips never intended to advance, anywhere.[47] From his starting point, he had wide access to unoccupied spaces along which he easily could have advanced up the steps, or in any one of many directions, without trouble or hindrance.[48] The factual evidence now makes it obvious: instead of seeking to advance toward some location, Phillips sought to confront. He left his position and walked directly up to and into the personal space of numerous CovCath students, beating his drums in their faces and brushing against them, basically bullying these school-age children into shrinking away from his aggression.

Likewise, when he came to confront Nicholas, Phillips again did not seek to advance past Nicholas, instead walking directly up to him, freezing him with a look in the eye, a beating his drum more loudly than before.[49] As Nicholas testified, had Phillips sought to advance, Phillips

---

[44] *Id.*

[45] *E.g.*, Stip. Video 2 at 00:51-03:45; Stip. Video 3 at 02:08-04:24; Stip. Video 11 at 00:55-02:24; Stip. Video 17 at 03:48-07:57; Sandmann Dep. 149, 166-67, 170, 173, 277, 279-80, 339.

[46] *E.g.*, Stip. Video 3 at 02:08-04:24; Stip. Video 11 at 00:55-02:24; Sandmann Dep. 173, 277, 279-80.

[47] *See* n. 45, *supra*.

[48] *E.g.*, Stip. Video 5 at 03:55-04:21; Stip. Video 12 at 00:06-00:37.

[49] *E.g.*, Stip. Video 17 at 03:30-07:57; Stip. Video 2 at 00:51-03:45; Stip. Video 3 at 02:08-04:24; Stip. Video 11 at 00:55-02:24.

could have gone around Nicholas,[50] or alternatively Nicholas would have stepped out of the way.[51] Phillips was not looking to "advance" down a narrow passageway; indeed, as the Defendants' Joint Memorandum concedes,[52] he was not going anywhere, not to the Lincoln Memorial, nor the Reflecting Pool, nor one of the other monuments. Phillips had no destination, other than to dislodge the high school students from where they were standing. He was "advancing" only into the personal spaces of the students he sought to intimidate. He was not looking for a monument, as he contended after the fact; instead, he was looking for a confrontation. The young white school children, and not the Black Hebrew Israelite adults, were his targets, as he "advanced" on each one in turn, bullying them to the side one by one with his beating drum and invasion of their personal space. He did not seek to "advance" past Nicholas Sandmann; Phillips sought to confront him, the next person in the crowd. And Nick's refusal to be intimidated made him, once caricatured by Phillips' fabrications about "blocking" and "preventing his escape," the poster child for Phillips' political positions and the object of hatred across the nation.

## V.   **CONCLUSION**

In light of the above, Nicholas' Motion for Partial Summary Judgment should be granted.

---

[50] Sandmann Dep. 149, 166-67, 170, 277; *see also* Stip. Video 2 at 00:54 (showing three-foot opening to Nicholas' left and to Phillips' right); Stip. Video 16 at 00:06 (same).

[51] Sandmann Dep. 199.

[52] Joint Memorandum at 15 ("And neither Phillips nor any of the other persons who followed him had the initial intention of going to the Lincoln Memorial when they first started walked (sic) towards the students").

15

Respectfully submitted,

*/s/ Todd V. McMurtry*
Todd V. McMurtry (KBA #82101)
Jeffrey A. Standen (*pro hac vice*)
J. Will Huber (KBA #99339)
HEMMER DEFRANK WESSELS PLLC
250 Grandview Drive, Suite 500
Ft. Mitchell, Kentucky 41017
Phone: (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
jstanden@hemmerlaw.com
whuber@hemmerlaw.com

*Trial Attorneys for Plaintiff,
Nicholas Sandmann*

**CERTIFICATE OF SERVICE**

This is to certify that on March 14, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all parties indicated on the electronic filing receipt.

*/s/ Todd V. McMurtry*
Todd V. McMurtry, Esq.