UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

| | | |
|---|---|---|
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | : : : : : | **CASE NO. 2:20-cv-23-WOB-CJS** |
| Plaintiff, | : : | |
| v. | : : | |
| **THE NEW YORK TIMES COMPANY d/b/a THE NEW YORK TIMES,** | : : : | |
| Defendant. | : : : : | |
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | : : : : : | **CASE NO. 2:20-cv-24-WOB-CJS** |
| Plaintiff, | : : | |
| v. | : : | |
| **CBS NEWS, INC., et al.,** | : : | |
| Defendants. | : : | |
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | : : : : : | **CASE NO. 2:20-cv-25-WOB-CJS** |
| Plaintiff, | : : | |
| v. | : : | |
| **ABC NEWS, INC., et al.,** | : : | |
| Defendants. | : : : : | |

| | | |
|---|---|---|
| **NICHOLAS SANDMANN,** | : | **CASE NO. 2:20-cv-26-WOB-CJS** |
| Plaintiff, | : | |
| v. | : | |
| **GANNETT CO., INC., et al.,** | : | |
| Defendants. | : | |
| | : | |
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | : | **CASE NO. 2:20-cv-27-WOB-CJS** |
| Plaintiff, | : | |
| v. | : | |
| **ROLLING STONE, LLC, et al.,** | : | |
| Defendants. | : | |

### NICHOLAS SANDMANN'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE

### [ORAL ARGUMENT REQUESTED]

Todd V. McMurtry (KBA #82101)
Jeffrey A. Standen (*pro hac vice*)
J. Will Huber (KBA #99339)
HEMMER DEFRANK WESSELS PLLC
250 Grandview Drive, Suite 500
Ft. Mitchell, Kentucky 41017
Phone: (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
jstanden@hemmerlaw.com
whuber@hemmerlaw.com

*Trial Attorneys for Plaintiff, Nicholas Sandmann*

## INTRODUCTION

The report and testimony of Nicholas' linguistics expert, Dr. Craige Roberts, complies with the Federal Rules of Evidence.[1] Dr. Roberts is a Professor of Linguistics (Emerita) at The Ohio State University,[2] with a specialization in semantics and pragmatics.[3] She has made a career of the study of the meaning of words and the contexts in which they are employed and has published extensively.[4] Her erudition can assist the trier of fact in this case in carefully defining the meaning of words and applying them to a particular context. Her insight will be especially valuable in a matter in which the meaning of a few phrases can be the difference between liability and non-liability, or, as in this case, between Nicholas becoming the vilified poster child for racial insensitivity and resuming his quiet life as a high-school student. In a matter of such high importance, the jury should be accorded every advantage and provided every aspect of relevant information in making its decision. Dr. Roberts can provide expert information about how everyday native speakers use words and what they mean when they do.[5] Dr. Roberts' report and testimony would be reliable based on her education and helpful to the trier of fact, which considerations form the touchstone for admissibility of expert opinion.[6]

---

[1] Relevant excerpts of Dr. Roberts' deposition transcript, which are cited herein, are attached hereto as **Exhibit A**. Dr. Roberts' report was included as Exhibit A to her deposition and is attached hereto as **Exhibit B** and is cited herein as "Roberts Report." Dr. Roberts' report can be considered by this Court in its entirety because Dr. Roberts has agreed to testify at trial for Nicholas regarding the matters set forth therein. (*e.g.*, Roberts Dep. 65). The Federal Rules of Evidence are sometimes referred to herein as "FRE" or "Fed. R. Evid."

[2] Roberts Dep. 35–36, 41; Roberts Report at 2-3.

[3] Roberts Report at 2; Roberts Dep. 14-74 (discussing academic and professional experience and the science of linguistics in general).

[4] Roberts Report at 2-3; Roberts Dep. 47.

[5] *E.g.*, Roberts Dep. 80-82, 86, 103-104, 106-107; Roberts Report at 7 ("In determining truth conditions, the science of linguistics is purely descriptive—aiming to determine the plain meaning of an expression as that is understood by ordinary speakers of the language in which it is couched.").

[6] *E.g.*, Roberts Report at 7-8, 12-14.

The Defendants' Joint Memorandum in Support of their Motion to Strike ("Defendants Mot.") relies on the opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny in arguing that Dr. Roberts' testimony violates *Daubert* and the Federal Rules of Evidence.[7] The Defendants cite to the right cases, but they fail to put them in proper context. It is important that the *Daubert* factors be understood as particular to "scientific" processes and inquiry. Dr. Roberts is not a scientist, at least not along the dimension of the "hard sciences."[8] Her discipline is academically rigorous,[9] but it is not necessarily or always "subject to testing," does not customarily measure "error rates," and does not feature other indicia of the scientific method. Linguistics lies at the border between the humanities and the sciences.[10]

The Court, when reviewing expert testimony from non-hard-science fields, must apply the *Daubert* factors flexibly, omitting those factors that are of little relevance to the field. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42, 150 (1999). In *Kumho Tire*, the Supreme Court explained the proper approach to non-hard-science expert witnesses. *Id.* at 141 ("This case requires us to decide how *Daubert* applies to the testimony of engineers and other experts who are not scientists."). The Court stated that, although *Daubert's* "general holding – setting forth the trial judge's 'gatekeeping' obligation" applies to non-scientific testimony based on "'technical' and "'other specialized' knowledge," this "general holding" must be applied flexibly. *Id.* at 141-42.

> We also conclude that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is 'flexible,' and Daubert's list of

---

[7] Defendants' Mot. at 11-13, 15, 18-19.

[8] DICTIONARY.COM, *Hard Science*, https://www.dictionary.com/browse/hard-science (last visited Mar. 12, 2022) ("[a]ny of the natural or physical sciences, as chemistry, biology, physics, or astronomy, in which aspects of the universe are investigated by means of hypotheses and experiments.")

[9] Roberts Report at 2-3; Roberts Dep. 14-74 (discussing academic and professional experience).

[10] *See, e.g.*, Roberts Report at 2; Roberts Dep. 14-74.

2

> specific factors neither necessarily nor exclusively applies to all experts or in every case.

*Id.* (italics in original). Instead of requiring the application of irrelevant *Daubert* factors to expertise drawn from technical fields or from other specialized knowledge, "the law grants a district court . . . broad latitude when it decides *how* to determine reliability." *Id.* at 142.

The Defendants urge this Court to exclude Dr. Roberts' testimony because, in part, her testimony "is not based on any reliable or accepted methodology," lacks a tested "technique," has not been "tested," lacks a known "error rate," and so forth.[11] None of these considerations have plausible application to a linguist, nor to the learned discipline of linguistics. It would make little sense to ask a linguist trained in the lexicon of semantics about her error rate. Linguistics is not a science. *See, e.g.,* Janet E. Ainsworth, *Linguistics as a Knowledge Domain in the Law*, 54 Drake L. Rev. 651, 656 (2006) ("Scholars in humanities like art criticism, history, philosophy, and comparative literature are surely all seeking some kind of truth, but it is of a different order and nature than the truth sought by a molecular chemist or a geneticist"). Linguistics is rigorous: it is a highly robust field of academic inquiry that relies heavily on peer-reviewed journals for the dissemination of ideas and analysis. *Id.* at 652-54 ("The field of linguistics is a multi-faceted discipline incorporating the systematic study of every aspect of human communication."). It is a field that features a number of well-accepted modes of analysis and a large body of knowledge on which to base an analysis. *Id.* at 653-54 (noting that within the broader field of linguistics, researchers are studying phonetics, phonology, syntax, semantics, pragmatics, and discourse analysis, and that linguistics research has generated sub-specialties such as sociolinguistics, psycholinguistics, anthropological linguistics, and neurolinguistics).

---

[11] Defendants' Mot. at 14, 15-21.

3

This is not to say that linguistics is anything like the "type of pseudo-technical" discipline the Defendants dismissively caricature.[12] Linguistics may not be a "science" in the traditional sense, but "linguists' hypotheses about language make predictions that can be tested by external data …." Ainsworth, *supra*, at 658 (quoting Judith Levi, Conference, Northwestern University/Washington University Law and Linguistics Conference, 73 Wash. U. L.Q. 771 (1995)). The Oxford English Dictionary defines linguistics as "the scientific study of languages and its structure." *Linguistics*, OXFORD ENGLISH DICTIONARY (2020 ed.). Linguistics is a field with established methodologies, professional organizations, peer-reviewed publications, and schools of thought. *See* Ainsworth, *supra*, at 651, 654. Consequently, numerous courts have allowed expert linguist testimony on how "the average person" could understand a certain word or phrase. *Wadhams v. Board of County Commissioners*, 501 So. 2d 120, 213 (Fla. Dist. Ct. App. 1987), *rev'd on other grounds*, 567 So. 2d 414 (Fla. 1990) (noting that linguist testified that a voter's ballot containing an amendment to a county charter was "confusing" to the average person); *United States ex rel. Free v. Peters*, 806 F. Supp. 705, 709 (N.D. Ill. 1992), *withdrawn from LEXIS service*, 1993 U.S. Dist. LEXIS 5362 (permitting linguist to testify on comprehensibility of jury instructions); *Aveda Corp. v. Evita Marketing, Inc.*, 706 F. Supp. 1419, 1423 (D. Minn. 1989) (permitting expert linguistic testimony on homophone creating trademark infringement).

The Defendants cite to an article written by Professor Lawrence Solan from 1999 that reports, in summary, that while some courts by then had admitted linguistic expert testimony in libel cases, others had not.[13] But Professor Solan, writing with Professor Tiersma in 2002, partly reconsidered his categorical position. *See* Lawrence Solan & Peter Tiersma, *The Linguist on the*

---

[12] *Id.* at 2.

[13] *Id.* at 15-16 (citing Lawrence Solan, *Can The Legal System Use Experts on Meaning?*, 66 Tenn. L. Rev. 1167, 1193 (1999)).

4

*Witness Stand: Forensic Linguistics in American Courts*, Language, vol. 78, no. 2, Linguistic Society of America (2002) at 221-39. At least in cases involving "complex language," he conceded, "linguists can serve a role by acting as tour guides, walking the judge and jury through the disputed language, and explaining how the disputed language is an example of well-studied linguistic phenomena." *Id.* at 234-35. The authors, each trained as both lawyers and linguists, conclude, "the literature on syntax and semantics is so rich that there should rarely be any question about linguistic expertise meeting evidentiary standards under *Frye* or *Daubert*." *Id.* at 235.

Much has happened since Solan described the legal landscape in 1999. The historical antipathy of trial judges to expert testimony on matters once thought to be "exclusively" within the province of the factfinder has evolved to allow for wider latitude for expert input from the field of linguistics. *See*, *e.g.*, Robert A. Leonard, Juliane E.R. Ford & Tanya Karoli Christensen, *Forensic Linguistics: Applying the Science of Linguistics to Issues of the Law*, 45 Hofstra L. Rev. 881, 881 (2017) ("Forensic linguistics augments legal analysis by applying rigorous, scientifically accepted principles of language analysis to legal evidence . . .."); Roger W. Shuy, *Language and the Law*, published in Mark Aronoff & Janie Rees-Miller, THE HANDBOOK OF LINGUISTICS (2d ed. 2017), at 627–644, *available at* http://45.114.134.178:9000/digi/MP03/B1L3-0033.pdf (citing impressive range of legal claims, including defamation, on which linguists now testify).

Most fundamentally, expert linguistics testimony can help a factfinder separate "right" and "wrong" answers to the question of meaning. Ainsworth, *supra*, at 654-56 (identifying numerous issues, including "meaning" in defamation cases, on which expert linguist testimony has been allowed). The meaning of words is not, as Defendants continually assert,[14] all a matter of opinion. Instead, one's view of the meaning of a word can be right or wrong. KENT GREENAWALT, LAW

---

[14] *Id.* at 5-6, 13-15.

AND OBJECTIVITY 74 (1992) ("[Q]uestions about meaning can often be answered with confidence, that an answer can be objectively right or wrong"); RONALD DWORKIN, LAW'S EMPIRE vii-ix (1986) ("[I]n most hard cases there are right answers"); Owen Fiss, *Objectivity and Interpretation*, 34 Stan. L. Rev. 739, 744-45 (1982) ("[A]n interpretation can be measured against a set of norms that transcend the particular vantage point of the person offering the interpretation"). An expert in linguistics can provide information that will assist a jury in finding that right answer. Jurors will not be overwhelmed by technical analysis, as the Defendants claim. Jurors are very capable of evaluating scientific expert evidence fairly. *See*, *e.g.*, Michael S. Jacobs, *Testing the Assumptions Underlying the Debate About Scientific Evidence: A Closer Look at Juror "Incompetence" and Scientific "Objectivity,"* 25 Conn. L. Rev. 1083, 1094-98 (1993) (noting studies show jurors are able to draw valid factual conclusions even with regard to complicated scientific matters). Jurors can consider expert testimony without giving it excessive weight in their deliberations. Neil J. Vidmar & Regina A. Schuller, *Juries and Expert Evidence: Social Framework Testimony,* Law & Contemp. Probs., Autumn 1989, at 131, 173.

Federal courts have qualified linguistics experts to testify. *E.E.O.C. v. Beauty Enterprises, Inc.*, 361 F. Supp. 2d 11, 16-17 (D. Conn. 2005) (holding testimony of linguistics expert admissible under *Daubert* standards and Federal Rules of Evidence); *Alfa Corp. v. OAO Alfa Bank*, 475 F. Supp. 2d 357, 361-64 (S.D.N.Y. 2007) (holding expert opinion of linguist sufficiently reliable under the Federal Rules of Evidence); *J&J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 373-74 (D.N.J. 2002) (permitting linguist to testify on trademark infringement). Concededly, other federal courts have arrived at the opposite conclusion. *See Tilton v. Capital Cities/ABC, Inc.*, 938 F. Supp. 751, 752-53 (N.D. Okla. 1995). The law in this area is in development. The better answer is that the expert testimony of a linguist is both reliable and helpful

to the trier of fact. Jeffrey E. Thomas, *A Pragmatic Approach to Meaning in Defamation Law*, 34 Wake Forest L. Rev. 333, 333-34 (1999) (arguing that the pragmatics branch of linguistics provides an appropriate framework for the doctrinal role of meaning in defamation law); Lawrence M. Solan, *Can the Legal System Use Experts on Meaning?*, 66 Tenn. L. Rev. 1167, 1180-181 (1999) (noting use of linguists in defamation cases is consistent with use of experts from other disciplines; rejecting the idea that "we have a jury, so who needs a linguist?"). For an instructive case involving California's evidence code, see *Weller v. ABC, Inc.*, 232 Cal. App. 3d 991, 1007 (Cal. Ct. App. 1991). In *Weller*, the issue was how "the average viewer" would understand the words used in the television broadcast. *Id.* The court held:

> [The jury need not] be wholly ignorant of the subject matter of the [expert] opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the [California] statute declares that even if the jury had some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information ….

*Id.* The Defendants' wish that this Court apply a hyper-technical application of the *Daubert* factors simply does not comport with the law.

The Defendants' arguments are misplaced in another sense. They argue that Dr. Roberts' testimony should be excluded because defamation law does not involve the "hair splitting analysis of communication."[15] But this refusal to "split hairs" mentioned in *Barger*, and cited repeatedly by the Defendants, pertains to the standard of liability. *Barger*, 564 F. Supp. at 1155. It does not apply to the admissibility of expert testimony. *Id.* The statement the Defendants pluck from the opinion in *Barger* is irrelevant. Experts can in fact "split hairs," and often that is their job. They provide the finder of fact with information, based on specialized knowledge, that educates the jury

---

[15] *Id.* at 17 (citing *Barger v. Playboy Enterprises*, 564 F. Supp. 1151 (N.D. Cal. 1983), *aff'd*, 732 F.2d 163 (9th Cir. 1984)).

7

as to the matters at issue. Here, one important matter at issue is the meaning of certain words, as understood in ordinary conversation. Dr. Roberts' testimony provides reliable information that will be helpful to the Court in resolving the cross-motions for summary judgment and to the jury in deciding this case.

The study of linguistics is a serious academic discipline.[16] This Court may take judicial notice of the fact that every major university in the nation has a Department of Linguistics,[17] as do the highly prominent universities in this region.[18] Professors of this learned discipline, which the Defendants dismiss as merely providing a "type of pseudo-technical" testimony, routinely testify in court. *See* Lawrence Solan & Peter Tiersma, *The Linguist on the Witness Stand: Forensic Linguistics in American Courts*, *Language*, vol. 78, no. 2, Linguistic Society of America (2002) at 221–39 ("It is becoming increasingly common for linguists to testify as expert witnesses in both civil and criminal trials.") Solan and Tiersma cite to numerous examples: they report that linguists have testified about the likelihood of confusion from words in trademark cases, the comprehensibility of legal documents, the meaning of words in a statute, wills, or contracts, the ability of an arrestee to understand the Miranda warnings, and so forth. *Id.* They conclude, "[o]ur legal research found over one hundred published judicial opinions . . . in which language experts were mentioned," and that frequency "implies substantial participation by linguists in the legal system." *Id.*

---

[16] *E.g.*, Roberts Report at 2-5; Roberts Dep. 14-74.

[17] *E.g.*, HARVARD.edu, *Department of Linguistics*, https://linguistics.fas.harvard.edu/ (last visited Mar. 12, 2022); PRINCETON.edu, *Department of Linguistics*, https://linguistics.princeton.edu/ (last visited Mar. 12, 2022); STANFORD.edu, *Department of Linguistics*, https://linguistics.stanford.edu/ (last visited Mar. 12, 2022).

[18] *E.g.*, OSU.edu, *Department of Linguistics*, https://linguistics.osu.edu/ (last visited Mar. 12, 2022); MiamiOh.edu, *Linguistics*, https://miamioh.edu/cas/academics/departments/english/academics/majors/linguistics/index.html (last visited Mar. 12, 2022); UKY.edu, *Linguistics*, https://linguistics.as.uky.edu/ (last visited Mar. 12, 2022).

This Court should not apply a hyper-technical approach to exclude Dr. Roberts' testimony. *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's inadmissible."). Rather, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Information Systems, Inc. v. International Brotherhood of Electrical Workers Local Union No. 3, AFL–CIO*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004). This outcome is based on the recognition that "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

### THE DEFENDANTS' ARGUMENTS DO NOT ACCURATELY DESCRIBE ROBERTS' TESTIMONY

**1.    Analysis of the Stipulated Videos**

The Defendants concede that Dr. Roberts is indeed qualified as an expert and has an "extensive" publication record.[19] Nonetheless, they argue that "she has never published anything pertaining to video analysis of live events."[20] The "analysis" of videos, however, is not a thing. The Defendants misunderstand the field of linguistics and Dr. Roberts' academic specialty. Dr. Roberts has dedicated her career within the linguistics discipline to the study of semantics and

---

[19] Defendants' Mot. at 3.

[20] *Id.* at 3, 14.

9

pragmatics.[21] Pragmatics is the study of the use of language in context.[22] That context can involve a conversation, a speech, or a description or depiction of events in which the speaker was a participant.[23] The same word can have different meanings in different settings and circumstances.[24] As a result, Dr. Roberts is exactly qualified to consider the context in which words were used and then to assess the meaning of those words in that context. It does not matter if that context is contained in a verbal narrative or in a videographic display.

### 2. Consideration of Nicholas' Deposition Testimony

Dr. Roberts was careful, in keeping with the strictures of her discipline, not to allow Nicholas' deposition testimony to influence her opinion, lest she be accused of slanting her professional judgment to favor Nicholas' cause.[25] Instead, Dr. Roberts focused on the stipulated video evidence in this case, which controls. *Hanson v. Madison Cty. Det. Crt.*, 736 Fed. App'x 521, 527 (6th Cir. 2018) ("Where, as here, there is a videotape capturing the events in question, the court must view those facts in the light depicted by the videotape."). Nonetheless, the Defendants repeatedly attack her exercise of sound professional judgment.[26] This attack misunderstands the discipline of linguistics, a misunderstanding that permeates the entirety of the Defendants' Motion to Strike.[27] If the Defendants see Dr. Roberts' exercise of sound professional

---

[21] Roberts Report at 2; Roberts Dep. 14-74.

[22] Roberts Report at 2; Roberts Dep. 28 ("Pragmatics is the study of the way context influences interpretation.").

[23] Roberts Dep. 28-34 (discussing example).

[24] Roberts Dep. 20 ("As I said in my report, John loves Mary means something very different than Mary loves John…."), 28-34; Roberts Report at 8 (same).

[25] Roberts Dep. 82-83.

[26] Defendants Mot. at 4-5.

[27] The Defendants evidence their misunderstanding by referring repeatedly to the discipline of Linguistics in a dismissive way, terming it "pseudo-technical," "mind-reading," "translator of ordinary things," "Dr. Roberts' 'methodology' – if it can be called that," "Siskel-and-Ebert review process" and so forth.

discretion as a shortcoming, they will have ample opportunity to make of it what they will on cross-examination. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)). It is not a ground for exclusion of expert testimony.

### 3. Discussion of Dictionary Definitions

The Defendants' dismissive, know-nothing attitude toward the learned discipline of linguistics, and toward Dr. Roberts as a practitioner of linguistics, is evident in their repeated astonishment that Dr. Roberts refers to several dictionary definitions as part of her analysis.[28] This approach disrespects linguistics entirely. Even a casual reading of Dr. Roberts' thoughtful report shows that her discussion of "dictionary definitions" forms merely one aspect, the beginning, of her linguistic analysis.[29] Merely owning a dictionary does not make one an expert in linguistics.[30] Instead, things in the world exist apart from the words we use to refer to them; our words represent categorical descriptions of which the particular instance can participate to varying degrees. We can say that dinner is "nice" and mean by that everything from adequate to outstanding. Semantics

---

(Defendants Mot. at 1-2, 20). In other words, "we have a jury, so who needs a linguist?" Lawrence M. Solan, *Can the Legal System Use Experts on Meaning?*, 66 Tenn. L. Rev. 1167, 1180 (1999). This dismissive nihilism is not consistent with the sophisticated approach to expert testimony required by the "gatekeeper" function imposed by *Daubert*.

[28] Defendants' Mot. at 13-15.

[29] Roberts Report at 12-14; Roberts Dep. 190-99 (discussing consideration of dictionary definitions as only one part of the total analysis).

[30] Roberts Dep. 190-96, 197 (A: Everybody uses language, like [everyone] drives a car but they don't know how it works, just like most people don't know how a car works. I spent 40 years learning a little bit about how it works. We don't completely understand it yet. It's very deep and very complex…), 198-99.

studies these meanings; pragmatics studies meanings in contexts.[31] Dr. Roberts is a published expert in both specialties.[32] For someone to argue that all Dr. Roberts is doing is "looking up words in dictionaries" betrays a profound lack of appreciation for a field of study about which, one suspects, one knows very little.[33]

### 4. Ultimate Issue Testimony

Strangely, Defendants cite FRE 704 and a decision from 1985 to argue that ultimate issue testimony is not allowed.[34] As this Court knows, FRE 704 states the opposite: "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). The Defendants also argue that an expert opinion cannot invade "the province of the court" by "pronouncing a legal conclusion" or conveying "legal standards to the jury."[35] Nothing in the testimony of Dr. Roberts even pertains to any legal conclusions or legal standards. She is not testifying that a particular course of events constitutes "manipulation" or "scheme to defraud,"[36] or otherwise mimics the language of a statute. Her testimony is limited to one aspect of defamation liability, specifically the truth or falsity of a statement, and no more.[37] Expert testimony that does not usurp the trial judge's role in instructing the jury" does not violate FRE 704. *United States v. Bilzerian*,

---

[31] Roberts Report at 2 ("Semantics is the study of the underlying regularities in lexical meaning and syntactic form that permit native speakers to convey (sometimes complex) meaning. Pragmatics is the study of how context influences interpretation (for example, how context permits us to understand what a speaker means in using a pronoun)."); Roberts Dep. 28.

[32] Roberts Report at 2 ("My area of specialization in linguistics is semantics and pragmatics.").

[33] Roberts Dep. 196-97 (Q: Right, so – but my point is anybody could go to a dictionary and look up those usages, correct? A: Right, but I'm not just looking at the dictionary. People think that's what a linguist does. You've got it wrong. You start with the dictionary but I also look at the syntax and the context and all the things I'm doing here look at all three factors.).

[34] Defendants' Mot. at 21.

[35] *Id.* at 16, 21.

[36] *United States v. Scop*, 846 F.2d 135, 141 (2d Cir. 1988).

[37] Roberts Report at 1-2 (stating that she has been asked to answer whether two statements were false in light of the stipulated videos).

926 F.2d 1285, 1294-295 (2d Cir. 1991) (noting expert did not give his opinion on whether or not the defendant violated the securities laws); *United States v. Duncan*, 42 F.3d 97, 102 (2d Cir. 1994) (noting expert did not employ "legally specialized terms" in his testimony).

## CONCLUSION

In light of the above, the Defendants' Motion to Strike should be denied.

Respectfully submitted,

*/s/ Todd V. McMurtry*
Todd V. McMurtry (KBA #82101)
Jeffrey A. Standen (*pro hac vice*)
J. Will Huber (KBA #99339)
HEMMER DEFRANK WESSELS PLLC
250 Grandview Drive, Suite 500
Ft. Mitchell, Kentucky 41017
Phone: (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
jstanden@hemmerlaw.com
whuber@hemmerlaw.com

*Trial Attorneys for Plaintiff,
Nicholas Sandmann*

## CERTIFICATE OF SERVICE

This is to certify that on March 14, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all parties indicated on the electronic filing receipt.

*/s/ Todd V. McMurtry*
Todd V. McMurtry, Esq.